# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 93-DP-01173-SCT

### CONSOLIDATED WITH

### NO. 94-CA-00176-SCT

*DONALD LEROY EVANS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 9/18/93 |
| TRIAL JUDGE: | HON. KOSTA N. VLAHOS |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | WILLIAM S. BOYD, III |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LESLIE STAEHLE LEE |
| DISTRICT ATTORNEY: | CONO CARANNA |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY (DIRECT APPEAL) |
| DISPOSITION: | CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH AFFIRMED- 9/11/97 |
| MOTION FOR REHEARING FILED: | 9/19/97 |
| MANDATE ISSUED: | 8/17/98 |

**EN BANC.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. On August 5,1991, Donald Leroy Evans was arrested in Tangipahoa Parish, Louisiana, for the kidnapping of ten-year old Beatrice Louise Routh. Evans was subsequently transferred to Mississippi where he confessed to murdering Beatrice. On October 15, 1991, Evans was indicted for capital murder with the underlying felony of kidnapping and two counts of sexual battery. Due to extensive pretrial publicity, venue was changed to Adams County for the limited purpose of jury selection. The jury was returned to Harrison County and trial was held September 13-18, 1993. Evans was found

guilty of capital murder and two counts of sexual battery and received a death sentence. Evans now appeals his conviction to this Court, citing thirty-one assignments of error.

¶**2.** In reviewing Evans' assignments of error, we note that several of the issues were not presented to the trial court and are therefore procedurally barred and error, if any, is waived. This rule is not diminished in a capital case. *Cole v. State*, 525 So. 2d 365, 369 (Miss.1987), *cert. denied*, 488 U.S. 934 (1988); *Irving v. State*, 498 So. 2d 305 (Miss.1986), *cert. denied*, 481 U.S. 1042 (1987); *Johnson v. State*, 477 So. 2d 196 (Miss.1985), *cert. denied*, 476 U.S. 1109 (1986); *In re Hill*, 460 So. 2d 792 (Miss.1984); *Hill v. State*, 432 So. 2d 427 (Miss.1983), *cert. denied*, 464 U.S. 977 (1983); *Chase v. State*, 645 So. 2d 829, 845 (Miss.1994), *cert. denied*, 115 S.Ct. 2279 (1995), *reh'g denied*, 116 S.Ct. 20 (1995); *Foster v. State*, 639 So. 1263, 1270 (Miss.1994), *cert. denied*, 115 S.Ct. 1365 (1995), *reh'g denied*, 115 S.Ct. 1992 (1995). However, alternatively, this Court looks to the merits of the underlying claim knowing that any subsequent review will stand on the bar alone. *Chase v. State*, 645 So. 2d 829, 845 (Miss.1994),*cert. denied*, 115 S.Ct. 2279 (1995), *reh'g denied*, 116 S.Ct. 20 (1995); *Foster v. State*, 639 So. 1263, 1270 (Miss.1994), *cert. denied*, 115 S.Ct. 1365 (1995), *reh'g denied*, 115 S.Ct. 1992 (1995).

¶3. The issues not properly raised in the trial court are procedurally barred from consideration by this Court. The remainder have been carefully considered and found to be without merit. This Court affirms Evans' convictions and sentences.

## STATEMENT OF FACTS

¶4. On July 28, 1991, Tammy Giles and her two children, Beatrice and Melissa, along with Sherry Lynn Vincent and her two children and Vincent's mother and sister began their journey to the Mississippi Gulf Coast in search of employment and housing. The families initially stayed in motels and shelters and thereafter lived in the van in which they were traveling.

¶5. On August 1, the group parked the van in Jones Park in Gulfport to allow the children to play. At approximately two o'clock that afternoon, Tammy Giles sent Beatrice to obtain cigarettes from a man who was making a telephone call at the Harbor Shop. Unfortunately, the individual approached by Beatrice was a Texas parole violator named Donald Leroy Evans. Evans gave Beatrice a pack of cigarettes for her mother and followed the child to the van. Evans befriended the group and led them to believe that he was a former Navy Seal who had taught school in Texas.

¶6. After visiting for awhile, Evans offered to purchase groceries and requested that Beatrice accompany him to the store. Giles gave Beatrice permission to go with Evans and the two returned approximately twenty minutes later with bottled water, orange juice and ice. Evans and Beatrice left the park for a second time and traveled to a nearby convenience store to purchase diapers and snacks for the children.

¶7. After returning to Jones Park, Evans suggested they have a barbeque. Evans again requested that Beatrice accompany him to the store to purchase groceries for the barbeque. Evans led Giles to believe that the trip would take approximately one hour because he needed to call a friend who could help the group find an apartment.

¶8. Prior to leaving the park area a third time, Beatrice asked Sherry Lynn Vincent [1] to come along

because Beatrice did not like riding alone with Evans. Evans, however, refused to allow Vincent to ride along. Vincent told Giles about Beatrice's apprehension, but Giles allowed her daughter to leave with Evans. Evans and Beatrice left the park at approximately 7:00 p.m. Contrary to his representations to Giles, Evans did not go to the store, but rather continued west on Highway 90 to Pass Christian, eventually arriving in Covington, Louisiana. In his confession to police, Evans stated that Beatrice became worried when they did not stop for groceries. However, Evans stated that he "deluded her into thinking and believing" that they were just taking a longer route. Prior to reaching Louisiana, Evans stopped near Bay St. Louis and purchased ice cream for Beatrice. Evans also purchased gray duct tape.

¶9. Evans traveled to St. Tammany Parish, Louisiana, where he eventually stopped in a secluded wooded area. Evans remained in the jeep with Beatrice and ordered her to take off her clothes. Although Beatrice began crying and begged Evans to take her back to her mother, Evans responded that "there was no one there to help her and that she was alone with him." Beatrice asked to be taken to a bathroom because she could not control her bowels, but defecated in the vehicle after Evans refused. Evans cleaned the child with towels, wrapped duct tape around her head and mouth several times, and removed her clothing. Evans then sexually assaulted Beatrice vaginally and anally and strangled her to death with a white cotton rope.

¶10. Evans traveled back to Mississippi with Beatrice's body concealed in the backseat and later dumped the child's body in a wooded area in Pearl River County and disposed of her clothing nearby. Evans attempted to disguise the stolen Suzuki Samurai jeep in which he was traveling by removing the top. Evans traveled across Mississippi and Louisiana for four days, cashing checks at small country stores to survive.

¶11. When Evans did not return with Beatrice in one hour, Sherry Lynn Vincent contacted the Gulfport Police Department. Vincent described Evans, Beatrice, and the jeep in which they were riding. Vincent had memorized the license plate number on the jeep because she felt uncomfortable about Beatrice leaving the park with Evans.

¶12. Detective Whitney Carvin and Officer Tapper with the Gulfport Police Department met with Tammy Giles at Jones Park. After receiving the information regarding the jeep, Detective Carvin determined that the jeep belonged to Joseph Whitted and was in the possession of Donald Leroy Evans. On the following day, Detective Carvin signed an affidavit and warrant for kidnapping. After receiving information that Evans might be traveling to either Louisiana or Florida, Detective Carvin contacted Agent George Holder with the Federal Bureau of Investigation (hereinafter "FBI").

¶13. A phone monitoring device was placed on the telephone of Gail Stewart, Evans' girlfriend in Galveston, Texas, to aid the FBI in locating Evans. Law enforcement was also able to trace Evans through checks cashed by Evans. Evans was tracked by law enforcement from August 1, 1991 until August 5, 1991, when he was arrested by a sheriff's deputy from Tangipahoa Parish, Louisiana.

¶14. On August 19, 1991, Evans pled guilty to federal kidnapping charges and was sentenced to life in prison on October 24, 1991. On October 15, 1991, Evans was indicted by the Harrison County Grand Jury for capital murder with the underlying felony of kidnapping and two counts of sexual battery. Following a trial on September 13-18, 1993, Evans was found guilty on all counts and sentenced to death.

## A. GUILT PHASE

## I. WHETHER THE TRIAL COURT ERRED IN REFUSING TO SUPPRESS EVANS' STATEMENTS.

¶15. In *Chase v. State*, 645 So. 2d 829 (Miss.1994), *cert. denied*, 115 S.Ct. 2279 (1995),*reh'g denied*, 116 S.Ct. 20 (1995), this Court held that "[t]he general rule is that for a confession to be admissible it must have been given voluntarily and not given as a result of promises, threats or inducements." *Id.* at 838-39 (*citing Layne v. State*, 542 So. 2d 237, 240 (Miss.1989)). The burden is on the prosecution to prove beyond a reasonable doubt that the confession was voluntary. *Id.* (*citing Haymer v. State*, 613 So. 2d 837, 839 (Miss.1993); *Kirkland v. State*, 559 So. 2d 1046 (Miss.1990)). The "burden is met and a prima facie case made out by testimony of an officer, or other persons having knowledge of the facts, that the confession was voluntarily made without any threats, coercion, or offer of reward." *Id.*(*citing Cox v. State*, 586, So. 2d 761, 763 (Miss.1991)).

¶16. In *Hunt v. State*, 687 So.2d 1154 (Miss.1996), this Court reiterated the standard of review when determining the admissibility of confessions. In *Hunt*, this Court held:

> Once the trial judge has determined at a preliminary hearing, that a confession is admissible, the defendant/appellant has a heavy burden in attempting to reverse that decision on appeal. *Sills v. State*, 634 So. 2d 124, 126 (Miss.1994) (*quoting Frost v. State*, 483 So. 2d 1345, 1350 (Miss.1986)). Such findings are treated as findings of fact made by a trial judge sitting without a jury as in any other context. *Foster v. State*, 639 So. 2d 1263, 1281 (Miss.1994)(citations omitted). The trial judge's decision will not be reversed on appeal unless it is manifestly in error, or is contrary to the overwhelming weight of the evidence. *Id.* Where the evidence is contradictory, this Court "generally must affirm." *Lesley v. State*, 606 So. 2d 1084, 1091 (Miss.1992)(citations omitted).

*Id.* at 1160.

¶17. Evans argues that his statements should have been suppressed by the trial court on four bases: (1) Evans was subjected to coercion and harassment by law enforcement; (2) Evans' confessions were the product of plea negotiations with the federal government; (3) Evans was not advised either by law enforcement or his attorney that the conditions placed in the waiver of rights form were ineffective; (4) and Evans was not promptly taken before a state magistrate.

¶18. The testimony and evidence presented at the hearing on the Motion to Suppress detailed the sequence of events preceding Evans' confessions. Following his arrest, Evans invoked his right to remain silent and did not give a statement. Later that day, Evans was transported to New Orleans, Louisiana, and formally charged with the federal offense of kidnapping. Counsel was appointed and Evans waived extradition proceedings. Evans was returned to Mississippi on August 7, 1991.

¶19. On August 8, 1991, Evans made an appearance in federal court before United States Magistrate Judge Roper. Judge Roper appointed Fred Lusk to represent Evans on federal kidnapping charges. Later that day, Lusk met with Evans and made arrangements for Gail Stewart, Evans' girlfriend, to come to Gulfport.

¶20. Lusk testified that at the time he began meeting with Evans, Gulfport authorities were in the process of trying to locate Beatrice Louise Routh. Assistant United States Attorney (hereinafter "AUSA") Jay Golden informed Lusk "if this guy ever wants anything out of us he better tell us where the child is if the child is alive." Lusk and Stewart met with Evans several times over the next two days. Evans was emotional and upset at times, however, Lusk indicated that "a great deal of his turmoil or a great deal of his trying (sic) on both Thursday and Friday was brought about by Ms. Stewart discussing his and her religious philosophy and belief in God and what that should bring about and what that should - - what the end result of that belief as to particular circumstances should be." Lusk testified that Stewart was pushing Evans to make "full, complete disclosure, drop all screens, tell everything, do it, let's get on with it."

¶21. On August 10, 1991, at approximately 9:00 a.m., AUSA Golden requested a meeting with Evans in order to locate Beatrice. Lusk agreed to speak with Evans and arrived at the Harrison County Detention Center at approximately 12:00 p.m. Evans was meeting privately with Ms. Stewart at that time, however, federal and state law enforcement officers were also present.

¶22. Following several hours of discussions among Lusk, Evans, Stewart, and Golden, Evans agreed to reveal the location of Beatrice's body if certain conditions were met. Golden testified that he never spoke directly with Evans, but rather all communication was through Evans' attorney. Golden wrote Evans' requests on a sheet of paper: (1) to plead guilty to federal kidnapping; (2) to be maintained by federal authorities until fifteen days prior to state murder trial; (3) to be returned to federal authorities ten days after state trial for murder; (4) to remain in federal custody until fifteen days prior to an execution; (5) to be returned to federal custody if a stay of execution is granted.

¶23. Lusk took the sheet of paper to Evans who made several changes and returned the paper to Golden. Evans inserted "in a federal facility" to request number (2) and inserted the word "capital" before murder on number (2). Evans also inserted language stating that he would be maintained in a federal facility fifteen days prior to an execution date no matter how many stays were implemented. Golden testified that he told Evans' attorney that he was in no position to make promises, but agreed to prosecute Evans on federal kidnapping charges if there was a factual basis for the crime. Golden initialed the document after writing that he "would use whatever influence he had to insure that these desires will be carried out."

¶24. Despite the discussions between Golden, Lusk, and Evans, no agreements were reached. Golden terminated the discussions and left the jail after Evans indicated he wanted to take a shower and failed to sign a document, drafted by Golden, to reflect that Evans had been advised of his right to remain silent. Prior to leaving, Golden instructed law enforcement not to proceed unless Evans was so advised.

¶25. Prior to making a statement, Evans drafted a document, using portions of the language in the document drafted by Golden, wherein he acknowledged that he had been advised by his attorney and U.S. Magistrate Judge Roper against making any statements. That document provides the following:

> I, Donald Leroy Evans, having been advised by my attorney Fred Lusk that I have the right to remain silent, and also having been advised by Judge Roper that I don't have to say anything, and having been advised by various law enforcement agents that I have the right to remain silent do hereby decide that I want to make contingent statement regarding the kidnapping of Beatrice

Routh, to be used exclusively by my attorney Fred Lusk and the federal authorities to solely establish that a federal offense has been committed and, that the state of Mississippi in no way, shape, form, or usage. . . as well as the State of Louisiana. . . shall have no power to use this statement for any investigative or criminal applications whatsoever.

This statement is being made solely for the usage and protection of my attorney Fred Lusk. And as is undersigned by Attorney Fred Lusk he assures me, Donald Leroy Evans that no copies of this declaration will not be given in any copied form to any federal agency to be used against me.

This is only to establish protection of Fred Lusk and myself, Donald Leroy Evans, and to establish a federal crime has been committed and that I, Donald Leroy Evans will remain in federal custody throughout this whole criminal endeavor.

¶26. Evans and his attorney signed the document and their signatures were witnessed by Major Wayne Payne of the Gulfport Police Department and FBI Agent Holder. This document was later brought to the attention of Judge Gex at the federal guilty plea hearing on August 19, 1991, and placed under seal due to the ongoing criminal investigation. AUSA Golden testified that the first time he became aware of the existence of this document was at the guilty plea hearing.

¶27. Major Payne testified that Chief Payne of the Gulfport Police Department asked that he witness the signatures of Lusk and Evans. Major Payne testified that he did not read the document, nor was he aware of the contents of the document. After the document was witnessed, Evans' attorney folded it and placed it in his pocket. Payne testified that no copies of the document were given to him nor did he see any other law enforcement officer receive copies of the document. Payne confirmed that no agreements were made with Evans or his attorney by law enforcement prior to Evans' statement.

¶28. Detective Whitney Carvin testified that Evans was advised of his rights and asked to sign a FBI form styled "Interrogation, Advice of Rights" prior to making the statement. Detective Carvin, Agent Holder, and Evans testified that Evans indicated that he understood his rights, but declined to sign the form. Holder and Carvin testified that Evans refused to sign the waiver due to the language in the last paragraph of the form which stated that "no promises or threats have been made to me and no pressure or coercion of any kind has been used against me." Evans indicated that he would not sign because promises about housing in a federal facility and visitation with Ms. Stewart had been made.

¶29. Despite Evans' refusal to sign the waiver, Detective Carvin, Agent Holder, Lusk and Evans testified that Evans was advised of his rights prior to the interview. Evans' attorney also advised him of the impact of an incriminating statement on state charges.

¶30. At 8:14 p.m., the advice of rights form was signed by Agent Holder, Detective Carvin, and Lusk and Evans. Evans then proceeded to give his first statement wherein he described the events of August 1, 1991. Evans did not confess to the murder or sexual assault of Beatrice at this time, but did describe the kidnapping. Evans stopped the interview at approximately 8:28 p.m and indicated that he would lead investigators to the body. Evans was accompanied by his attorney and girlfriend during the ride to Pearl River County where the body was eventually located.

¶31. At approximately 2:56 a.m., Evans was returned to the Harrison County Detention Center,

advised of his rights, and interviewed by Agent Holder. Evans again refused to sign the waiver of rights form. In his second statement, Evans confessed to kidnapping and murdering Beatrice.

¶32. Evans later agreed to give a videotaped confession on August 14, 1991. The statement was taken at approximately 4:31 p.m. at the Harrison County Detention Center and a videotape and transcript of the statement was introduced into evidence at the hearing on the Motion to Suppress. Present during that statement were Agent Holder, Detective Carvin, and Fred Lusk. Evans was advised of his rights and declined to sign a waiver of rights form. The waiver, however, was witnessed by Evans' attorney. Evans and his attorney stated that agreements had been made regarding Evans' housing and visitation. Evans, however, agreed that no other promises had been made. The contents of this statement is consistent with the two prior statements. However, for the first time, Evans described the sexual assault of Beatrice.

### A. COERCION BY LAW ENFORCEMENT.

¶33. Evans argues that his confession was involuntary because he was coerced and harassed by law enforcement. During the Motion to Suppress, Evans was questioned about coercion and/or intimidation by law enforcement. Evans described being "threatened" by Sergeant Steve Barnes of the Gulfport Police Department while he was in custody in Louisiana. Evans testified that Barnes stated that things would go worse on Evans if he did not cooperate. Evans also claims that Sergeant Barnes told him that "the major's on his way over here and it's not going to be real nice when he gets here." Evans, however, testified that he remained silent.

¶34. After being booked into the Harrison County Detention Center, Evans testified that he was not given a mattress or hygiene items, was not allowed to bathe, and was kicked by an officer. Evans testified that he was prevented from sleeping due to harassment by jail personnel throughout the night and was denied food.

¶35. In determining the voluntariness of a confession, a trial court must examine the "totality of the circumstances" surrounding the statement. *Chase v. State*, 645 So. 2d 829, 841 (Miss.1994), *cert. denied*, 115 S.Ct. 2279 (1995), *reh'g denied*, 116 S.Ct. 20 (*quoting Davis v. State*, 551 So.2d 165, 169 (Miss.1989), *cert. denied,* 494 U.S. 1074(1990), *reh'g denied*, 495 U.S. 953 (1990)). In addition, "the resolution of conflicting testimony regarding voluntariness is a question of fact to be resolved by the trial judge at the suppression hearing." *Id.* (*quoting Smith v. State*, 465 So. 2d 999, 1002 (Miss.1985)).

¶36. The trial court was presented with conflicting evidence about Evans' harassment allegations. Evans' attorney testified that Evans did not complain about harassment by jail officials during August 7-10, 1991. Lusk also testified that Evans complained that a guard had been obnoxious to him, but clarified that this alleged incident occurred after Evans' statements.

¶37. Lusk testified that although Evans did not like the food he was given, he was not denied food by law enforcement. In fact, Lusk testified that he purchased food for Evans from the snack bar and brought Evans food from home. Lusk also testified that Evans had a steady supply of coffee and snacks.

¶38. Lusk testified that "[law enforcement] were doing everything possible to make us as - - to be as

helpful and to make us as comfortable as possible so that if there was a problem it was taken care of immediately by the sheriff himself or by Lieutenant Carver." Detective Carvin and Agent Holder testified that Evans was not in any way threatened or coerced into making his statement to law enforcement.

¶39. Despite Evans' allegations of harassment, the testimony at the hearing on the Motion to Suppress reveals that Evans was not coerced into making a statement. While Evans may have had complaints about his accommodations, there is nothing to suggest that he endured treatment which would render his confession involuntary. Moreover, at all times prior to and during his statements, Evans was represented by counsel. The testimony is uncontradicted that prior to each statement Evans was advised of his rights by Agent Holder and his attorney. Evans was so familiar with his rights and the consequences of a waiver that he drafted a document wherein he agreed to make a contingent statement. Evans' familiarity is also evidenced by the fact that he refused to sign the waiver of rights form.

¶40. Somewhat problematic, however, is the presence of Gail Stewart. At Evans' request, Stewart was flown to Gulfport by U.S. Customs. Prior to traveling to Gulfport, Stewart allowed FBI agents to place a telephone recording device in her home in order to track Evans' whereabouts. Stewart was allowed to meet with Evans during the three-day period leading up to the confession during which she counseled counseled Evans about their religious beliefs and encouraged him to confess. Evans' attorney testified that Ms. Stewart was the most important person in Evans' life.

¶41. The presence of Gail Stewart is somewhat similar to the situation in *Abram v. State*, 606 So.2d 1015, 1033 (Miss.1992), wherein this Court held that the confession was involuntary due to "various statements conveyed to Abram [which] proximately caused him to confess. . . . " In *Abram*, after several unsuccessful attempts to secure a statement from the defendant, the Sheriff "solicited the intervention of Reverend Jones on the belief that he would put Abram at ease." *Id.* at 1022. Reverend Jones had been one of Abram's school teachers and counselors. As instructed by the Sheriff, Reverend Jones encouraged Abram to confess and advised Abram that it might be easier on him if he cooperated with law enforcement.

¶42. Here, however, this Court is faced with a situation which may be distinguished from *Abram*. Gail Stewart was not acting on behalf of law enforcement. Rather, Evans requested her presence. Specifically, Evans stated that he would consider speaking with law enforcement if he could visit with Stewart.

¶43. Additionally, there is no indication that Stewart advised Evans that "cooperation might be of some benefit." *Abram*, 606 So. 2d at 1031. In *Abram*, the confession was held to be involuntary partially due to the fact that various individuals conveyed to the defendant the impression that his cooperation/confession might have been beneficial. These circumstances are not present in the case *sub judice*.

¶44. Moreover, there is no indication that Stewart's advice induced Evans to confess. Lusk testified that Evans indicated if the authorities would bring Stewart over then Evans would tell authorities where the body was located. While her presence seems undoubtedly to have contributed to Evans' urge to confess, there is nothing in this record which compels the conclusion that Stewart *induced* Evans to confess.

¶45. In **_Colorado v. Connelly_**, 479 U.S. 157,170 (1986), the United States Supreme Court, addressing the issue of the voluntariness of a waiver under the Fourteenth Amendment clearly held:

> The "sole concern of the Fifth Amendment, on which **_Miranda_** was based is governmental coercion. _See_ **_United States v. Washington_**, 431 U.S. 181, 187 [52] L.Ed.2d 238, 97 S.Ct. 1814 [1818] (1977); **_Miranda,_** _supra_, [384 U.S. at 460, 16 L.Ed. 2d 694, 86 S.Ct. 1602 [1620] 10 Ohio Misc 9, 36 Ohio Ops 2d 237, 10 ALR 3d 974. Indeed, the Fifth Amendment privilege is not concerned "with moral and psychological pressures to confess emanating from sources other than official coercion." **_Oregon v. Elstad_**, 470 U.S. 298, 305, 84 L.Ed.2d 222, 105 S.Ct. 1285 [1290] (1985). The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on "free choice" in any broader sense of the word.

¶46. In light of the testimony, the trial judge was well within his discretion in holding that Evans' confessions were voluntary. Moreover, here, as in **_Thorson v. State_**, 653 So. 2d 876, 887 (Miss.1994), "[w]e are not confined in this case to a written record, but have the videotaped confession of [Evans]." The videotape does not suggest any coercion, and in it Evans indicated that he understood his rights and wished to make a statement. Based on the totality of the circumstances, there is nothing to suggest that the trial judge's findings were manifestly wrong or against the overwhelming weight of the evidence.

## B. WHETHER EVANS' CONFESSION WAS MADE DURING PLEA NEGOTIATIONS.

¶47. Evans next challenges the admissibility of his confessions on the basis that they were "precipitated by plea negotiations" and were therefore inadmissible under M.R.E. 410. Specifically, Evans argues that his confessions were made in conjunction with plea negotiations wherein Evans agreed to lead investigators to the body if he was allowed to plead guilty to federal kidnapping charges.

¶48. A review of Evans' Motions to Suppress and the argument presented before the trial court reveals that Evans did not assert this specific ground in arguing his confessions were inadmissible at trial. Although Evans argued during the hearing on the Motion to Suppress that his previous _pro se_ offers to plead guilty to capital murder were inadmissible under M.R.E. 410 and Miss.Crim. R. Cir. Ct. Prac. 4.03, Evans did not argue that his confessions were inadmissible for these same reasons. On numerous occasions, this Court, has held that an objection on one ground waives remaining grounds for purposes of appeal and that the failure to raise an issue in the trial court requires this Court to impose a procedural bar on appeal. Notwithstanding Evans' failure to raise this specific ground before the trial court, this Court may, alternatively, consider the merits of the argument. **_Chase v. State_**, 645 So. 2d 829, 845 (Miss.1994), _cert. denied_, 115 S.Ct. 2279 (1995), _reh'g denied_, 116 S.Ct. 20 (1995) ; **_Foster v. State_**, 639 So. 1263, 1270 (Miss.1994), _cert. denied_, 115 S.Ct. 1365 (1995), _reh'g denied_, 115 S.Ct. 1992 (1995).

¶49. M.R.E. 410 provides (in pertinent part):

> Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in

the plea discussions:

(1) A plea of guilty which was later withdrawn;

(2) A plea of nolo contendere;

(3) Any statement made in the course of any proceedings under Mississippi statutory or rule of court provisions regarding either of the foregoing pleas; or

(4) Any statement made in the course of plea discussions with an attorney for the prosecuting authority which does not result in a plea of guilty or which results in a plea of guilty later withdrawn.

¶50. The initial issue before this Court is whether Evans' confessions fall within the ambit of M.R.E. 410. That rule specifically provides that inadmissible discussions are those "with an attorney for the prosecuting authority which does not result in a plea of guilty or which results in a plea of guilty later withdrawn." We, however, are not faced with a situation wherein the discussions sought to be admitted were between Evans and a prosecuting attorney. The record clearly reflects that Evans' statements were made to Detective Whitney Carvin and FBI Agent Holder. Moreover, the record reflects that AUSA Golden discontinued his discussions with Evans' prior to any statements.

¶51. A review of M.R.E. 410 and URCCC 8.04 clearly reveals that the only governmental officer with authority to enter into plea negotiations is the prosecuting attorney. This view is entirely consistent with federal interpretation of the language contained in Fed. R. Evid. 410 and Fed. R. Crim. Prac, 11(e)(6) which mirror M.R.E. 410.

¶52. In *United States v. Keith*, 764 F.2d 263, 265 (5th Cir. 1985), the Fifth Circuit held that Fed. R. Crim. P. 11(e)(6) makes clear that the sort of plea bargain discussions that are inadmissible under it are only those had with a government attorney. "Discussions with a law enforcement agency in the spirit of cooperation and with hope for leniency, are not inadmissible under 11(e)(6)(D)." *Id.* (*citing United States v. Jiminez-Diaz*, 659 F.2d 562, 568 (5th Cir.1981)). *See also United States v. Jones,* 32 F.3d 1512, 1517 (11th Cir.1994) (FBI agent is without authority to enter into negotiations regarding charges or sentence); *United States v. Davidson*, 768 F.2d 1266, 1270 (11th Cir.1985) ("[T]he automatic exclusion rule of Rule 11(e)(6) 'does not extend to statements made to law enforcement agents, as distinguished from government counsel'."). Applying this reasoning to the case *sub judice* compels the conclusion that Evans was not engaged in the type of discussions contemplated by M.R.E. 410.

¶53. In *United States v. Kettering*, 861 F.2d 675 (11th Cir. 1988), the defendant, like Evans, sought to enforce a plea agreement made by a law enforcement officer. There, the court conducted the following two-pronged inquiry to determine whether the plea agreement was enforceable:

[T]he general rule requiring governmental adherence to promises made during plea negotiations is subject to two conditions. First, the agent making the promise must be authorized to do so, and second, the defendant must detrimentally rely on the promise. If either condition is lacking, then the agreement is unenforceable and the government may withdraw its offer.

*Id.* at 677 (*quoting Johnson v. Lumpkin*, 769 F.2d 630, 633 (9th Cir. 1985)).

¶54. As indicated earlier, Agent Holder and Detective Carvin were not authorized to conduct plea negotiations with criminal defendants. Moreover, prior to Evans' first statement, AUSA Golden, the only government officer with authority to conduct plea negotiations, left the jail and terminated all discussions with Evans. Golden testified that the only directive given to Agent Holder and Detective Carvin was the admonition not to proceed with a statement unless Evans was advised of his rights. There is simply no evidence in this record to support the conclusion that Holder and Carvin were authorized to conduct any type of plea negotiations with Evans.

¶55. Moreover, a review of the testimony presented at the Motion to Suppress clearly reveals that Evans was not involved in "plea negotiations." Prior to making his initial statement to law enforcement, Evans' primary concerns were to be housed in a federal facility and to have visitation privileges with Gail Stewart. Evans' objective, therefore, was to cooperate with federal authorities and provide enough information to establish federal jurisdiction. Specifically, Evans had to establish that he transported Beatrice across state lines.

¶56. Evans relies on *Hutto v. Ross*, 429 U.S. 28 (1976), where the United States Supreme Court held that a confession is not *per se* inadmissible in a criminal trial because it was made subsequent to an agreed upon plea bargain that did not call for such a confession. However, in *Hutto*, the Court clearly stated that the issue in that case was not "the admissibility in criminal trials of statements made during the plea negotiation process." *Id.* at 30, n.3.

¶57. Evans also relies on *United States v. Herman*, 544 F.2d 791 (5th Cir. 1977), and *United States v. Robertson*, 582 F.2d 1356 (5th Cir. 1978), wherein the Fifth Circuit addressed whether statements made by defendants were inadmissible at a subsequent criminal trial pursuant to Fed.R. Crim. P.11 (e)(6) and Fed. R. Evid. 410. Fed. R. Evid. 410 and Fed. R. Crim. Prac. 11(e)(6) mirror M.R.E.. 410.

¶58. The analysis set forth in *Robertson* is instructive. There, the Court, en banc, held:

> Plea negotiations are inadmissible, but surely not every discussion between and accused and agents for the government is a plea negotiation. Suppressing evidence of such negotiations serves the policy of insuring a free dialogue only when the accused and the government actually engage in plea negotiations: "discussions in advance of the time for pleading with a view to an agreement whereby the defendant will enter a plea in the hope of receiving certain charge or sentence concessions."

(citations omitted). *Id.* at 1365. In *Robertson,* the court directed that trial courts should carefully consider the totality of the circumstances to determine whether a discussion should be characterized as a plea negotiation. *Id.* at 1366. Recognizing the vulnerability of confessions if the accused's subsequent account were the sole determinative factor, the *Robertson* court directed trial courts to "apply a two tiered analysis and determine, first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable given the totality of the objective circumstances." *Id.* The *Robertson* court held that the distinction within this analysis is between "offers to do something in furtherance of a negotiated plea, which are inadmissible, and independent admissions of fact, which may be admitted." *Id.* at 1367 (citations omitted). The *Robertson* court, citing *Hutto v. Ross*, 429 U.S. 28, 30 (1976), held that confessions or admissions which are either made in the absence of plea

negotiations or which are wholly independent from any plea negotiations are still admissible. *Id.* Continuing, the court stated:

> Generally, a person who has been fully advised of his rights may make a full or partial admission to the arresting officers. Such a statement, if otherwise admissible under the general law of confessions, still is admissible despite the fact that the accused makes some request of those in charge. Such a request, without more, does not transform a confession into a plea negotiation.

*Id.*

¶59. Applying the ***Robertson*** analysis to the present case reveals that Evans' statements were not made during plea negotiations. Foremost is the fact that AUSA Golden repeatedly testified that he was not engaged in "plea negotiations" with Evans. Golden testified that while "negotiations" had taken place, these were not tied to a "plea". Moreover, as reflected in the record, Evans' attorney agreed with Golden during the federal guilty plea hearing that while "some agreements" had been made, they were not "necessarily tied to this plea." As stated earlier, a frustrated Golden left the Detention Center and terminated any discussions.

¶60. At the time Golden left the courthouse, no plea bargain been established. Prior to Golden's departure, a sheet of paper with Evans' "desires" had been passed between Evans and Golden, but as testified to by Golden, no plea negotiations had taken place nor had Golden expressly agreed to the conditions written on the paper. Golden repeatedly testified that he instructed Evans that he could not agree to allow Evans to plead guilty to federal kidnapping charges because he was not sure that federal authorities had jurisdiction. Following Golden's departure, Evans gave a statement.

¶61. From the record, it appears that Evans was negotiating with the federal authorities with regard to Evans' placement in a federal facility as well as with regard to Evans' desire to plead guilty to federal kidnapping charges. However, after several hours and no basis in fact to establish that a federal crime had occurred, the AUSA left the jail. Therefore, any "plea negotiations" clearly terminated. Moreover, Evans and his attorney were advised that Golden had left and from this point forward it was a state investigation. Evans' decision to make a statement was clearly motivated by his desire to be housed in a federal facility. A necessary prerequisite to federal housing is of course that Evans be prosecuted for a federal offense. Evans' first inculpatory statement was made after Golden's departure. Therefore, if any plea negotiations had in fact occurred, these had terminated and Evans was now cooperating in order to establish federal jurisdiction.

¶62. Whatever Evans' subjective impressions may have been at the point at which he made his August 10, 1991 statements, this expectation was not reasonable given the totality of the objective circumstances. *See **United States v. Robertson***, 582 F.2d 1356, 1366 (5th Cir.1978). Moreover, the case *sub judice* clearly demonstrates the distinction set forth in ***Robertson*** where that court held, "distinction will be drawn between offers to do something in furtherance of a negotiated plea, which are inadmissible, and independent admissions of fact which may be admitted." *Id.* Evans' statements were independent admissions of fact and were therefore admissible. There is no merit to this issue.

### C. WHETHER THE FAILURE OF LAW ENFORCEMENT TO ADVISE THE DEFENDANT THAT THE LIMITATION PLACED IN HIS WAIVER OF RIGHTS WAS INEFFECTUAL VIOLATED EVANS' FIFTH AND FOURTEENTH

**AMENDMENT RIGHTS.**

¶63. Evans argues that he was not advised by law enforcement that the limitation placed in the waiver of rights form was ineffectual and therefore he did not make a knowing and intelligent waiver of his Fifth Amendment right to remain silent. On August 10, 1991, Evans refused to sign a document drafted by AUSA Golden wherein Evans would attest to the fact that he had been advised of his constitutional right to remain silent by his attorney and U.S. Magistrate Judge Roper. After Evans refused to sign this document, Golden terminated his discussions with Evans and left the detention center.

¶64. Golden testified that the next time he saw the "document" that he had drafted on August 10, 1991, was at the federal guilty plea hearing. However, Evans, using portions of Golden's language from the original document, drafted his own statement wherein he indicated he wished to make a "contingent statement regarding the kidnapping of Beatrice Routh." Unlike the document drafted by Golden, Evans included additional language which purported to limit the use of the statement. Specifically, the document stated ". . . to be used exclusively by my attorney Fred Lusk and the federal authorities to solely establish that a federal offense has been committed and, that the State of Mississippi in no way, shape, form, or usage. . . as well as the State of Louisiana . . . shall have no power to use this statement for any investigative or criminal applications whatsoever."

¶65. Evans testified that he prepared the document which Lusk took to Golden. Evans testified that Detective Carvin took the unsigned document, made copies and returned the document to Lusk. Carvin testified that he did not remember taking the document to be photocopied. However, Carvin testified that to his knowledge the document was "a form brought - - brainstorm of attorney Fred Lusk to cover him because Donald kept wanting to do this and wanting to do this and wanting to do this and Fred kept advising him not to do this, not to do this, not to do this, and I think that was some kind of - - I thought it was a form where it was just an agreement between Donald and Fred that Donald would not come back and get Fred for being a bad attorney at a different time."

¶66. Evans testified that no one explained to him that the limiting language was ineffectual and thus he was under the impression that neither Louisiana or Mississippi would be able to use the statements. After the document was returned to Evans, Lusk and Evans signed the document. Agent Holder and Wayne Payne of the Gulfport Police Department witnessed the signatures of Evans and Lusk. Major Payne testified that Chief Payne told him to sign the document in order to witness the signatures of Lusk and Evans. Payne testified, however, that he did not read the document. Following the signatures, Payne testified that Lusk took control of the original document and that no law enforcement officers received a copy.

¶67. Gulfport Police Chief George Payne testified that law enforcement was not aware of the contents of the document, but that he understood that Lusk indicated that "he had some concerns . . . in reference to protecting himself and how he defended his clients and that he was - - he, as I remember it, prepared a document between him and his client and asked that after it was signed that there be a witness, and I directed the chief of detectives at the time to witness the signing of the document."

¶68. Agent Holder testified that he also witnessed the signatures of Lusk and Evans, but did not understand the contents of the document. Holder testified that Golden was not present when this

document was signed. Holder testified that he made no promises in relation to pending state charges in either Louisiana or Mississippi nor did he have the capacity to do so. Holder testified that Evans later sent him a copy of the document. When asked what he believed the purpose of the document to be, Agent Holder testified:

A. Your Honor, I'm not certain, but I believe it was to show that Mr. Lusk had advised Mr. Evans of his constitutional rights or that Mr. Evans was well aware of his constitutional rights. But, I might be in error on that. It wasn't of any concern to me because all I was doing was witnessing it.

¶69. Evans' attorney testified that he was in possession of the original document. Lusk testified that he handed the document to Chief Payne who in turn gave the document to Major Payne to witness. However, Lusk testified that Golden was not present and had left after becoming "tired of playing Donald Evans games and, you know, it was wearing out everybody."

¶70. Lusk testified that he did not advise Evans that limiting language in the document was ineffective. Specifically, Lusk testified:

Q. He didn't ask you could he limit that statement?

A. No, sir. I never discussed it with him at all. He gave it to me, I looked at it, handed it to the police officers and smiled.

¶71. Lusk testified that after the document was signed he advised Evans about the ramifications of making a statement. Lusk testified that before every statement he and Agent Holder advised Evans that the statements could be used against him. When specifically asked what the purpose of this document was, Lusk testified:

A. As Jay Golden said - - and the purpose of the agreement was two-fold; so that Mr. Evans would acknowledge that he had been advised of his rights and also that Fred Lusk had advised him of his rights to remain silent and that he was, you know, that he fully understood what he did when he made the statement if he made a statement.

Q. There was never any purpose in this agreement that was signed by you and Evans and witnessed by Wayne Payne and George Holder that the State of Mississippi or the State of Louisiana would not pursue charges against him or would not use statements against him, were there?

A. That was not discussed between Mr. Evans and I.

Q. Was that discussed between you and any police?

A. No, Sir.

¶72. Furthermore, Lusk testified that the original document drafted by Golden did not contain any language limiting the use of the information provided in Evans' statements. Lusk's testimony corroborates that by Evans and Lusk during the federal guilty plea hearing. Moreover, during the guilty plea hearing, Evans stated to the court that this document was not an agreement, but was "just

basically an attestation to the fact that Fred Lusk has advised me of my right to remain silent and so on. . . . "

¶73. This record clearly demonstrates that no agreement was reached either with the State of Mississippi or the State of Louisiana. Rather, the sole purpose of this document was to protect Lusk from future claims of ineffective assistance of counsel. The record amply supports the conclusions of the trial judge: that Evans unilaterally inserted limiting language into a document. There is no indication that this language was discussed with law enforcement or with the AUSA. Moreover, there is no indication that law enforcement was aware of any language which purported to limit the use of the information provided by Evans.

¶74. Evans was repeatedly advised by his attorney and Agent Holder that he was not required to make a statement. Evans was advised prior to each statement that the information given in the statement *could* and *would* be used against him. Evans, however, accompanied by counsel, chose instead to make a statement. The document drafted and executed by Evans was a private agreement between an attorney and his client, not a "waiver" of rights. There was simply nothing that the State of Mississippi was obligated to honor. There is no merit to this issue.

### D. WHETHER THE STATE FAILED TO TAKE EVANS BEFORE A COMMITTING MAGISTRATE IN VIOLATION OF HIS FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS.

¶75. Evans next argues that the failure of the State to take him before a judicial officer in a timely manner undermines the voluntariness of his confessions. Evans argues that at the time he made his statements to law enforcement he was unaware that he would be facing state murder charges.

¶76. Evans was arrested on August 5, 1991, in Louisiana on federal kidnapping charges. At that point, authorities were not aware that Beatrice had been murdered. Five hours after his arrest, Evans was taken before a United States Magistrate in New Orleans, advised of his rights and formally charged with kidnapping. Counsel was appointed and Evans waived extradition proceedings after which he was transported to Harrison County on August 7, 1991.

¶77. On August 8, 1991, Evans was given an initial appearance before U. S. Magistrate Judge Roper in Biloxi. Judge Roper advised Evans of his rights and appointed attorney Fred Lusk to represent Evans on the federal kidnapping charge. Evans, represented by counsel, later confessed to the kidnapping and murder of Beatrice.

¶78. At the time of Evans' confessions, he had been arrested on federal kidnapping charges. On August 2, 1991, a warrant was issued against Evans on state kidnapping charges. However, at the time of Evans' statements, he had not been arrested on state kidnapping charges. An arrest warrant for capital murder was not issued until August 20, 1991. Evans was arrested for capital murder at 10:30 a.m. on August 20, 1991, at the Harrison County Jail and was soon given an initial appearance.

¶79. At the time of Evans' arrest, Unif. Crim. R. Cir. C. P. 1.04[(2)] governed initial appearances and required that every arrested person be taken before a judicial officer without unnecessary delay. Here, however, Evans had not been arrested on any state charges at the time of his statements. Rather, Evans had only been charged with federal kidnapping charges for which he did receive an initial

appearance.

¶80. In *Abram v. State*, 606 So. 2d 1015 (Miss.1992), this Court held that "[t]he importance of this first appearance is that the accused is advised of his right to remain silent, his right to appointment of counsel, his right to communicate with counsel and family, his right to preliminary hearing, and the conditions under which he may obtain release, if at all. *Id.* at 1029. In *Abram*, this Court held that "[b]ecause the 'major purpose' of the initial appearance 'is to secure to the accused prompt . . . advice of his right to counsel by a judicial officer . . . who [presumably] has no professional duty nor personal inclination to try to exact a waiver of that right,' it is imperative that the initial appearance be given 'without unnecessary delay' as the rule commands." *Id.* (*quoting Nicholson v. State*, 523 So. 2d 68 (Miss.1988)). "'Without unnecessary delay' means as soon as 'custody, booking, administrative and security needs have been met.'" *Id.*

¶81. Abram was arrested without a warrant on August 12, 1982. Questioning began and Abram eventually gave a full confession. Despite the fact that a judge was available at all times, Abram was not given an initial appearance until August 15, 1982, immediately after his uncounseled confession was obtained by law enforcement. This Court held:

> The failure to provide Abram with an initial appearance sooner had devastating consequences for the defense, clearly derogating his right to a fair trial. Common sense suggests that law enforcement authorities would never have obtained an uncounseled confession from Abram had he been given an initial appearance, and consequently, access to counsel, without unnecessary delay. *See cf.*, *Nicholson*, 523 So. 2d at 77. We hold the failure to provide the initial appearance reversible since, as a consequence, Abram gave a full confession in the absence of, and in violation of, his right to counsel. Such an error could hardly be deemed harmless since the conviction of Abram for capital murder was based entirely on his confession.

*Id.* at 1029.

¶82. The facts in the case *sub judice* are clearly distinguishable from those present in *Abram*. The most glaring distinction is that Evans did not make an *uncounseled* confession. Rather, Evans, in spite of advice from his attorney and U.S. Magistrate Judge Roper, made three separate statements. Prior to each statement, Evans was counseled and warned by his attorney against making any statements. Moreover, Evans memorialized his acknowledgment that he had been advised of his right to remain silent by Judge Roper and his attorney. Also unlike *Abram*, the conviction in the case *sub judice* was not based entirely on his confession.

¶83. In *Neal v. State*, 451 So. 2d 743, 757 (Miss.1984), *cert. denied*, 469 U.S. 1098 (1984), this Court held that "[r]epeated *Miranda* warnings coupled with the passage of enough time to allow an accused to become acclimated to his surroundings followed thereafter by a voluntary waiver are generally more than sufficient to remove from a subsequent confession the taint, if any, of delay in taking the accused before a committing magistrate." Evans had been in custody for four days prior to making his first statement. Moreover, Evans was repeatedly advised by his attorney, Detective Carvin, and Agent Holder of his right to remain silent.

¶84. Evans, however, argues that he did not understand that his statements could be used in a subsequent state murder prosecution. Evans' attorney testified that he advised Evans that his

statements could be used against him in both state and federal court. Lusk testified that he instructed Evans not to give a statement because there was no body. Specifically, Lusk advised Evans that "I did not believe there was enough evidence unless he incriminated himself to bring about any state charges."

¶85. Perhaps the most conclusive evidence which demonstrates that Evans was fully aware that state capital murder charges would be pursued is Defense Ex. 12 to the Motion to Suppress wherein Evans' housing and visitation requests were listed. These requests focus solely on his desire to be housed in a federal facility despite a state capital murder conviction. Evans' awareness is illustrated by the fact that at one point, Evans inserted into the document the word "capital" before murder. Moreover, Evans, in this document, contemplates the fact that his execution may take place.

¶86. Evans was aware of the possibility and the probability of state murder charges if he made incriminating statements. However, acting in direct conflict to the advice given by his counsel, Evans chose to confess. There is simply no indication that the appointment of state counsel, who would have presumably counseled Evans as did Lusk, would have deterred Evans from confessing.

¶87. In *Wright v. State*, 512 So. 2d 679, 681 (Miss.1987), this Court held:

> Under our law Wright was entitled to counsel without unnecessary delay following his arrest, and nothing turns on whether that law be labeled constitutional or procedural or both. Denial of that entitlement will result in reversal of a subsequent conviction, however, only where it is shown that the accused experienced some untoward consequences flowing directly from denial of counsel.

¶**88.** At all times during and prior to making statements, Evans was represented by an attorney. He was advised by his attorney and a federal judge not to make incriminating statements. Evans was aware that federal kidnapping charges were pending. Moreover, Evans was advised by his attorney that if a body was discovered, state murder charges would follow. Evans chose not to follow this advice. There is simply nothing in this record which demonstrates that the trial judge erred in finding that Evans' confessions were voluntary and admissible. This issue is without merit.

### E. WHETHER THE STATE VIOLATED *AGEE V. STATE*.

¶89. Evans argues that the State failed to satisfy *Agee v. State*, 185 So. 2d 671 (Miss.1966). Specifically, Evans argues that the State failed to call Deputy Lee to rebut Evans' harassment allegations and Sheriff Joe Price to respond to Evans' allegation that Sheriff Price made promises regarding his treatment in the jail.

¶90. In *Agee*, this Court held "*Lee v. State*, *supra*, is also authority for the proposition that when, after the State has made out a prima faci e case as to the voluntariness of the confession, the accused offers testimony that violence, threats of violence, or offers of reward induced the confession, then the State must offer all the officers who were present when the accused was questioned and when the confession was signed, or give an adequate reason for the absence of any witness." 185 So.2d at 673.

¶91. In *Morgan v. State*, 681 So. 2d 82 (Miss.1996), the defendant alleged that a detective threatened to hit him with his blackjack. This Court held that "[t]he prosecution was charged under

*Agee* with putting all of the detectives on the stand who were present when Detective Hall allegedly threatened Morgan." *Id.* at 89.

¶92. Here, the State called each law enforcement officer who was present when Evans was questioned and when the statements were made. Specifically, the State called Detective Whitney Carvin and FBI Special Agent George Holder and Major Wayne Payne of the Gulfport Police Department. In rebuttal, the State recalled Detective Carvin and called Assistant U.S. Attorney Golden and Gulfport Police Chief George Payne.

¶93. Sheriff Price was not called, nor does the State offer any reason why he was not. However, the trial court heard testimony concerning the assurances by Sheriff Price to Evans that his complaints would be remedied. Moreover, there was no dispute that Sheriff Price spoke with Evans on August 10, 1991, and made such assurances. Given that little conflict existed about Sheriff Price's presence or his assurances, his testimony was not required.

¶94. Evans also argues that Deputy Lee should have been called as a witness by the State. This Court has held that "[o]nly those persons who are claimed to have induced a confession through some means of coercion are required to be offered by the State under *Agee*." *Abram v. State*, 606 So. 2d 1015, 1030 (Miss.1992)(*citing* *Reid v. State*, 266 So. 2d 21, 26 (Miss.1972)). Evans, however, did not testify that Deputy Lee made any threats or offers of reward which induced his confession. In *Thorson v. State*, 653 So. 2d 876 (Miss.1994), this Court held that the *Agee* Rule was satisfied despite the fact that the State did not call officers who allegedly were abusive and yelled at the defendant two days prior to his confession. There, this Court held:

> The principle enunciated in *Agee* remains sound, but its importance to an accused has receded in view of the strong affirmative mandates of *Miranda*. In *Abram v. State*, 606 So. 2d 1015, 1030 (Miss.1992), we held "Only those persons who are claimed to have induced a confession through some means of coercion are required to be offered by the State under *Agee*. We hold that any alleged statement made by Cook and some unidentified person on March 7 at which time Thorson revealed nothing had no bearing on Thorson's confession on the Monday following. Indeed, he never claimed that they did. Here, Thorson informed the officers on Monday, March 9, that he had read and understood his rights, and there is nothing, as above noted, about any of this videotape suggesting coercion or mistreatment of any kind. *Mettetal v. State*, 602 So. 2d 864, 868 (Miss.1992).

*Id.* at 888. As in *Thorson*, there is no indication that alleged actions by Deputy Lee contributed or induced Evans' confession. As such, the State was not required to call him as a witness under the *Agee* Rule. This issue is without merit.

### II. WHETHER THE TRIAL COURT ERRED IN TRANSFERRING VENUE TO ADAMS COUNTY.

¶95. On August 25, 1993, the trial court transferred venue to Adams County for the limited purpose of jury selection. To say that extensive publicity surrounded Donald Leroy Evans would be an understatement. Immediately surrounding the offense and the arrest of Evans, Mississippi was inundated with widespread and extensive media coverage. For example, in excess of 100 articles ran in the Sun Herald, which serves the Mississippi Gulf Coast area, and approximately 87 articles were

published in the Clarion-Ledger, which serves the Jackson area. Following Evans' subsequent confessions to multiple murders across the country, media coverage was rampant on local, state and national levels.

¶96. Jury selection began on September 7, 1993, in Adams County. During voir dire, Evans made a motion ore tenus to renew the Motion for Change of Venue. Evans renewed his motion, citing adverse pre-trial publicity, and arguing that members of the venire had been prejudiced by newspaper articles which appeared in the Clarion-Ledger and the Natchez Democrat on the day of trial. Evans argued that the articles published by the Clarion-Ledger and the Natchez Democrat caused such news saturation in the community that there was a presumption that he could not receive a fair trial. Evans also argued that the Natchez Democrat article discussed high-level security measures taken by local authorities in preparation for the trial. Counsel argued that "under the circumstances it is clear that the indication that the State has been given from Adams County that it is a very, very dangerous man that we have here." Evans argued that the article in the Clarion-Ledger was even more prejudicial because it contained a conversation with Tammy Giles, the mother of Beatrice Louise Routh. The trial court questioned the venire panel extensively about their knowledge of the case and the newspaper articles. Those individuals who indicated that they had read the article in the Clarion-Ledger were placed on the final panel. The trial court overruled Evans' renewed motion.

¶97. Defense counsel renewed the change of venue motion again after a media representative was observed taking pictures of the venire panel. The trial court conceded that panel members were photographed but overruled the motion.

¶98. As in *Carr v. State*, 655 So. 2d 824, 840 (Miss.1995), *cert. denied*, 116 S.Ct. 782 (1996), the issue in this case "is not whether a change of venue should have been granted, as it was indeed granted; but whether a second change of venue should have been granted. . . . " There, this Court held:

> It is well-established in Mississippi that [t]he granting of a change in venue is a matter so largely in [the] discretion of the trial court that a judgment of conviction will not be reversed on appeal on the ground that a change of venue was refused, unless it clearly appears that trial court abused its discretion. *Billiot v. State*, 454 So. 2d 445, 454 (Miss.1984)(*quoting Parks v. State*, 267 So. 2d 302, 304 (Miss.1972)). However, *Fisher v. State*, 481 So. 2d 203, 215 (Miss.1985) , admonishes that the decision to change venue, although left to the sound discretion of the trial judge, is not one involving unfettered discretion.

*Id.*

¶99. Upon proper application for a change of venue, a presumption arises that an impartial jury can not be obtained. Pursuant to Miss. Code Ann. § 99-15-35 (1972), proper application requires a written motion supported by affidavits of two or more witnesses showing that the defendant cannot have a fair and impartial trial in the particular county because of prejudgment of the case or grudge or ill will to the defendant in the public mind. *Porter v. State*, 616 So. 2d 899, 906 (Miss.1993).[(3)]

¶100. However, the presumption that impartial jury can not be obtained may at times be irrebuttable. Elements which should serve to indicate an irrebuttable presumption

are:

> (1) Capital cases based on consideration of a heightened standard of review;
>
> (2) Crowds threatening violence toward the accused;
>
> (3) An inordinate amount of media coverage, particularly in cases of
>
> (a) serious crimes against influential families;
>
> (b) serious crimes against public officials;
>
> (c) serial crimes;
>
> (d) crimes committed by a black defendant upon a white victim;
>
> (e) where there is inexperienced trial counsel.

*White v. State*, 495 So. 2d 1346, 1349 (Miss.1986).

¶101. "When reviewing whether the trial judge has so abused his discretion this Court will look to the completed trial including the voir dire examination of the jurors to ascertain if the defendants have received a fair and impartial trial." *Billiot v. State*, 454 So. 2d 445, 455 (Miss.1984), *cert. denied*, 469 U.S. 1230 (1985)(*quoting Franklin v. State*, 189 Miss. 142, 158-59, 196 So. 787, 789 (1940); *Stevenson v. State*, 325 So. 2d 113, 118 (Miss.1975)).

¶102. Despite Evans' contentions, the trial judge did not abuse his discretion when selecting Adams County as the venue for purposes of jury selection. From August 1, 1991, the date on which Beatrice was abducted from Gulfport, until February 21, 1993, only twelve articles were published in the Natchez Democrat regarding the case. All of these articles were published on or before October 3, 1991.

¶103. Moreover, media coverage in Adams County was much less extensive than in other areas of the State. For example, the Sun Herald, which serves the Gulf Coast, published approximately one hundred and twenty articles and the Clarion Ledger published in excess of eighty articles. From August 1, 1991, to February 2, 1993, twenty-four articles appeared in the Enterprise Journal which serves areas surrounding and including McComb. Twenty-eight articles ran in The Picayune Item and twenty articles were published in The Daily Leader. The Hattiesburg American published approximately 49 articles.

¶104. Evans, conceding that no region of the State was immune from pre-trial publicity, argues that the situs of jury selection should have been transferred north of Highway 82 or to the northeastern portion of the state. The Delta-Democrat Times, which serves Greenville and surrounding areas, contained no articles about the Evans matter. However, as with other areas of the State, this area is reached by the Clarion-Ledger as well.

¶105. Moreover, the northeastern portion of the state was comparatively similar to Adams County in the amount of media exposure. The Oxford Eagle published fourteen articles. The Daily Sentinel-Star, serving Grenada and surrounding areas, published approximately thirteen articles and the

Starkville Daily News published approximately ten articles. The Commercial Dispatch, serving the Columbus area, published approximately twelve articles. The trial court did not abuse his discretion in transferring venue to Adams County.

¶106. Evans also argues that venue should have been transferred following publication of articles on the first day of trial by the Clarion-Ledger and Natchez Democrat. The article published in the Natchez Democrat contained commentary by the trial judge as to why Adams County had been chosen as the site for jury selection. Additional comments from the Sheriff of Adams County discussed security measures taken in preparation for the trial.

¶107. The Clarion-Ledger article contained a detailed conversation with Tammy Giles, Beatrice's mother, wherein Giles expressed her sorrow and indicated that a plastic box with Beatrice's ashes was all that she had left of her daughter. Giles described Evans as someone she believed she could trust. The article also detailed the chronology of events of the Evans case beginning with Evans' arrest on August 5, 1991. The article stated that Evans led law enforcement to the body; pled guilty to a federal kidnapping charges; escaped from the Harrison County Jail; and confessed to multiple murders.

¶108. During voir dire, the trial judge allowed individual sequestered voir dire to question jurors about their knowledge of the case. Jurors were specifically questioned as to whether they had read these articles. Those jurors who had read the Clarion-Ledger were placed on the final venire panel. As noted by the State, there was less information about the case in the Natchez Democrat article than the jury will have "as soon as the Court reads them the indictment."

¶109. Of the twelve jurors eventually impaneled to hear this matter, only three indicated they had read the Natchez Democrat article. Two of those jurors indicated that they read only a portion of the article. Each of these jurors indicated that they could set aside what they had read and rely only on the evidence presented at trial. None of the jurors which were actually impaneled read the article which appeared in the Clarion-Ledger.

¶110. A presumption of prejudice may be rebutted by the State's demonstration that an impartial jury was actually impaneled. *Morgan v. State*, 681 So. 2d 82, 92 (Miss.1996). Based on voir dire proceedings it appears that an impartial jury was actually impaneled. The abduction and murder of Beatrice Louise Routh and Evans' subsequent claims to have murdered in excess of sixty people generated a tremendous amount of publicity throughout Mississippi and the United States. As in *Simon v. State*, 688 So.2d 791, 804 (Miss.1997), "[i]t is unlikely that a change of venue to other area of this State would have resulted in a venire comprised of members who had not heard about the case in some form or fashion." There, this Court held that "[t]he linchpin is whether the venire members stated that they could be fair and impartial jurors if chosen." *Id.* (citations omitted). Here, each juror indicated that they could be fair and impartial.

¶111. Moreover, as in *Porter*, "[v]iewing the verdict rendered in light of the evidence presented, it does not seem that the State needed the benefit of a prejudiced jury for [Evans'] conviction." *Porter*, 616 So. 2d at 906. After thorough review, we cannot conclude that the trial judge abused his discretion in refusing to grant an additional change of venue.

### III. WHETHER THE TRIAL COURT ERRED IN FAILING TO THE ADMONISH

**THE JURY TO DISREGARD COMMENTS MADE DURING VOIR DIRE.**

¶112. Evans next argues that the trial court erred in refusing to grant a mistrial after prospective juror Tedder made certain statements during voir dire. Evans also argues the trial court erred by failing to admonish the venire to disregard these comments. Following questions by the district attorney, prospective juror Tedder indicated that she would be uncomfortable and unable to serve as a juror because she found "it very difficult to be in the same room with [Evans]. . . . " Following the remark, the district attorney questioned the venire as to "whether the fact that someone in your community makes an expression like that affect your ability to be fair to the State of Mississippi or to this defendant?" The record reflects that all jurors indicated that it would not.

¶113. Evans later requested the trial court to quash the venire panel and moved for a mistrial. Evans argued that the comments made by juror Tedder were highly prejudicial. In response, the trial court noted the negative response by the veniremen when questioned about the effect of the remarks and held that Evans' motion was not well taken.

¶114. In ***Brent v. State***, 632 So. 2d 936, 941 (Miss.1994), this Court held:

> The decision to declare a mistrial is within the sound discretion of the trial judge. See ***Arizona v. Washington***, 434 U.S. 497, 512, 98 S.Ct. 824, 834, 54 L.Ed.2d 717 (1978); ***Grandberry v. Bonner***, 653 F.2d 1010 (5th Cir. 1981). To find error from a trial judge's failure to declare a mistrial, there must have been an abuse of discretion. ***Jones v. State***, 398 So. 2d 1312, 1318 (Miss.1981); ***Schwarzauer v. State***, 339 So. 2d 980, 982 (Miss.1976).

¶115. Trial judges in this state are further guided by Uniform Criminal Rules of Circuit Court Practice 5.15[(4)]:

> The court shall declare a mistrial upon the defendant's motion if there occurs during the trial an error or legal defect in the proceeding, or conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case.

¶116. In ***Hopson v. State***, 625 So. 2d 395 (Miss.1993), this Court held the trial court did not err in refusing to grant a mistrial after improper comments by two potential jurors. This Court stated:

> ***Benson*** clearly applies to this case. In both cases there were improper comments from a potential juror, and in both cases, the follow-up questions revealed that there was nothing to indicate that the venire panel had been biased, prejudiced or would be less than fair in discharging its duty by what had occurred. *See* ***West v. State***, 463 So. 2d 1048, 1054 (Miss.1985). Further, once the trial judge is satisfied that the potential jurors are without prejudice that would prevent them from being fair and impartial jurors, it is within the discretion of the court to make the final determination as to whether the panel should be quashed. ***Robinson***, 253 So. 2d at 400.

***Hopson***, 625 So. 2d at 403.

¶117. The refusal of the trial court to grant a mistrial was not an abuse of discretion. Although the trial court did not admonish the jury to disregard the comment, the prosecutor immediately questioned the jury as to whether the comment would influence their ability to serve. All jurors gave

a negative response. The follow-up question by Mr. Caranna clearly disclosed that "no juror felt or believed that the statement made . . . would prejudice him or prevent him from being a fair and impartial juror." *Id.* (*quoting* **Robinson v. State**, 253 So. 2d 398, 400 (Miss.1971)).

### IV. WHETHER THE TRIAL COURT PROHIBITED EVANS FROM QUESTIONING THE VENIRE PANEL ABOUT THEIR ABILITY TO FOLLOW THE LAW GOVERNING THE DEATH PENALTY.

¶118. Evans argues that defense counsel was denied the opportunity to question jurors about their ability to follow the law governing the imposition of the death penalty. Voir dire was conducted pursuant to Rule 5.02 of the Unif.Crim.R.Cir.Ct. P.(1993), which provides:

> In the voir dire examination of jurors, the attorney shall direct to the entire venire questions only on matters not inquired into by the court. Individual jurors may be examined only when proper to inquire as to answers given or for other good cause allowed by the court. No hypothetical questions requiring any juror to pledge a particular verdict will be asked.

¶119. In **Davis v. State**, 684 So. 2d 643, 651-52 (Miss.1996), this Court set forth the following guidelines when reviewing challenges to voir dire proceedings:

> [T]he trial court has broad discretion in passing on the extent and propriety of questions that are addressed to the venire. **Jones v. State**, 381 So. 2d 983 (Miss.), *cert. denied*, 449 U.S. 1003, 101 S.Ct. 543, 66 L.Ed.2d 300 (1980). Abuse of discretion will only be found where Davis shows clear prejudice resulting from undue lack of constraint on the prosecution or undue constraint on the defense. *Id. See also*, **Williams v. State**, 544 So. 2d 782, 784 (Miss.1987)("[T]his court will take note of abuse on appeal where prejudice to the accused is present."); **Leverett v. State**, 112 Miss. 394, 73 So. 273, 274 (1916)(reversing where whole trend of voir dire intended to impress jury with idea that their duty was to convict.)

¶120. Evans first argues he was prohibited from asking jurors whether they would consider mitigating circumstances such as child abuse, substance abuse, and mental illness. The record below belies this argument. Evans refers to several instances in the record wherein the trial judge allegedly "prevented questioning about mitigating factors." When the entire record is examined it is clear that the trial judge was concerned that defense counsel was attempting to use hypothetical questions in order to secure a commitment from the jurors that they would render a particular verdict.

¶121. In **West v. State**, 553 So. 2d 8, 22 (Miss.1989), this Court stated:

> Our law allows an attorney for either side to probe the prejudices of the prospective jurors to the end that all will understand the jurors' thoughts on matters directly related to be tried. What is impermissible is for an attorney to attempt to secure from the juror a pledge that, if a certain set of facts occur or are presented, the juror will vote a certain way. We take this view because there may well be other facts which would require a conscientious juror to do otherwise even though the assumed hypothetical fact comes to pass. Furthermore, in the course of deliberation a juror should be encumbered by her oath, the evidence and the instructions from the trial court- and nothing more.

¶122. Once defense counsel agreed to rephrase his questions, the trial court allowed this line of inquiry. Far from preventing defense counsel from questioning the venire about mitigating factors, the record reveals that the trial judge assured defense counsel that he had no problem with the questions as rephrased. Defense counsel then explained to the venire that the function of mitigating circumstances is to mitigate punishment, not to excuse the crime. Counsel discussed both statutory and non-statutory mitigating factors. For example, counsel inquired whether jurors would consider mitigating circumstances such as child abuse, mental illness, substance abuse, and the influence of alcohol during the commission of the crime. Counsel also inquired whether the venire would weigh mitigating circumstances against aggravating circumstances in order to determine the appropriate sentence. Evans was clearly afforded the opportunity to fully explore whether jurors would consider mitigating circumstances.

¶123. Evans next argues that defense counsel was prohibited from questioning venire members as to whether they would automatically vote for the death penalty. In *Morgan v. Illinois*, 504 U.S. 719 (1992), the United States Supreme Court held that a trial court may not refuse inquiry into whether a potential juror would automatically impose the death penalty upon conviction of the defendant. In *Morgan*, the Court held:

> [T]he belief that death should be imposed *ipso facto* upon conviction of a capital offense reflects directly on that individual's inability to follow the law. Any juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of the law. It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so. A defendant on trial for his life must be permitted on *voir dire* to ascertain whether his prospective jurors function under such misconception.

*Morgan*, 504 U.S. at 735-36. (internal citations omitted). The Supreme Court noted that a juror who would automatically impose the death penalty "obviously deem[s] mitigating evidence to be irrelevant to their decision to impose the death penalty: They not only refuse to give such evidence any weight but are also plainly saying that mitigating evidence is not worth their consideration and that they will not consider it." *Id.*

¶124. Contrary to Evans' assertions, defense counsel questioned the jury as to whether they would automatically impose the death penalty. Moreover, jurors were asked whether they would automatically vote for the death penalty where the victim was a child. Jurors who answered affirmatively were questioned further by defense counsel.

¶125. However, when counsel attempted to question jurors regarding their verdict given the specific facts of this case, the trial court, relying on Rule 5.02, did not allow the questions. For example, the trial court would not allow defense counsel to ask whether jurors would vote for the death penalty when a person, previously convicted of felony, is convicted of capital murder with an underlying felony of kidnapping or sexual battery. The trial judge stated, "when you asked them what penalty would be appropriate under the hypothetical set of facts that you asked, you're asking for their decision as to the verdict at the sentencing phase" and noted that "the questions as propounded did not incorporate all the elements concerning the issue which would be submitted to the jury."

¶126. Unlike *Morgan*, this venire was questioned about the automatic imposition of the death penalty

and the consideration of mitigating circumstances. The trial court correctly refused to allow defense counsel to ask hypothetical questions and inquire as to the juror's conclusions or the verdict they would reach and simply directed that the questions asked by defense counsel accurately set forth the law. Unif. R. Crim. Ct. Prac. 5.02; *Simon v. State*, 688 So.2d 791 (Miss.1997); *Williams v. State*, 544 So. 2d 782, 785 (Miss.1987); *West v. State*, 553 So. 2d 8 (Miss.1989). *Morgan v. Illinois*, 504 U.S. 719 (1992) does not require otherwise.

¶127. Here, the venire was questioned as to whether they would listen to the evidence and require the State to prove its case beyond a reasonable doubt. Moreover, during *voir dire*, jurors were questioned as to whether they would listen the evidence about aggravating and mitigating circumstances, weigh this evidence and then make a decision regarding punishment.

¶128. This Court has stated that "[t]rial courts have a responsibility to control *voir dire* but in doing so they must take care not to hinder a full exploration of a juror's predispositions, by hypothetical or otherwise." *Mack v. State*, 650 So. 2d 1289, 1305 (Miss.1994), *cert. denied*, 116 S.Ct. 214 (1995) (*citing* *Dennis v. United States*, 339 U.S. 162, 171-72 (1950)). However, "[t]he line between a proper and improper question is not always easily drawn; it is manifestly a process in which the trial judge must be given a considerable discretion." *Simon v. State*, 688 So.2d at 799. Finding no abuse of discretion by the trial court, this issue is without merit.

### V. WHETHER THE TRIAL COURT ERRED IN DENYING SEVERAL DEFENSE CHALLENGES FOR CAUSE.

¶129. Evans next argues that the trial court erred in denying eight defense challenges for cause. Each challenge is reviewed below with accompanying discussion. However, prior to addressing each challenge, it is necessary to revisit *Chase v. State*, 645 So. 2d 829, 845 (Miss.1994), *cert. denied*, 115 S.Ct. 2279 (1995), *reh'g denied*, 116 S.Ct. 20 (1995), wherein this Court stated:

> [T]his Court has held on more than one occasion that when a trial court fails to sustain a challenge for cause by the defense, it must be shown that the defense had exhausted all of its peremptory challenges before the trial court's refusal to allow the challenge for cause. *Chisolm v. State*, 529 So.2d 635, 639 (Miss.1988); *Johnson v. State*, 512 So. 2d 1246, 1255 (Miss.1987).

> The rationale behind this rule was set out in *Hansen v. State*, 592 So. 2d at 129-130:

> [T]he appellant has the power to cure substantially any error so long as he has remaining unused peremptory challenges. We would put the integrity of the trial process at risk were we to allow a litigant to refrain from using his peremptory challenges and, suffering an adverse verdict at trial, secure reversal on appeal on grounds that the Circuit Court did not do what appellant wholly had the power to do.

*Chase*, 645 So. 2d at 845-46.

¶130. In *Berry v. State*, 575 So. 2d 1, 9 (Miss.1990), *cert. denied*, 500 U.S. 928 (1991), this Court held:

> Denial of a challenge for cause is not error where it is not shown that the defense has exhausted

peremptory challenges and is thus forced to accept the juror. ***Rush v. State***, 278 So. 2d 456, 458 (Miss.1973). This threshold test is applicable in a capital murder case.

¶131. Evans did not exhaust his peremptory challenges until the State tendered the twelfth juror. Therefore, any assignment of error prior to the exhaustion of peremptory challenges is barred. Alternatively, however, we address the merits of each challenge.

## A. Juror Merideth.

¶132. Evans argues that the trial court should have granted the defense challenge for cause on the basis that Meredith had extensive knowledge about the case and indicated that she believed Evans was guilty. Juror Meredith did sit on the jury.

¶133. Juror Meredith had extensive knowledge about the case, including Evans' escape from jail and the fact that Beatrice's body was maintained in storage for two years. Moreover, Meredith indicated that she believed Evans was guilty. Meredith stated that this opinion was confirmed after the defense attorneys stated that they expected that Evans would be proven guilty. However, Meredith indicated that she had reached no opinion as to Evans' punishment. Upon further questioning by the trial judge, Meredith stated that she could set her knowledge of the case aside.

¶134. Evans' challenge for cause was overruled by the trial court. Evans later renewed the challenge for cause and his motion for additional peremptory challenges summarizing as follows:

> The problem is that there are others down the list that we know we're going to get to that we feel are more worthy of our peremptory challenges than perhaps Ms. Merideth. I mean, we basically are caught in a catch 22 in this matter. That in order to preserve our objection to Ms. Merideth we've got to strike her peremptorily. The problem is if we do there are some down the list that we know we absolutely do not want.

The trial court overruled Evans' motion and urged counsel to file the motion again "at such time as any are exhausted, all 12 are exhausted and there's a compelling reason otherwise. . . . " Defense counsel then accepted Merideth.

¶135. At the time Evans challenged Meredith for cause, he had six remaining peremptory challenges. Evans, however, made a strategic decision to retain Merideth and not exercise a peremptory challenge which may have been better utilized on another juror. Any prejudice which may have occurred from Merideth's presence on the jury is obviated by the fact that defense counsel, during voir dire, repeatedly conceded that the State of Mississippi could prove Evans' guilt beyond a reasonable doubt. Although Merideth had firm opinions about Evans' guilt which were confirmed by statements by defense counsel, she repeatedly indicated that she had no opinions about Evans' punishment.

¶136. The trial court cannot now be put in error for Evans' strategic decisions. This issue is without merit.

## B. Juror Harris

¶137. Like Juror Merideth, Evans had not exhausted his peremptory challenges at the time his

challenge for cause was denied. As such, this assignment of error was not properly preserved and is therefore barred from consideration on appeal. *See Chase v. State*, 645 So. 2d 829, 845 (Miss.1994), *cert. denied*, 115 S.Ct. 2279 (1995), *reh'g denied*, 116 S.Ct. 20 (1995); *Berry v. State*, 575 So. 2d 1, 9 (Miss.1990). However, without waiving the bar, we alternatively address the merits of this argument.

¶138. Juror Harris did in fact serve on the petit jury and indicated during individual sequestered voir dire that she knew about the facts on the case from due to television coverage. Harris also indicated that she knew about Evans' escape from jail.

¶139. In *Billiot v. State*, 454 So. 2d 445, 457 (Miss.1984), *cert. denied*, 469 U.S. 1230 (1985), *reh'g denied*, 470 U.S. 1089 (1985), this Court held "a juror who may be removed on a challenge for cause is one against whom a cause for challenge exists that would likely effect his competency or his impartiality at trial." In *Billiot*, this Court relied on *Armstrong v. State*, 214 So. 2d 589, 593 (Miss.1968), *cert. denied*, 395 U.S. 965 (1969), wherein this Court held that "[t]hose [jurors] who say that they could follow the evidence and the instructions of the court should be retained, and those who cannot follow the instructions of the court should be released."

¶140. Harris repeatedly indicated that she could be impartial and follow the instructions of the court. Harris stated that she would consider mitigating circumstances and would make the State prove aggravating circumstances beyond a reasonable doubt. Moreover, Harris stated that she had not formed an opinion about Evans' guilt or innocence or what punishment he should receive. Evans chose not to utilize a peremptory challenge to strike Harris. As such, the record does not reveal that the trial judge abused his discretion in refusing to strike Juror Harris for cause.

## C. Juror Thornburg

¶141. Norman Thornburg did not sit on the petit jury. During individual sequestered voir dire Thornburg indicated that he could set aside what he had heard about the case. Thornburg admitted that he believed "if Evans was found guilty that the death penalty would be appropriate." Thornburg, stated that this belief was not based on the media coverage, but rather based on the "nature of the crime itself." Later, however, Thornburg stated that he could set his opinion aside and decide the case based on the evidence and the law.

¶142. Evans challenged Thornburg for cause due to his knowledge of Evans' escape. The trial court overruled the challenge and Evans peremptorily struck Thornburg. Based on Thornburg's ability to listen to the evidence and follow the law, it was not error for the trial court to refuse Evans' challenge for cause. Moreover, Evans use of a peremptory challenge to remove Juror Thornburg cured any error which may have been present. *See Chase v. State*, 645 So. 2d 829, 845 (Miss.1994), *cert. denied*, 115 S.Ct. 2279 (1995), *reh'g denied*, 116 S.Ct. 20 (1995).

¶143. Like Thornburg, the remaining jurors challenged by Evans indicated that despite their knowledge of the case, they could disregard what they had seen or heard and listen to the evidence presented at trial. Based on these responses, the trial judge did not err in refusing to excuse these jurors for cause. Moreover, each of the remaining jurors were peremptorily struck by Evans and did not serve on the petit jury. Any error which may have occurred was cured by Evans' peremptory strikes. *Chase*, 645 So.2d at 845.

## VI. WHETHER THE TRIAL COURT ERRED IN REFUSING TO GRANT EVANS ADDITIONAL PEREMPTORY CHALLENGES.

¶144. Evans next argues that he was denied a trial by a fair and impartial jury when the trial court erred in refusing to grant additional peremptory challenges when 124 of 127 potential jurors had knowledge of the facts of the case. Evans repeatedly requested additional peremptory challenges. However, prior to the exhaustion of Evans' twelve challenges, the trial court ruled that the motion was premature. Evans exhausted his twelfth peremptory challenge on Juror Cavin and the State struck the next juror. Juror Stevens was accepted by the State becoming the twelfth juror and Evans again reurged his motion for additional peremptory challenges. The trial judge questioned Evans about the basis for the motion:

> The basis, Your Honor, that we stated previously in all of our motions. We've been forced to exhaust all 12 of ours and accept people that we might not have otherwise accepted, strike people that would have otherwise been acceptable had not it been for the publicity regarding the matters I stated.

¶145. Jurors Harris, Jones, and Merideth indicated that they had knowledge of the case including Evans' escape. Jones was excused by the trial court for personal reasons. Harris and Merideth were challenged for cause by Evans on the basis that they had extensive knowledge about the facts of the case. However, each of these jurors indicated they could set aside matters they had seen or heard and consider only the evidence produced at trial. Evans did not peremptorily strike Harris or Merideth from the jury.

¶146. In the preceding assignment of error, Evans complained about the presence of Juror Stevens, the jury foreman. Steven was the twelfth juror chosen after the exhaustion of Evans' peremptory challenges. Evans did not challenge Stevens for cause. However, it is precisely at this point, when faced with a juror with knowledge of the facts of the case and without further peremptory challenges, that Evans should have challenged Stevens for cause. *Chase v. State*, 645 So.2d 829, 845 (Miss.1994), *cert. denied*, 115 S.Ct. 2279 (1995), *reh'g denied*, 116 S.Ct. 20 (1995); *Chisolm v. State*, 529 So. 2d 635, 639 (Miss.1988); *Johnson v. State*, 512 So. 2d 1246, 1255 (Miss.1987), *cert. denied*, 484 U.S. 968 (1987). Having not made such a challenge, Evans cannot now assign Stevens' presence on the jury as error. Notwithstanding the lack of a challenge, Stevens indicated that he could be impartial and fair and would restrict his consideration to the evidence presented at trial.

¶147. In *Mettetal v. State*, 615 So. 2d 600, 615 (Miss.1993), this Court held that the "loss of a peremptory challenge does not constitute a violation of the constitutional right to an impartial jury." There, this Court held that "[s]o long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean that the defendant was denied his constitutional rights." *Id.* (*quoting Ross v. Oklahoma*, 487 U.S. 81, 88 (1988)).

¶148. Evans, however, argues that this case is similar to that before this Court in *Mhoon v. State*, 464 So. 2d 77 (Miss.1985), where twelve of the thirty-nine veniremen who were not excused for cause were either police officers or related by blood or marriage to current or former police officers. Of the twelve jurors selected, a uniformed police officer served as foreman and five other jurors were related to law enforcement officers. There, we held that the "sheer number of law enforcement-

connected persons in the jury pool, as well as persons selected as jurors, has worked a great hardship on Mhoon." *Id.* at 81. This Court stated:

> Given the statistical aberration in the jury pool, the judge could have done several things to ameliorate its prejudicial effect: (1) he could have afforded counsel additional peremptory challenges; (2) he could have increased the size of the available venire as well as affording additional challenges, or (3) he could have sustained at least some of the challenges for cause. *A.B.A. Standards Relating to Juror Use and Management* (1983); Standard 9(b) & (g) at 83, 85-86 . . . .

*Id.* Noting the opportunity for undue influence over the opinions of other jurors, we held that "under this novel situation the coercive inference on the jury precludes this Court from saying that this appellant was afforded his constitutional right of a trial by an impartial jury secured by Art. 3, § 26 of our Constitution." *Id.* at 82.

¶149. Evans now argues that the extensive number of persons in the jury pool with knowledge about the case warranted additional peremptory challenges. One hundred and sixteen veniremen were present during voir dire. Of the 101 veniremen actually considered, six indicated that they had no knowledge about the case. Those jurors who indicated that they knew about the facts of the case were extensively questioned during individual sequestered voir dire.

¶150. Of those jurors actually impaneled, eleven jurors and one alternate possessed some knowledge about the case. However, each of these jurors indicated that they could consider only the evidence presented in court.

¶151. In *Mhoon*, *supra*, this Court noted that because of the novel situation Mhoon's counsel would have had to use every single one of his peremptory challenges just to exclude persons connected with the police force. Evans' counsel was faced with a similar dilemma. However, the issue before this Court, and the primary concern of the *Mhoon* Court, is whether the sheer presence of a majority of veniremen who had some knowledge of this highly publicized case warrants the conclusion that Evans was not tried by a fair and impartial jury.

¶152. In *Shell v. State*, 554 So. 2d 887 (Miss.1989), *rev'd on other grounds*, 498 U.S. 1 (1990), *on remand*, 595 So. 2d 1323 (Miss.1992), this Court was again confronted by the "statistical aberration" argument. There, this Court distinguished *Mhoon* on several bases. First, this Court noted that unlike *Mhoon*, defense counsel in *Shell* had two remaining peremptory challenges at the conclusion of voir dire and could have challenged two jurors who served on the jury who had relatives that had been murdered. Moreover, this Court held:

> In the case *sub judice*, the trial court questioned each member of the venire about their ability to be impartial, and defense counsel asked each member of the venire if those relationships would prevent them from being "fair and impartial" toward the defendant, Robert Shell. Neither juror Sherrod, whose uncle had been killed, nor juror Goss, whose brother had been killed, indicated they would find it difficult to fulfill their obligations in a fair and impartial manner. Neither juror was peremptorily challenged or challenged for cause.

*Id.* at 890. As in *Shell*, each juror indicated they could be fair and impartial. From the record before

us, we cannot now conclude that Evans did not receive a fair and impartial trial.

## VII. WHETHER THE TRIAL COURT ERRED IN GRANTING CHALLENGES FOR CAUSE EXERCISED BY THE STATE.

¶153. Evans argues that the trial court erred in granting cause challenges exercised by the State on four potential jurors based on their views about capital punishment. However, other than general reference to the United States and Mississippi Constitutions, Evans cites no authority for this issue. This Court has repeatedly held that "[a]n assignment of error, unsupported by any authority, 'lacks persuasion' on review." *Williams v. State*, 684 So. 2d 1179, 1202 (Miss.1996)(*quoting Johnson v. State*, 626 So. 2d 631, 634 (Miss.1993); *Smith v. State*, 430 So. 2d 406, 407 (Miss.1983); *cert. denied*, 498 U.S. 1033 (1991)). Despite Evans' lack of authority and argument, a review of the excluded jurors reveals no error by the trial court.

¶154. Evans first argues that the exclusion of Juror Hawkins was error. Hawkins, however, was not excused due to his views about capital punishment, but rather due to the nature of his employment and the resulting hardship that an extended period of jury service would impose.

¶155. The remaining jurors about which Evans complains were excused because they could not consider the death penalty under any circumstances. First, Evans argues the exclusion of potential juror Smith was in error. The record reveals that Juror Smith indicated that he was a pentecostal minister and could not consider the death penalty. The State then challenged Smith for cause.

¶156. This issue is clearly without merit as the record reveals that defense counsel indicated that although he would not agree to Smith's exclusion on a *Witherspoon* basis, he did not want Smith on the jury. After further questioning by the Court, defense counsel again stated that he did not want Smith on the jury due to Smith's statements to the court.[(5)] The trial court then sustained the challenge. Any error that may have resulted from the challenge for cause by the State was effectively waived by Evans when he also asked that Smith not be placed on the jury. Despite Evans' waiver, the exclusion of Smith was not error. Juror Smith's responses to questioning about the death penalty revealed that he would not vote for the death penalty under any circumstances.

¶157. In *Simon v. State*, 688 So.2d 791 (Miss.1997), this Court set forth the guidelines utilized to determine whether a juror was properly excused on the basis of his/her beliefs concerning capital punishment as follows:

Prospective jurors in capital cases may only be excluded for cause based on their views of capital punishment when those views would 'prevent or substantially impair the performance [their] [sic] duties as juror[s] in accordance with [their] instructions and oath.' " *Williamson v. State*, 512 So.2d 868, 880-81 (Miss.1987)(*quoting Wainright v. Witt*, 469 U.S. 412, 424, 105 S.C.. 844, 852, 83 L.Ed.2d 841, 851-52 (1985); *Gray v. Mississippi*, 481 U.S. 648, 107 S.C.. 2045, 2051-52, 95 L.Ed.2d 622 (1987)). As a juror's bias against the death penalty does not have to be proven with unmistaken clarity, the decision of whether or not to excuse the juror is left to the trial judge's discretion. *Stringer v. State*, 500 So. 2d 928, 943 (Miss.1986). The juror need not expressly state that he absolutely refuses to consider the death penalty; an equivalent response made in any reasonable manner indicating the juror's firm position will suffice. *Willie*, 585 So. 2d at 673; *Williamson*, 512 So. 2d at 881. Due to the trial judge's presence during the

voir dire process, he is in a better position to evaluate the prospective juror's responses. *Williamson*, 512 So. 2d at 881. Finally, the determination of whether a juror is fair and impartial is a judicial question, and will not be set aside unless such determination is clearly wrong. *Carr v. State*, 555 So. 2d 59, 60 (Miss.1989); *King v. State*, 421 So. 2d 1009, 1016 (Miss.1982), *cert. denied*., 461 U.S. 919, 103 S.C.. 1903, 77 L.Ed.2d 290 (1983).

*Id.* at 799.

¶158. Continuing, this Court held:

> The *Adams-Witt* standard was adopted by this Court in *Balfour v. State*, 598 So. 2d 731 (Miss. 1992), and *Hansen v. State*, 592 So. 2d 114, 128 (Miss.1991), *cert. denied*, 118 L.Ed.2d 590, 1992 U.S. Lexis 2882, 112 S.C.. 1970, 60 U.S.L.W. 3781 (1992). In both *Balfour* and *Hansen*, this Court consider the holding of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.C.. 1770, 20 L.Ed.2d 776 (1968). The *Witherspoon* line of cases establishes the general proposition that a "juror may not be challenged for cause based on his views about capital punishment unless those views would substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) (*reaffirmed in* *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.C.. 844, 83 L.Ed.2d 841 (1985)).

*Simon*, 688 So.2d at 800.

¶159. Jurors Smith, Hammond, and Brown unequivocally indicated that they could not under any set of circumstances consider the death penalty. In *Simon*, 688 So.2d at 800, this Court stated ". . . if a prospective juror is irrevocably committed to vote against the death penalty regardless of the facts and circumstances, then the prospective juror can be struck from the jury." *Witherspoon*, 391 U.S. at 522, n. 21; *Williamson v. State*, 512 So.2d 868, 881 (Miss.1987), *overruled on other grounds*, *Blue v. State*, 674 So. 2d 1184 (Miss.1996). The trial court did not abuse his discretion. This issue is without merit.

### VIII. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE TESTIMONY OF DR. MCGARRY.

¶160. Evans next argues that Dr. McGarry should not have been allowed to testify as to the results of the autopsy performed on August 11, 1991, because officials failed to comply with statutory provisions governing autopsy procedure. Miss. Code Ann. §§ 41-37-9, 41-61-57, -59, -61, -65.

¶161. Specifically, Evans challenges the authority of Dr. McGarry to perform the autopsy. Evans voiced his objections to Dr. McGarry's testimony in a motion in limine filed on the seventh day of trial. The trial court conducted a hearing where Evans argued that the State failed to produce a court order from Pearl River County or authorization from the State Medical Examiner's Office authorizing Dr. McGarry to perform the autopsy. Relying on *Pendergraft v. State*, 213 So. 2d 560 (Miss.1968), *appeal dismissed*, 394 U.S. 715 (1969), *reh'g denied*, 395 U.S. 941 (1969), the trial court held that Evans lacked standing to challenge statutory technicalities and overruled the motion.

¶162. Prior to reaching the merits of Evans' argument, *Pendergraft* is instructive. Pendergraft argued

that the doctor who performed the autopsy should not be allowed to testify as to his findings at trial because the statutory requirements were not followed. Specifically, Pendergraft argued that a copy of the autopsy report had not been filed with the circuit court clerk. *Id.* at 563. After review, this Court held:

> It was not the legislative intent and purpose for an accused in a criminal case to have the standing or the right to complain that all technicalities had not been strictly followed in the ordering of an autopsy. The principal purpose of the statute is set forth in Section 7158-02, Mississippi Code of 1942 Annotated (Supp.1966) in these words:

> "An autopsy may be performed, as provided by this act for the purpose of determining the primary and/or contributing cause of death in the interest of public health and in criminal cases."

> It would be passing strange if an accused could thwart the main purpose of the statute because of a technicality.

*Id.* at 564.

¶163. This Court is again faced with a situation where the accused in a murder trial seeks to challenge technical requirements of autopsy procedures. Here, as in ***Pendergraft***, Evans lacks standing to challenge technical compliance with autopsy procedure and therefore the trial court properly allowed Dr. McGarry to testify.

¶164. Notwithstanding Evans' lack of standing, statutory autopsy procedure was followed in the case *sub judice*. Miss. Code Ann. § 41-37-5 allows only a physician duly licensed by the Mississippi State Board of Health to perform an autopsy. It is undisputed that Dr. McGarry was a licensed physician.

¶165. Evans argued that authorities failed to comply with Miss. Code Ann. § 41-37-9 because there was no court order from a Pearl River County circuit or chancery court which allowed the autopsy to be conducted. Miss. Code Ann. § 41-37-9 states, in pertinent part:

> A circuit judge, chancellor or county judge of the county or district where a person died or where the body of such deceased person may be or where the mortal stroke or other cause of death occurred, *may, in his discretion*, either in term time or vacation, order an autopsy to be performed upon the body of such deceased person. . . .

(emphasis added). This statute is clearly directed at autopsies conducted by court order upon the petition of either a county prosecuting attorney or the district attorney. Autopsies may also be ordered upon petition of certain health officials or performed by consent. Miss. Code Ann. §§ 41-37-23; -25.

¶166. Miss. Code Ann. § 41-61-65 provides that autopsies may also be performed upon the recommendation of the medical examiner investigating the case. Specifically, that statute provides, in pertinent part:

> If, in the opinion of the medical examiner investigating the case, it is advisable and in the public interest that an autopsy or other study be made for the purpose of determining the primary and or/contributing cause of death, an autopsy or other study shall be made by the State Medical

Examiner or by a competent pathologist designated by the State Medical Examiner.

\* \* \*

In determining the need for an autopsy, the medical examiner may consider the request from the district attorney or county prosecuting attorney, law enforcement or other public officials or private persons.

¶167. In the case *sub judice*, the State advised the trial court that it was prepared to call Judge John Stafford, Coroner of Pearl River County during August 1991, to testify that he had authorized Dr. McGarry to conduct the autopsy. Under Miss. Code Ann. § 41-61-57 (2), Stafford is considered a county medical examiner investigator and pursuant to § 41-61-65 could recommend that an autopsy be performed. During the hearing on the motion in limine, the District Attorney indicated that Dr. McGarry was on the list of competent certified pathologists in the state from whom county medial examiners could choose. Moreover, Evans did not challenge Dr. McGarry's qualifications. This issue is without merit.

### IX. WHETHER MISS. CODE ANN § 99-11-27 PROHIBITS THE STATE OF MISSISSIPPI FROM TRYING A DEFENDANT FOR CAPITAL MURDER WHEN THE DEFENDANT HAS BEEN CONVICTED OF THE UNDERLYING FELONY IN FEDERAL COURT.

¶168. Evans argues that Miss. Code Ann. § 99-11-27 bars the State of Mississippi from prosecuting him for capital murder while in the commission of a kidnapping following his guilty plea to federal kidnapping charges. Evans and the State agree that this issue is one of first impression. Evans concedes that a constitutional claim of double jeopardy would be unsuccessful in light of **Bankston v. State**, 236 So. 2d 757 (Miss.1970), and the dual sovereignty doctrine. *See* **U.S. v. Lanza**, 260 U.S. 377 (1922); **Bartkus v. Illinois**, 359 U.S. 121 (1959), *reh'd denied*, 360 U.S. 907 (1959); **Heath v. Alabama**, 474 U.S. 82 (1985). However, Evans argues that § 99-11-27 serves as a statutory bar, one acknowledged by the United States Supreme Court in **Bartkus v. Illinois**, 359 U.S. 121 (1959), *reh'g denied*, 360 U.S. 907 (1959).

¶169. Miss. Code Ann. § 99-11-27 provides:

Every person charged with an offense committed in another state, territory, or country may plead a former conviction or acquittal for the same offense in such *other state, territory, or country*; and, if such plea be established, it shall be a bar to any further proceedings for the same offense here.

(emphasis added).

¶170. This Court has not had occasion to interpret this statute. However, when reviewing a statute enacted by the legislature, this Court has established the following guidelines.

In considering a statute passed by the legislature, . . . the first question a court should decide is whether the statute is ambiguous. If it is not ambiguous, the court should simply apply the statute according to its plain meaning and should not use principles of statutory construction. **Pinkton v. State**, 481 So. 2d 306 (Miss.1985); **MISS CAL 204, LTD. v.Upchurch**, 465 So. 2d

326 (Miss.1985); *Mississippi Power Company v. Jones*, 369 So. 2d 1381 (Miss.1979). Whether the statute is ambiguous, or not, the ultimate goal of this Court in interpreting a statute is to discern and give effect to the legislative intent.*Anderson v.Lambert*, 494 So. 2d 370, 372 (Miss.1986); *Clark v. State ex. rel Mississippi State Med.Ass'n.*, 381 So. 2d 1046 (Miss.1980).

*City of Natchez, Miss. v. Sullivan*, 612 So. 2d 1087, 1089 (Miss.1992).

¶171. The initial issue is whether § 99-11-27 applies when the prior conviction was for a federal offense. The legislative history of this statute reveals no legislative intent. Originally enacted in 1848, the language of the current statute has remained the same since 1871. See Hutchinson's Code, Ch. 59, § 2881.

¶172. Miss. Code Ann. § 99-11-27 is unambiguous. The language clearly does not include the federal government. Therefore, a prior federal conviction would not serve as a bar to a subsequent state prosecution. Moreover, this interpretation of the statute is consistent with the principles of "dual sovereignty" announced by the United States Supreme Court. The Supreme Court has repeatedly held that principles of dual sovereignty will not bar a subsequent state prosecution following a federal conviction.

> There is no question that under the Federal Constitution a State may prosecute a defendant for conduct which was already charged in either a federal indictment or an indictment from another state because of the concept of "dual sovereignty." *U.S. v. Lanza*, 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314 (1922); *Heath v. Alabama*, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985). "The dual sovereignty doctrine is founded on the common law conception of crime as an offense against the sovereignty of the government. When a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offences.'" *Heath*, 474 U.S. at ---, 106 S.Ct. at 437, 88 L.Ed.2d at 394.

*State v. King,* 215 N.J. Super. 504, 512-513, 522 A.2d 455, 458 (1987).

¶173. In *Bankston v. State*, 236 So. 2d 757, 759 (Miss.1970), this Court, following principles of dual sovereignty, held that a prior federal conviction for bank robbery did not bar a subsequent state prosecution for armed robbery. In upholding the state prosecution, this Court reiterated the words of Chief Justice Taft, writing for a unanimous Court in *United States v. Lanza*, 260 U.S. 377, 382 (1922):

> We have here two sovereigns, deriving power from different sources, capable of dealing with the same subject matter within the same territory. . . . Each government in determining what shall be an offense against its peace and dignity is exercising its own sovereignty, not that of the other.

¶174. However, Evans argues and the State concedes that several states have construed the statutory phrase "another state, territory, or country" to include the federal government. *See State v. Caliguri*, 99 Wash. 2d 501, 512, 664 P.2d 466 (1983); *Turner v. State*, 94 Nev. 518, 583 P.2d 452, 453 (1978); *Wilson v. State*, 270 Ind. 67, 383 N.E. 2d 304 (1978); *State v. West*, 260 N.W. 2d 215 (1977); *People v. Belcher*, 11 Cal. 3d 91, 520 P.2d 385, 389 (1974); *People v. Lo Cicero*, 14 N.Y.

2d 374, 200 N.E. 2d 622 (1964).

¶175. We, however, are guided by the clear and unambiguous language of Miss. Code Ann. § 99-11-27. There is simply no indication that this statute was intended to prevent a subsequent prosecution by the State of Mississippi following a federal conviction. Had such a construction been intended appropriate language could have been easily included. Moreover, our interpretation of the statute is consistent with the long-standing doctrine of dual sovereignty announced in *United States v. Lanza*, 260 U.S. 377 (1922), and adhered to by this Court in *Bankston v. State*, 236 So. 2d 757, 759 (Miss.1970). There is no merit to this issue.

## X. WHETHER THE TRIAL COURT ERRED IN FINDING EVANS COMPETENT TO STAND TRIAL.

¶176. On June 4, 1993, defense counsel filed a Motion to Determine Competency. In a letter to the trial court Evans objected to the pleadings and argued that his refusal to consult with his attorneys was not the result of mental incompetency but rather his continued effort to maintain his right to proceed pro se.

¶177. On August 9-11, 1993, the trial court held an extensive hearing to determine whether Evans was competent to stand trial. Seven of Evans current and former attorneys testified that Evans was incompetent to stand trial. Dr. Marc Zimmerman testified on Evans' behalf and concluded that Evans was not competent to stand trial. Dr. Henry Maggio, testifying for the State, concluded that Evans was competent to stand trial.

¶178. Evans now argues the trial court erred in finding that Evans was competent. For the sake of clarity and brevity sub-issues raised by Evans have been consolidated.

## A. WHETHER THE TRIAL COURT ERRED IN RULING THAT A DEFENDANT MUST PROVE HIS COMPETENCY BY SUBSTANTIAL EVIDENCE.

¶179. Evans argues that the trial court erroneously required Evans to prove his competency by substantial evidence. Evans argues that although a defendant has the burden of production at a competency hearing, the prosecution must prove by a preponderance that a defendant is competent to stand trial.

¶180. When making the ruling on competency, the trial court specifically stated that "[a]s stated in *Medina v. California*, 505 U.S. 437, 448 (1992), *reh'g denied*, 505 U.S. 1244 (1992), the burden of proof in this case rests upon the movants to prove by substantial evidence that the defendant is mentally incompetent to stand trial." The trial court concluded that the movants "failed in the presentment of their case."

¶181. In *Emanuel v. State*, 412 So. 2d 1187, 1188-89 (1982), this Court announced the procedure to be utilized where there is a serious question about an accused's sanity or competency to stand trial. In *Emanuel*, this Court specifically held "[i]t naturally devolves upon the defendant to go forward with the evidence to show his probable incapacity to make a rational defense." *Id.* at 1188.

¶182. The procedures set forth in *Emanuel* have been approved by the United States Supreme Court. *Griffin v. State*, 504 So. 2d 186, 191 (Miss.1987). In *Griffin*, this Court held that although

on the federal level the prosecution is required to prove the competency of a criminal defendant by a preponderance of the evidence, this Court would not impose a "greater burden on state officials, especially in light of the fact that our procedures for determining competency are specifically designed to afford the accused due process of law and ensure that he is capable of making a rational defense prior to being tried for the crime for which he is accused." *Id.* (*citing Emanuel*, 412 So.2d 1187 (Miss.1982)). In *Griffin*, this Court held that the State was not required to prove competency beyond a reasonable doubt or by clear and convincing evidence.

¶183. Moreover, in *Medina v. California*, 505 U.S. 437, 448 (1992), *reh'g denied*, 505 U.S. 1244 (1992), the United States Supreme Court held:

> Once a State provides a defendant access to procedures for making a competency evaluation, however, we perceive no basis for holding that due process further requires the State to assume the burden of vindicating the defendant's constitutional right by persuading the trier of fact that the defendant is competent to stand trial.

¶184. In *Medina*, the Supreme Court concluded that the allocation of the burden of proof to a criminal defendant to prove incompetence does not offend the Fourteenth Amendment. *Id.* at 445.

¶185. The trial judge committed no error in holding that the burden of proof was allocated to the defense. This issue is without merit.

### B. WHETHER THE FINDING THAT EVANS WAS COMPETENT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.

¶186. As stated earlier, the procedures which govern a competency determination were set forth in *Emanuel v. State*, 412 So. 2d 1187, 1188-89 (Miss.1982). *See also* Uniform Rule of Circuit and County Court Practice Rule 9.06 (1996). In *Emanuel*, this Court held:

> When the trial court has made a finding that the evidence does not show a probability that the defendant is incapable of making a rational defense, we will not overturn that finding unless we can say, from the evidence, that the finding was manifestly against the overwhelming weight of the evidence. The evidence must show more than a possibility that defendant is incompetent to stand trial-the evidence must go further until it appears to the trial court that there is a probability that defendant is incapable of making a rational defense. In this initial inquiry, the trial judge must weigh the evidence and be the trier of the facts.

*Emanuel*, 412 So. 2d at 1189.

¶187. At the hearing on the Motion to Determine Competency, Evans first called Dr. Marc Zimmerman, clinical psychologist with a sub-specialty in forensic psychology. Dr. Zimmerman testified that he visited with Evans on two occasions at the Harrison County Detention Center for a total of approximately ten hours. Zimmerman testified he administered both an MMPI (Minnesota Multiphasic Personality Inventory) and the Short Categories Test. Zimmerman testified that he reviewed Evans' VA and Texas Department of Corrections records; spoke with several of Evans' attorneys and jail personnel; and reviewed pleadings and correspondence drafted by Evans.

¶188. Zimmerman concluded that Evans did not have sufficient capabilities to rationally understand

the proceedings against him or to enable him to consult with counsel. Zimmerman also testified that Evans demonstrated psychotic symptoms, such as delusions of persecution and grandeur which prevented him from interacting with counsel in a rational manner because he believed that his attorneys were involved in a conspiracy against him. On cross-examination, Zimmerman highlighted portions of letters written by Evans which purportedly demonstrated the delusions. However, Zimmerman conceded that an individual may be delusional without being psychotic. Moreover, Zimmerman agreed that Evans had been factually correct in representations made to the court.

¶189. Zimmerman concluded that Evans displayed symptoms of paranoid schizophrenia and may have also suffered from organic brain dysfunction. Zimmerman's testimony was consistent with prior psychological evaluations wherein Evans was diagnosed as suffering from schizophrenia and personality disorders.

¶190. Evans' second witness was Capital Defense Association staff attorney John Holdridge. Holdridge testified that he was asked to visit Evans during 1992 by Evans' advisory counsel, James Tucker, and thereafter, had weekly telephone conversations with Evans. Holdridge testified that although intelligent, Evans was not competent to stand trial because Evans did not have the ability to confer with counsel nor did he possess a rational and factual understanding of the proceedings. Holdridge testified that Evans could advise his counsel but not in a rational manner. For example, Holdridge testified that he could not gain any information from Evans about possible mitigation in the pending proceedings.

¶191. Holdridge testified that he had met Evans twice and that Evans became incredibly irrational during stressful situations. On cross-examination, Holdridge conceded that Evans had a factual understanding of the proceedings, but did not understand that an execution would actually take place. Holdridge testified that he had seen Evans make objections and that Evans "is a very smart guy and knows a lot about the law." Holdridge testified that he never denied that Evans could make legal arguments, but he could not determine how sound the argument is.

¶192. Evans also called attorney Jim Davis, who represented Evans for approximately one month during 1991. Davis, like Holdridge, testified that he was unable to get Evans to speak about the pending charges during meetings, but rather Evans rambled about collateral matters. Davis testified that Evans was irrational; would not follow advice; and became violent on one occasion. Davis testified that Evans did not possess a rational or factual understanding of the proceedings. On cross-examination, Davis conceded that the majority of defendants trust a public defender less than a retained attorney. Davis also testified that there had been a competency hearing in Texas relating to pending criminal charges wherein Evans had been found competent to stand trial.

¶193. Dale Robinson, a Gulfport attorney appointed to represent Evans for approximately three weeks, was Evans' next witness. Robinson testified that he met with Evans on two occasions for a total of eight hours and shortly thereafter filed a motion to withdraw. Robinson testified that although Evans had a factual understanding of the proceedings, he was not able to consult with his attorneys in a rational manner. Robinson testified that Evans was unable to carry on a coherent conversation and did not trust him. Robinson testified that as formal proceedings grew closer the pressure would "cause him to lose whatever little control he continues to lose more and more." On cross-examination, Robinson testified that although Evans did file motions and make objections, he did not

make rational decisions.

¶194. James Tucker, Evans' standby counsel for approximately nine months, testified that he was unable to get Evans to help to prepare the case for trial. Tucker testified that Evans was irrational and would not discuss the facts of the case although Evans understood the pending charges and was aware of the potential sentence. Tucker conceded that various motions filed by Evans were articulated in a coherent fashion and that legal research requested by Evans on various issues did appear to be on point with pending legal issues. Moreover, Tucker testified that at times Evans simply did not want to make decisions.

¶195. Fred Lusk, Evans' appointed attorney on federal kidnapping charges, testified that he represented Evans for approximately two months on state charges. Lusk testified that he requested a competency evaluation prior to the federal guilty plea primarily for his own protection, however, after the guilty plea hearing he became more concerned about Evans' competency. Lusk testified that Evans had the ability to understand and respond and was very adamant with his opinions. However, Lusk testified that Evans refused to discuss the facts of the case after he was appointed to represent Evans on state capital murder charges because Evans wanted to proceed pro se. Lusk testified that Evans was very remorseful and wanted the death penalty, but also did things for attention and sought control.

¶196. William S. Boyd, III, Evans' defense counsel at trial, testified that he initially believed Evans was rational. Boyd testified that Evans had some working knowledge of the court system, but would not discuss the preparation of a defense. Rather, Evans only wished to discuss collateral matters. Boyd testified that Evans later began exhibiting signs of paranoia and extreme mistrust. Boyd testified that Evans wanted control and would go into a rage if not in control. Boyd testified that of approximately 120 hours of telephone conversations with Evans approximately two hours were productive. Boyd testified that Evans did not possess a sufficient ability to consult with an attorney nor did Evans have a rational and factual understanding of the proceedings brought against him. However, on cross-examination, Boyd agreed that Evans understood the charges against him and the possible sentence. Boyd also conceded that Evans had been rational at different times since his arrest.

¶197. Defense attorney, Donald Smith indicated, via proffer to the court, that his testimony would be cumulative of Boyd and the opinions were identical. Smith did not testify.

¶198. Dr. Henry Maggio, psychiatrist, was the final witness. Maggio testified that he was asked to evaluate Evans in 1991 in conjunction with the federal guilty plea. Maggio testified that the interview lasted approximately three and a half hours, however, for approximately two hours Evans spoke with his attorney about locating bodies in other murder cases Evans claimed to have committed.

¶199. Evans eventually began his interview with Maggio. Based on his observations and formal evaluation, Maggio concluded that Evans was of normal intelligence and competent to assist counsel and to stand trial. At that time, Maggio did not make a formal diagnosis. Maggio testified that although Evans was very manipulative, he was oriented to person, place, time and situation, and possessed an excellent memory.

¶200. Maggio evaluated Evans for purposes of the state capital murder prosecution during August, 1993. Prior to this visit, Maggio received Evans prior mental health records. Maggio testified that

when he arrived Evans was on the phone with his attorney and refused to speak. Maggio testified that Evans was "collected, in complete control and manipulative." Following this second examination, Maggio again concluded that Evans was competent to stand trial. Maggio testified that he found no evidence of psychosis or schizophrenia. Rather, Maggio concluded that Evans suffers from mixed personality disorder with paranoid and grandiose features. Maggio described individuals with such disorders as "intact with reality, [aware of] what they are doing, . . . keen, shrewd, manipulative, cunning, [and] . . . commonly known as a con artist." Maggio concluded that Evans has the ability to understand the nature and extent of charges against him as well as the ability to cooperate with counsel if he so chooses.

¶201. On cross-examination, Maggio testified that some assumptions he operated under when formulating his opinion were based on newspaper accounts and conceded that he was irritated with Evans during the evaluation. Maggio disagreed with the previous diagnosis of schizophrenia because Evans did not demonstrate symptoms for a six month period, but acknowledged that Evans had been hospitalized four times for schizophrenia and personality disorders. However, Evans was never under observation for a six-month period and each facility released Evans because he was not psychiatrically incompetent.

¶202. After hearing extensive testimony, the trial court found that substantial evidence demonstrated that Evans was competent to stand trial. In reaching this conclusion the trial judge noted that he placed great value on Evans' appearance and demeanor during court appearances as well as the multitude of motions filed by Evans, each of which demonstrated Evans' understanding of the nature of the charges against him and his ability to rationally confer with counsel.

¶203. Evans, however, argues that the findings of the trial court demonstrate that the trial judge "ignored the testimony of seven attorneys" who testified that Evans was incompetent to stand trial. As argued by Evans, the United States Supreme Court in *Medina v. California,* 505 U.S. 437, 450 (1992), *reh'g denied*, 505 U.S. 1244 (1992), acknowledged that "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense." Despite Evans' claims, there is no indication that the trial court ignored the testimony of the attorneys. Rather, the trial court allowed extensive questioning of each attorney, followed by questions by the court. Moreover, the trial court specifically indicated that he had relied on the testimony of attorneys Tucker, Lusk and Boyd in making his decision.

¶204. Additionally, a review of the testimony reveals that all of the attorneys conceded that Evans did possess a factual understanding of the proceedings and the charges against him. However, conflicting evidence was presented on the issue of whether Evans could or simply chose not to rationally confer with counsel and aid in his own defense. This type of conflict is properly resolved by the trier of fact.

¶205. Evans also argues that the trial court discounted and ignored the testimony of Dr. Zimmerman, the defense psychologist, because Zimmerman was not a psychiatrist. Evans argues that the trial judge labored under a misconception that a psychiatrist was at a "higher and more respected level than a psychologist."

¶206. Evans correctly argues that psychologists are considered competent to evaluate criminal defendants. The record demonstrates the trial judge did have some concerns over the exact subject matter about which a clinical psychologist could testify. Specifically, the trial court was concerned

about Zimmerman's testimony about medications. During voir dire, the record reflects that Zimmerman testified that psychologists and psychiatrists function similarly in the clinical evaluation of individuals, but that psychiatrists are medically-trained and may prescribe medication. The trial court simply required Zimmerman to confine his testimony within the bounds of expertise developed on voir dire. While the trial court noted the differences between a medically-trained psychiatrist and a psychologist, there is no indication in the record that the trial court ignored Zimmerman's testimony.

¶207. We are faced with a record which reveals a great deal of conflict and tension among Evans and his attorneys, and conflicting evidence about whether Evans could not or would not aid in the preparation of his defense. The record, however, demonstrates that Evans has the ability to recall events, relate those events and has an excellent memory. There was no dispute that Evans understood the proceedings and charges against him. The conflict in testimony, however, arises over Evans' response to this knowledge. Initially, Evans refused to accept the advice given by his attorneys and chose instead to make statements to law enforcement. Each attorney believed this to be irrational. While Evans perhaps made decisions contrary to his attorneys' advice, this is not the equivalent of mental incompetency. Evans clearly preferred to proceed pro se and did not want the services of an attorney. As a result, Evans was uncooperative with each of the seven attorneys appointed to represent him. However, throughout the trial, Evans consistently displayed an awareness of the proceedings as well as an ability to make objections and confer with counsel and the trial court. There is no dispute that Evans, throughout his lifetime, has been treated for various mental disorders, however, as noted by Dr. Maggio, one suffering from mental illness may be rational and competent to stand trial. From the evidence presented at the hearing, the trial court's decision does not appear to be against the overwhelming weight of the evidence. This issue is without merit.

## XI. WHETHER THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY ON THE OFFENSE OF MURDER.

¶208. When reviewing challenges to jury instructions denied by a trial court, this Court utilizes the following standard:

> Where the jury could, based on the evidence presented find [Evans] not guilty of the crime charged, but guilty of the lesser included offense, a lesser included offense instruction is warranted. *Toliver v. State*, 600 So.2d 186, 192 (Miss.1992); *Fairchild v. State*, 459 So. 2d 793 (Miss.1984). Where [Evans] has requested the jury be instructed on a lesser charge, this Court will look at the evidence in the light most favorable to [Evans] in determining whether such was warranted. *Taylor v. State*, 577 So. 2d 381, 383 (Miss.1991). If a rational or a reasonable jury could find [Evans] not guilty to the principal offense charged in the indictment yet guilty of the lesser-included offense, then the lesser included offense instruction should be granted. *Monroe v. State*, 515 So. 2d 860, 863 (Miss. 1987).

*Davis v. State*, 684 So.2d 643, 656-7 (Miss.1996).

¶209. Evans argues that a murder instruction was warranted because Beatrice's mother consented to Beatrice accompanying Evans for the purpose of performing sexual acts for money. Evans argues that Giles' consent negated the elements of the underlying felony of kidnapping. This Court has repeatedly held that a lesser-included offense instruction is warranted only where there is an evidentiary basis for it. *Davis v. State,* 684 So. 2d 643 (Miss.1996); *Mease v. State*, 539 So. 2d

1324, 1330 (Miss.1989). Because there was no evidentiary basis for a instruction on the offense of murder, the trial court did not err. The evidence, viewed in the light most favorable to Evans, clearly demonstrated that a kidnapping occurred. Miss. Code Ann. § 97-3-53 sets forth the offense of kidnapping. In *Hughes v. State*, 401 So. 2d 1100 (Miss.1981), this Court restated the statute to clearly set forth the elements of kidnapping:

> Every person who shall, without lawful authority
>
> (1) forcibly seize and confine any other;
>
> (2) or shall inveigle or kidnap any other
>
> (3) with intent
>
> (a) to cause such person to be secretly confined or imprisoned in the state against his will,
>
> (b) or to cause such other person to be sent out of this state against his will,
>
> (c) or to cause such other person
>
> (1) to be deprived of his liberty,
>
> (2) or in any way held to service against his will . . .
>
> Under the statute the state must prove that a person, without lawful authority *either* (1) forcibly seized and confined another person, or (2) inveigled or kidnapped another person, intending to subject such person to either (a), (b), or (c) above.

*Id.* at 1105. (emphasis added).

¶210. Evans' confession clearly establishes the requisite elements of kidnapping. In his confession, Evans stated:

> I led them to believe that I was going to the store to pick up some bar-b-que items that we could bar-b-que on the beach. And ah I told them I also had to stop and make some phone calls, to try to help them get situated in an apartment, I was gonna try to get them some gas money, cause they were out of gas. When I went to the store I went under the, when I left, with them feeling that I had the intention to go to the store and buy some other stuff and do some other errands . . . .

¶211. When he continued driving rather than stopping at the store, Evans told investigators that:

> Beatrice kept on asking where are you going, where are you going. And I also told Beatrice at this time that I was gonna buy her some t-shirts and stuff. We stopped at the store and I bought her an ice cream cone and it was at this time that I purchased some duct tape. It was a store en route to I-10. At this time Beatrice asked concerned where we were going, she kept on asking where we are going, I, I deluded her into thinking and believing that ah the way we were going was a round-about way, it was like a loop of the Gulfport area.

¶212. In *Wilcher v. State*, 455 So. 2d 727, 731 (Miss.1984), *cert. denied*, 470 U.S. 1034 (1985),

*vacated in part*, 635 U.S. 789 (1993), this Court held that the crime of kidnapping may be accomplished by trickery and deceit. Wilcher intentionally gave the victims the wrong directions to his home in order to lead them to a deserted place where he intended to rob them. Here, as in **Wilcher**, the evidence showed that Evans led Giles and Beatrice to believe that he was going to the store to purchase groceries for a barbecue. Moreover, Evans unequivocally stated that his intentions were to "rape and kill" from the time he left Jones Park with Beatrice.

¶213. Despite his present claims, there is simply no evidence that Giles understood that Evans intended to rape and murder her daughter. Evans stated in his confession that Giles and the others understood that Evans was only taking Beatrice "to buy groceries" and that they would return in approximately one hour. Moreover, Evans indicated that "they did not know my intentions at the time" and that he and Giles "made no agreements" regarding her "offer" for Beatrice to perform sexual acts for Evans.

¶214. Although Evans cites **Giles v. State**, 650 So. 2d 846 (Miss.1995), in arguing that he was denied an opportunity to present his defense theory to the jury, **Giles** is distinguishable. Giles was indicted for capital murder with the underlying felony of sexual battery. However, at the time of trial, Miss. Code Ann. § 97-3-99 provided that a person was not guilty of sexual battery if the alleged victim was that person's legal spouse and at the time of the alleged offense such person and the alleged victim were not separated and living apart. The evidence that Giles was married to the victim at the time of the offense was uncontradicted. Although the evidence at trial demonstrated that Giles and the victim were living apart, this Court held the instruction was warranted.

¶215. Unlike **Giles**, there is no evidence to support a murder instruction in the case *subjudice*. Given the evidence in this record, a reasonable jury could not have found Evans not guilty of capital murder. The jury was instructed that they were required to find each element alleged by the State in the indictment beyond a reasonable doubt. Moreover, the jury was given the opportunity to sentence Evans to life imprisonment rather than the death penalty. *See **Davis v. State***, 684 So. 2d 643, 657 (Miss.1996), *cert. denied*, 117 S.Ct. 1437 (1997). This issue is without merit.

### XII. WHETHER THE TRIAL COURT ERRED IN DENYING DEFENSE OBJECTIONS TO JURY INSTRUCTIONS REGARDING VENUE AND WHETHER HARRISON COUNTY LACKED JURISDICTION TO BRING SEXUAL BATTERY CHARGES.

¶216. Evans next challenges Jury Instructions S-1C and S-9 as incorrect statements of law. Instruction S-1C reads as follows:

> If you believe from all the evidence in this case, beyond a reasonable doubt, that the Defendant, Donald Leroy Evans, on or about August 1, 1991, in the First Judicial District of Harrison County, Mississippi, did wilfully, unlawfully and feloniously inveigle or kidnap Beatrice Louise Routh, with intent to cause Beatrice Louise Routh to be imprisoned against her will, and, while in the commission of said kidnapping, did, with or without deliberate design, then and there, kill Beatrice Louise Routh, a human being, regardless of where such killing took place, and without authority of law, then the defendant is guilty of Capital Murder in Count I, and it is your sworn duty to say so by your verdict.

> If the State has failed to prove any one or more of these elements beyond a reasonable doubt, then you shall find the Defendant Not Guilty of Capital Murder in Count I.

¶217. Evans, relying on *Pruett v. State*, 431 So. 2d 1101, 1105 (Miss.1983), *cert. denied*, 464 U.S. 865 (1983), and after raising a proper objection at trial, argues that Instruction S-1C failed to require the jury to find that the alleged kidnapping continued unbroken until Beatrice was murdered in Louisiana.

¶218. In *Pruett*, the defendant was charged with capital murder with the underlying felony of kidnapping. There, the victim was kidnapped and taken hostage during a bank robbery in Hinds County. Pruett drove the victim to Sumter County, Alabama, where he forced the victim to disrobe in order to keep her under his control. Pruett left the victim for a short period in order to return to his car to take a shot of cocaine, after which he returned to the area and murdered the victim.

¶219. Pruett argued that Mississippi lacked jurisdiction because the killing occurred in Alabama. Pruett argued that although the kidnapping commenced in Mississippi, the period of time wherein he left the victim to return to his vehicle "broke the chain of events constituting the 'capital murder'." In *Pruett*, this Court held "[a]t least it was for the jury to determine whether appellant abandoned the kidnapping and then resumed the act as a mere 'murder.'" *Id.* at 1105.

¶220. Here, as in *Pruett*, Evans was charged with capital murder with the underlying felony of kidnapping. Evans' confession, which is uncontradicted, indicates that Beatrice was killed in Louisiana. Thus, it was for the jury to determine whether Beatrice was murdered while Evans was engaged in a kidnapping.

¶221. The jury was instructed in S-1C that they had to find that Evans killed Beatrice "while in the commission of a kidnapping." Implicit in this language is the requirement that the jury find that Evans was engaged in or committing the offense of kidnapping. Thus, as argued by Evans, the jury in the case *sub judice* was required to find the kidnapping unbroken until Beatrice was murdered in Louisiana.

¶222. Moreover, the record reflects ample evidence from which the jury could conclude that Evans was engaged in a kidnapping which originated in Harrison County and continued into the State of Louisiana. Evans stated that he led Beatrice and her mother to believe that he was only going to the store to purchase items for a barbecue. This was confirmed by Sherry Lynn Vincent (Wilson) and Betty Vincent. Evans also stated that when Beatrice became concerned about the fact that he failed to stop at a grocery store he deceived her into believing that they were simply traveling around Gulfport. Moreover, Evans stated that his intentions were to "rape and kill" when he left with Beatrice.

¶223. Like *Pruett*, Evans maintained complete control over his victim until he reached Louisiana. Evans' statement establishes that he initially gained control over Beatrice by trickery and deceit and thereafter maintained control by trickery and deceit. Although Evans stopped momentarily in Hancock County to purchase ice cream and duct tape, Beatrice remained under his control. There is simply no indication that Evans ever abandoned the kidnapping. *See also* **Thorson v. State**, 653 So. 2d 876, 895 (Miss.1994); **Erwin v. State**, 557 So. 2d 799, 800 (Miss.1990). Moreover, Miss. Code Ann. § 99-11-17 clearly states:

Where an offense is commenced in this state and consummated out of it, either directly or by the accused or by any means or agency procured by or proceeding from him, he may be indicted and tried in the county in which such offense commenced or from which such means or agency proceeded.

¶224. Evans also argues that Instruction S-9 was error. Instruction S-9 reads as follows:

The Court instructs the Jury that in considering Counts II and III of the Indictment, it does not matter what county or state the sexual battery (ies) occurred in as long as you find beyond a reasonable doubt that the kidnapping commenced in the First Judicial District of Harrison County, Mississippi.

¶225. Evans argues that Harrison County lacked both venue and jurisdiction over sexual battery charges. Evans argues that in *Pruett*, this Court relied on the fact that Pruett was charged with capital murder during the commission of kidnapping. There, this Court held that the "killing of Mrs. Lowe in Alabama could not have been capital murder unless she first had been kidnapped. The acts are inseparable under that crime." *Pruett*, 431 So. 2d at 1105. Here, however, Evans argues that there is no authority which holds that a "when a defendant commits an offense against a victim in a county, the defendant may be tried in that county for all offenses he has committed against the victim."

¶226. In *Erwin v. State*, 557 So. 2d 799, 800 (Miss.1990), the appellant challenged venue and jurisdiction of the trial court. This Court held that venue and jurisdiction were proper where the "evidence clearly show[ed] that the kidnapping and violence leading to the rape clearly commenced at the Majik Mart, clearly established to be in Jackson County." *Id.*

¶227. Here, as in *Erwin*, the evidence at trial clearly established that the kidnapping which eventually led to the sexual assault of Beatrice commenced in Harrison County. Moreover, Evans, in his own words, stated that his intentions were to "rape and kill" from the time he left Jones Park, which was established to be in Harrison County. *See* Miss. Code Ann. § 99-11-17.

¶228. As with Instruction S-1C, Evans argues that Instruction S-9 failed to instruct the jury that it must find that the kidnapping continued unbroken until the time of the sexual batteries. Here, as reflected in *Erwin*, the jury was instructed that it had to find beyond a reasonable doubt that the kidnapping "commenced in Harrison County." Therefore, this instruction was proper. Moreover, there is no affirmative requirement in *Pruett* that a jury be instructed that they must find the kidnapping continued unbroken.

¶229. Evans also argues that language in Instruction S-9 constituted a directed verdict on the kidnapping offense. Specifically, Evans argues that rather than "the kidnapping" the instruction should have stated "a kidnapping." "When considering a challenge against a jury instruction, the instructions should be read and considered as a whole." *Williams v. State*, 684 So. 2d 1179, 1202 (Miss.1996)(*citing Roundtree v. State*, 568 So. 2d 1173, 1177 (Miss.1990)). The language in S-9 did not constitute a directed verdict. First, the jury was instructed by Instruction C-1A that they were not to single out one instruction alone as stating the law but must consider the instructions as a whole. Moreover, the jury was repeatedly instructed that they were required to find each and every element of the kidnapping offense beyond a reasonable doubt. This issue without merit.

**XIII. WHETHER THE TRIAL COURT ERRED IN SUSTAINING THE OBJECTION TO THE QUESTIONING OF WITNESS SHERRY LYNN WILSON CONCERNING THE ARREST OF TAMMY GILES, THE VICTIM'S MOTHER, AND IN PLACING CONDITIONS UPON THE ABILITY OF THE DEFENSE TO CALL TAMMY GILES AS AN ADVERSE WITNESS.**

¶230. Evans argues that the trial court erred in sustaining the State's objection to the cross-examination of defense witness Sherry Lynn Wilson, therefore prohibiting Evans from questioning Wilson about the arrest of Tammy Giles, Beatrice's mother. The record reveals that defense counsel conceded that Evans intended to call Tammy Giles as an adverse witness. As a result, the trial court ruled that questioning regarding the arrest of Tammy Giles as an accessory before the fact to sexual battery should be developed through Giles and not Wilson.

¶231. Evans now argues there was no legal basis for the ruling by the trial judge and that the fact that the defense intended to call Giles as an adverse witness should not have precluded questioning Wilson about Giles' arrest. Despite his argument regarding the thwarted cross-examination of Wilson, Evans cites no authority to support his contentions. "An assignment of error, unsupported by any authority, 'lacks persuasion' on review." *Williams v. State*, 684 So. 2d 1179, 1202 (Miss.1996) (*quoting Johnson v. State*, 626 So. 2d 631, 634 (Miss.1993)); *Smith v. State*, 430 So. 2d 406, 407 (Miss.1983); *cert. denied*, 498 U.S. 1033 (1991)).

¶232. The record reveals the trial court denied Evans' attempted cross-examination of Wilson on the grounds of relevancy. "A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses his discretion so as to be prejudicial to the accused, the Court will not reverse this ruling." *Fisher v. State*, 690 So.2d 268, 274 (Miss.1996)(*quoting Shearer v. State*, 423 So. 2d 824, 826 (Miss.1982)).

¶233. Relevant evidence is defined by M.R.E. 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the . . . needless presentation of cumulative evidence." M.R.E. 403.

¶234. Defense counsel argued that he wished to question Wilson about Giles' arrest, however, during the bench conference counsel admitted that he intended to call Giles as an adverse witness. The trial court then ruled that the information sought by counsel should be inquired about by questioning Giles, rather than Wilson. Having voiced their intentions to call Giles as an adverse witness, this line of questioning of Wilson was clearly cumulative and was properly excluded by the trial court. There was no abuse of discretion.

¶235. Evans also argues that the trial court placed "legally-insupportable conditions on the defendant's ability to call Giles at the guilt-innocence phase of the trial." Evans wished to call Giles to testify as to her statements made to law enforcement during August 1991 wherein Giles indicated that she allowed her daughter to go with Evans and perform sexual favors in order to obtain money for the family. Specifically, Evans argues that the trial court ruled that the defense could call Giles "only if she conceded the facts in her police statements, and not if the defense merely intended to

cross examine her with those statements, which he termed hearsay."

¶236. After completing its case-in-chief, the State made a motion in limine seeking to prohibit the defense from calling witnesses Brad Necaise and Tammy Giles on the ground that the testimony of these witnesses was irrelevant. After entertaining argument on the motion, the trial court overruled the State's motion as to Necaise, but partially granted the motion with regard to Giles. During the argument on the motion, defense counsel addressed the relevancy of Giles' testimony as follows:

It all goes to the question of inveiglement. The mother allowed the child to go, she knew what she was going for, and the point is what we're getting at is we're attacking the underlying felony in this matter of kidnapping. That there was a consensual letting the child go regardless of the homicide aspect of this. There is the underlying felony of kidnapping which we have a right to introduce evidence concerning the issue of whether or not there was in fact inveiglement of the victim in this matter.

¶237. In response to argument by the State that parental consent was irrelevant to the kidnapping of a child over the age of ten years of age pursuant to Miss. Code Ann. § 97-3-53, defense counsel additionally argued that:

The statement by Tammy Giles says that Beatrice Routh on her own came up with the idea of going with Mr. Evans for the purpose of obtaining money, that she disagreed with her but she allowed her to go. That this was something that -- that according to the mother, was dreamed up in the mind of the victim. And it goes to show the victim's state of mind in this thing and her intentions and the intentions of her mother. They discussed the matter.

After hearing argument by counsel, the trial court indicated that their were hearsay problems with Giles' testimony. Specifically, the trial judge voiced his concerns over whether Giles would admit or deny the content of her prior statements. The court stated:

If she says that that's fine, but if she doesn't say that on the stand I'm looking at an issue as the ground rules have been laid by Mr. Smith that he anticipates, or Mr. Martin, one or the other, he anticipates attacking her with this 12, 14-day old statement in the event she doesn't say that. So I agree with you on the first part. If she comes up here and swears that's what was in the girl's mind at that time that's fine, but I don't know as to whether or not you can attack her.

When asked by the trial judge exactly what Giles was expected to testify to, defense counsel indicated that Giles had refused to speak to them. The trial judge then directed the district attorney to instruct Giles to speak with defense counsel. Defense counsel spoke with Giles, and announced they would not call her during the guilt-innocence phase, but would do so during the sentencing phase.

¶238. No proffer as to the content of Giles' testimony was made nor was a definite ruling secured from the trial judge on this issue. From the record, the trial court did not deny Evans the right to call Giles as an adverse witness, but rather simply made cautionary observations about the hearsay problems with testimony defense counsel sought to elicit from Giles. After speaking with Giles, defense counsel announced that they would not call Giles.

¶239. In *Gayten v. State*, 595 So. 2d 409, 413 (Miss.1992), this Court held that the failure to seek a

definitive ruling on objections or to seek corrective action by the defendant waives the issue for the purposes of appeal. *See also Cole v. State*, 525 So. 2d 365, 369 (Miss.1987), *cert. denied*, 488 U.S. 934 (1988), *reh'g denied*, 488 U.S. 1023 (1989); *Cummings v. State*, 465 So. 2d 993, 996 (Miss.1985). Moreover, this Court has repeatedly held that "when testimony is excluded at trial, a record must be made of the proffered testimony in order to preserve the point for appeal." *Gates v. State*, 484 So. 2d 1002, 1008 (Miss.1986). In *Settles v. State*, 584 So. 2d 1260, 1265 (Miss.1991), this Court stated "if a proffer is required in the face of an erroneous ruling, surely no less is required to preserve the issue where no ruling is made." Evans ' failure to seek a definite ruling by the trial court combined with the lack of a proffer of Giles' testimony waives this issue. This issue is without merit.

## XIV. WHETHER THE TRIAL COURT FAILED TO PROHIBIT PROSECUTORIAL MISCONDUCT.

¶240. Evans next argues that several comments by the prosecuting attorney constituted misconduct. Evans challenges these comments on four bases: (1) improper personal opinion; (2) improper bolstering of expert testimony; (3) improper argument asking the jury to "send a message"; and (4) improper reference to victim characteristics.

¶241. Evans first argues that the prosecutor improperly injected personal opinion into closing argument by using the the pronoun "I". In *Nixon v. State*, 533 So. 2d 1078, 1100 (Miss.1987), this Court held:

> Prosecutors should refrain from interjecting personal beliefs into the presentation of their cases. *U.S. v. Young*, 470 U.S. 1, 8, 105 S.Ct. 1038, 1043, 84 L.Ed.2d 1, 8 (1985). A prosecutor may strike hard blows, but he is not at liberty to strike foul ones. *Berger v. U.S.*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935).

A review of the record below reveals that defense objected to only one of the comments now presented for review on appeal. In *Johnson v. State*, 477 So. 2d 196, 209-10 (Miss.1985), *cert. denied*, 476 U.S. 1109 (1986), *reh'g denied*, 476 U.S. 1189 (1986), this Court held:

> We next observe it is the duty of a trial counsel, if he deems opposing counsel overstepping the wide range of authorized argument, to promptly make objections and insist upon a ruling by the trial court. The trial judge first determines if the objection should be sustained or overruled. If the argument is improper, and the objection is sustained, it is the further duty of trial counsel to move for a mistrial. The circuit judge is in the best position to weigh the consequences of the objectionable argument, and unless serious and irreparable damage has been done, admonish the jury then and there to disregard the improper comment.

¶242. The contemporaneous objection rule remains applicable in death penalty cases. *Williams*, 684 So. 2d at 1203. Alternatively, without waiving the procedural bar, this Court may address the merits of an assignment of error. The language claimed by Evans to be improper is italicized.

¶243. (i) During closing argument at the guilt-innocence phase of the trial, the prosecutor made the following statements:

(a) Now I don't know what the defense was doing in this case when they called, what was his name, Brad Necaise. Brad Necaise had nothing to say *as far as I'm concerned.* All he did was confirm what every else has already said, that on that occasion Donald Leroy Evans was in fact in Jones Park, and that the victim in this case was in fact in the jeep and talked to somebody.

In *Davis v. State*, 684 So. 2d 643, 655 (Miss.1996), this Court held:

[The prosecutor] may comment upon any facts introduced into evidence. He may draw whatever deductions seem to him proper from these facts, so long as he does not use violent and abusive language, and even in many cases incentives may be justified and even called for, as pointed out by Chief Justice Whitfield in *Gray v. State*, 90 Miss. 235, 43 So. 289 [1907].

(citations omitted). Here, the prosecutor was simply commenting on facts introduced into evidence and reasonable deductions from that evidence. There was no impermissible argument.

(b) Now, they continue to admit on one and two so I'm not going to spend a lot of time on those either. I really feel like you could go right now but I have a duty, folks, and so let me feel like I do my part, I think Mr. Martin has taken care of our job and *I didn't hear anything from the other side that appealed to me.* But remember when we went through all that questions on voir dire and we took a little bit longer than some of you wanted us to because we were going down through and trying to talk to everybody. *So let me just make sure that my obvious is your obvious before we get into this*.

In *Blue v. State*, 674 So. 2d 1184, 1208 (Miss.1996), *cert. denied*, 117 S.Ct. 588 (1996), this Court held that "it is error to argue statements of fact which are not in evidence or not necessarily inferable to it, and which are prejudicial to the defense." *Chase v. State*, 645 So. 2d 829, 855 (Miss.1994), *cert. denied*, 115 S.Ct. 2279 (1995), *reh'g denied*, 116 S.Ct. 20 (1995); *Nixon v. State*, 533 So. 2d 1078, 1100 (Miss.1987), *cert. denied*, 490 U.S. 1102 (1989), *reh'g denied*, 492 U.S. 932 (1989). This comment did not refer to facts in evidence or inferences from the evidence, but rather was clearly one expressing personal opinion regarding the strength of Evans' defense. However, when the entire line of closing argument is read in context, it is clear that the prosecutor was making introductory remarks prior to reviewing the testimony of the witnesses at trial and arguing inferences and conclusions from that testimony. The prosecutor made it clear that the conclusions he was making could be drawn from the evidence.

(c) Now whatever piece of skin that Dr. Riddick found an anus in may be of some interests at a pathologists convention, but to this jury it doesn't raise reasonable doubt, does it? *I don't think so*.

As in *Blue*, it would have been more appropriate for the prosecutor to draw inferences without stating his personal opinion. However, as this Court stated in *Blue*, "the very purpose of an advocate is to help the jury draw conclusions from the evidence and to make suggestions as to a proper conclusion." *Blue*, 674 So. 2d at 1208 (*quoting Peyton v. State*, 286 So. 2d 817, 819 (Miss.1973)).

(d) Now that's what we had in there. We're at a very important part of this case. We all seem that we're focusing on count three right now, but we still heard from some of these witnesses that only talked about count one and two, and what was that? The two women. There the

defense is reaching for reasonable doubt. They want to pull something out of this for their client. *They have a hard job*, and you know I told you that these fellows and the State are not enemies, the defense counsel, but we have met our burden on all three counts, and the skill of those lawyers to try to raise reasonable doubt when none exist[s] cannot appeal to you. You can't reward the lawyers for excellent work that they have done *in a hard, hard case by giving them a bone*. We have earned a verdict on all three counts, and that's what we ask you to return at this time so that we can get on *with the important part of this case*.

Although in the nature of personal opinion, this line of argument did not express a belief in the guilt or innocence of Evans, but rather merely indicated to the jury that this was a difficult case. Surely, there was no dispute about the level of difficulty surrounding the prosecution or defense. Moreover, the prosecutor correctly stated that the jurors could not by their verdict reward defense attorneys for a job well done, but rather were required to rely on the evidence. The prosecutor simply argued to the jury that it must consider the evidence and not be swayed by their like or dislike of the attorneys. There is no misstatement of law. This line of argument was not improper.

¶244. (ii) During closing argument at the sentencing phase the prosecutor made the following statements:

> (a) May it please the court, counsel opposite, ladies and gentlemen of the jury. I almost feel like I'm at a loss for words right now because *I feel that we have proven beyond a reasonable doubt so many aggravating circumstances, the weight of which is just so totally overwhelmed that even if you thought that everything that the defense submitted to you was mitigating circumstances they wouldn't even move the scale at all. That our aggravating circumstances weigh so much that no matter what they put on the other side of that scale it's going to stay there on the floor. That it's not going to move.*

This comment is quite similar to that challenged in *Nixon*, 533 So.2d 1078 (Miss.1987), where the prosecutor argued: "We believe that once we have adduced our evidence that you will see that the aggravating circumstances outweigh any mitigating circumstances that might be presented and that he ought to be given a penalty of a death sentence on account of his crime." There, this Court held that the "blows struck by the prosecutor were neither hard nor foul. Likewise, the language does not even approach the threshold of reversibility." *Nixon*, 533 So. 2d at 1100.

> (b) Then they tell you, *and this one I mean I'm - - I just can't believe it to tell you the truth, I just can't believe it*. They want you to consider the fact as a mitigating circumstance that Tammy Jean Giles received a sentence of two years.

Again the prosecutor was clearly commenting on facts introduced into evidence by Evans. Although language other than that expressing his belief may have been more appropriate, this line of argument does not constitute reversible error.

> (c) And you also have the jury instructions that will tell you that it is not an accounting procedure, just like I've explained it to you. *I think one aggravating circumstance outweighs anything that they have*. We've got five of them, five. Count them.

Again this comment is similar to that made in *Nixon* where this Court concluded that the comment

did not constitute reversible error.

¶245. (iii) During rebuttal closing argument at the sentencing phase, the prosecutor made the following statements:

(a) . . . No one is mad at them, but they also don't deserve because you like them to get their client off. Just like your feeling about us plus or minus, remember what we discussed in voir dire - -

BY MR. SMITH: If the Court please, we'll object to the characterization of "get their client off."

BY THE COURT: Rephrase it, Mr. Caranna.

Get their client, *in my view* an inappropriate sentence to be specific. Let him go back up there to know change in Marion.

In *Nixon*, 533 So. 2d at 1100, the prosecutor argued: "We believe . . . he ought to be given a penalty of a death sentence on account of his crime." Here, the prosecutor, as in *Nixon*, was arguing Evans ought to receive the appropriate sentence. As in *Nixon*, this language does not approach to threshold of reversibility.

(b) *I am against child abuse and I hope you are. I am against every bad thing that ever happened to Donald Leroy Evans and his siblings,* but the rest of them overcame those problems, and for a lot of his life so has he. And when does he mess up? When he voluntarily drinks himself or cocaines himself, however it is ingested, into his problems.

During the sentencing phase, Evans called several witnesses to testify as to the abuse that he endured as a child as mitigating circumstances. This Court has held that a prosecutor may comment on any facts introduced into evidence. *Davis*, 684 So. 2d at 656.

(c) There was proof that like everybody else, when a psychiatrist talks to you he is going to give you a diagnosis. Does it prevent him from acting logically? Does it prevent him from making rational choices? Does it prevent him - - no, and their doctor didn't even see that even he did see delusional [sic], and remember I wanted to know how many Donald Leroy Evans' there *were because I haven't seen these delusions. I've seen the grandiosity that Dr. Maggio imagine [sic] talked about. I've seen those other kind of things*, but that's the weighing process that you're going to have to make; and make your decision, final decision.

While the prosecutor admittedly indicated to the jury that he had not seen Evans' delusional behavior, this statement, when placed in proper context, reveals that the prosecutor was commenting on the evidence as testified to by Dr. Maggio. A prosecutor may comment upon any facts introduced into evidence. *Davis*, 684 So. 2d at 656. Moreover, the prosecutor immediately explained to the jury that it was their duty to weigh the evidence.

¶246. Evans next argues that the prosecutor bolstered the testimony of State expert witnesses and misstated the evidence. Evans first argues that the prosecutor bolstered the testimony of Dr. Paul McGarry. Evans argues that the following argument was improper:

Then we had Dr. McGarry testify. Now Dr. McGarry has first of all determined the cause of death to be strangulation and then he determined that she was vaginally penetrated. This all before Donald has admitted to any sex whatsoever. And they bring in two doctors, who, first of all, can't determine anything, don't see anything and can't confirm anything. The only they do know is that it's a homicide. Dr. McGarry had 15,000 autopsies, they had maybe 10, 000 together. Put both of them together and you might have one Dr. McGarry. *That's why we have Dr. McGarry and they had Dr. Zimmerman and Dr. Hayne*.

¶247. Although the record reveals a factual objection to the mistake in the doctor's name[(6)], there is no objection on the basis that the prosecutor was bolstering the credibility of Dr. McGarry. Therefore, this issue is waived for appellate purposes. Additionally, this Court has repeatedly held that an objection at trial on one or more specific grounds constitutes a waiver of all other grounds.

¶248. Without waiving the procedural bar, this Court may consider the alleged errors on the merits. *Chase v. State*, 645 So. 2d 829 (1994), *cert. denied*, 115 S.Ct. 2279, *reh'g denied*, 116 S.Ct. 201 (1995); *Foster v. State*, 639 So. 1263, 1270 (Miss.1994), *cert. denied*, 115 S.Ct. 1365 (1995), *reh'g denied*, 115 S.Ct. 1992 (1995).

¶249. In *Foster*, this Court held:

A prosecutor is forbidden from interjecting his personal beliefs regarding the veracity of witnesses during closing argument. *United States v. Young*, 470 U.S. 1, 5, 50, 105 S.C.. 1038, 1041, 1048-49, 84 L.Ed.2d 1, 6, 15 (1985); *Dunaway v. State*, 551 So. 2d 162, 164 (Miss.1989) (prosecutor who referred to defense expert as "a whore" committed error, but not reversible error); *Tubb v. State*, 217 Miss. 741, 743-45, 64 So. 2d 911, 912-13 (1953) (prosecutor who tells jury during closing argument he knew the State's witnesses were telling the truth commits error which m ay be reversible.). By the same token, it is incumbent on defense counsel to raise a proper objection when the offense language is uttered or waive appellate review of the issue. *Marks v. State*, 532 So. 2d 976, 984 (Miss.1988); *Johnson v. State*, 477 So. 2d 196, 209-10 (Miss.1985), *cert. denied*, 476 U.S. 1109, 106 S.C.. 1958, 90 L.Ed.2d 366 (1986). This rule provides the trial court with the opportunity to sustain an objection and admonish the jury to disregard moments after the erroneous language is uttered. *Monk v. State*, 532 So. 2d 592, 600-01 (Miss.1988); *Baker v. State*, 327 So. 2d 288, 292-93 (Miss.1976).

*Id.* at 1288.

¶250. Here, however, the prosecutor did not improperly interject personal beliefs as to the veracity of Dr. McGarry. Rather, the record demonstrates that the prosecutor was simply commenting on the credentials of the experts which were clearly in evidence at trial. There was no improper comment.

¶251. Evans also argues that the following comment by the prosecutor in rebuttal closing was improper bolstering.

Now Dr. McGarry didn't trot from Louisiana. He's not a hired-gun. I think you saw him. Did he look like the kind of guy that would make up his mind based on what Cono Caranna or William Martin or the State of Mississippi asked him to do? *He makes up his mind based on what he*

*sees in a body.*

¶252. When read in context, it is clear that the prosecutor was arguing that Dr. McGarry was not a hired gun as argued by defense counsel. The prosecutor argued that Dr. McGarry examined the body at the scene and drew his conclusions from that examination. As in *Davis*, it was perfectly proper for the prosecution to rebut a defense counsel argument. *Davis*, 684 So. 2d at 655. There was no improper comment.

¶253. Evans next argues that the following comment by the prosecutor was improper personal opinion and bolstering:

> And equally, even though *I think* Dr. Maggio got the best of that argument, remember he said if you're bad schizophrenic - - a lot of people are schizophrenic.

¶254. A review of this statement in the context of the entire line of argument reveals that the prosecutor was rebutting evidence that Evans suffered from schizophrenia. The prosecutor first reviewed the testimony of Dr. Zimmerman, the defense expert. After which he began to compare the testimony of Zimmerman and Dr. Maggio, the State's expert. Throughout this argument the prosecutor repeatedly stated to the jury that they were required to make the final decision. Specifically, the prosecutor stated, "Y'all heard the evidence, y'all are the final deciders of that fact. I'll leave that with you."

¶255. Evans next argues that the prosecutor "sought to bolster his case" when making the following statement:

> We allege that this all occurred on August 1, 1991. In order to prove this case the State is going to call numerous witnesses. *Now we may not call every witness there is*, and the witnesses may be called out of turn, that is the purpose of opening statement, to let you know how we want our evidence to come, but it doesn't always flow that way. With schedules and things being disoriented sometimes we have to call witnesses out of turn.

¶256. The prosecutor was simply explaining the trial process to the jury. Following this statement, the prosecutor told the jury what the State expected to prove through each witness. This, of course, is the very purpose of an opening statement. When read in context, there was no improper bolstering.

¶257. Evans also argues that the prosecutor misstated the evidence when making the following statements:

> They cross-examined our witnesses about did anybody have any conversations about sex but they haven't tied that up and I objected at that time and the court said, "Well, if they don't tie it up you can come back later and object and we'll strike it from the record." And I didn't even go into that. It wasn't necessary because they didn't tie it up. The only words of sex that you heard in this trial have come out of the mouth of these two defense attorneys.

¶258. Specifically, Evans argues that in his confession, he stated that Tammy Giles had offered Beatrice to him for sexual purposes. A review of the confession does in fact reveal that Evans made those statements. However, at trial, Evans did not object on the grounds that the prosecution was misstating the evidence. Moreover, when the prosecutor resumed argument after Evans' objection, he

repeated, "This is the only time you heard about it is out of the mouth of the attorneys." Again, there was no objection by Evans on the grounds that this line of argument misstated the evidence.

¶259. Arguing facts not in evidence is impermissible closing argument. *Cabello v. State*, 471 So. 2d 332, 346 (Miss.1985), *cert. denied*, 476 U.S. 1164 (1986). However, here, when closing argument is viewed in its entirety, the brief reference coupled with the lack of an objection by Evans does not appear to rise to the level of statements condemned by this Court.

¶260. Evans next argues that several comments by the prosecution were the equivalent of asking the jury to send a message. Specifically, Evans argues that the following comments were improper:

> Remember how you thought we were crazy that day up in Natchez when we said, "Look, we're going to bring you down to Gulfport, Mississippi." And you said, "You don't understand we're from Adams County. What is the idea?" And slowly we explained that concept to you. Well *our two communities have come together on this because we are a community of interest. But look at all the other communities who were involved in this. Maybe we are straightening out some things for some other folks*.
>
> * * *
>
> BY MR. CARANNA: *You are a part of the criminal justice system, the final step, and it is by your vote that this decision will be made*.

¶261. Evans argues that these comments were the equivalent of asking the jury to send a message. Evans objected to the first statement and was sustained by the trial court. Therefore, any error which occurred was cured. *Foster v. State*, 639 So. 2d 1263 , 1282 (Miss.1994), *cert. denied*, 115 S.Ct. 1365 (1995), *reh'g denied*, 115 S.Ct. 1992 (1995). However, after the prosecutor continued and remarked that the jury was the "final step", Evans did not raise further objection. As to the latter statement, Evans argument is barred.

¶262. Without waiving the procedural bar, this Court may address the assignment of error on the merits. *Chase v. State*, 645 So. 2d 829 (1994), *cert. denied*, 115 S.Ct. 2279, *reh'g denied*, 116 S.Ct. 201 (1995); *Foster v. State*, 639 So. 1263, 1270 (Miss.1994), *cert. denied*, 115 S.Ct. 1365 (1995), *reh'g denied*, 115 S.Ct. 1992 (1995).

¶263. This Court has repeatedly cautioned prosecutors against using the "send a message" argument. *Hunter v. State*, 684 So. 2d 625, 637 (Miss.1996); *Chase v. State*, 645 So. 2d 829, 854 (Miss.1994), *cert. denied*, 115 S.Ct. 2279 (1995), *reh'g denied*, 116 S.Ct. 20 (1995); *Williams v. State*, 522 So. 2d 201, 209 (Miss.1988); *Carleton v. State*, 425 So. 2d 1036, 1039 (Miss.1983).

¶264. Here, however, the prosecution did not ask the jurors to send a message, rather the present commentary is similar to that discussed in *Williams v. State,* 522 So. 2d 201, 209 (Miss.1988).

> In *Carleton v. State,* 425 So. 2d 1036 (Miss.1983), a similar argument had been made by the prosecutor, "You know, we have got to let people know what the people of Harrison County stand for." *Carleton*, 425 So. 2d at 1039. There we cautioned that each case must stand on its own facts, but we found nothing improper about the statement and held that the trial court properly overruled the appellant's objection to the statement. *Carleton*, 425 So. 2d at 1039. In

*Ramseur v. State*, 368 So.2d 842 (Miss.1979), we held that the trial judge properly sustained an objection to an argument that the jurors were representatives of "the people of the State of Mississippi and this community." *Ramseur*, 368 So. 2d at 844. In *Ramseur*, we stated that if the remarks were improper, no prejudice resulted since an objection to the argument was sustained. *Ramseur*, 368 So. 2d at 845.

In *Fulgham v. State*, 386 So. 2d 1099 (Miss.1980), we considered a longer argument in which the jury was depicted as a final link in the chain of law enforcement. *Fulgham*, 386 So. 2d at 1101. Fulgham was reversed on other grounds and we stated, "We do not think that this assignment of error standing alone would require reversal." *Fulgham*, 386 So. 2d at 1101.

¶265. In *Williams*, this Court, noting the lack of an appropriate record for appellate review, refused to reverse the appellant's conviction due to the following remark by the prosecutor: "By your vote, you can make the statement clearly, steadfastly, and unequivocally that law or order exists for everyone in Harrison County." However, this Court clearly indicated that the remark was improper. *Williams*, 522 So. 2d at 209.

¶266. In light of the foregoing, the remarks by the prosecutor were extremely close to those considered by this Court to be improper. However, as in *Williams* and *Fulgham*, these comments alone do not appear to require reversal.

¶267. Evans' final challenge involves the alleged improper reference to the characteristics of the victim. During the sentencing phase the prosecutor made the following remarks:

Now we're told that Donald never had a chance. I didn't see that Beatrice Louise Routh ever had a chance.

¶268. Again, the record reveals no objection. This assignment of error is barred. Notwithstanding the procedural bar, this Court has held that it is proper for the prosecution to rebut a defense argument that certain evidence should be considered as mitigating. *Davis*, 684 So. 2d at 655. Here, the prosecutor was clearly rebutting the defense suggestion that due to his childhood circumstances, Evans never had a chance.

¶269. However, Evans argues that this argument was improper victim impact evidence. This Court addressed a similar argument in *Davis v. State*, 684 So. 2d 643, 655 (Miss.1996). In *Davis*, the prosecution, during closing argument in the sentencing phase, attempted to recreate the victim's last moments by arguing:

I wonder what the victim was thinking. Then she makes it out. There's blood, two spots in the corner sitting down on the floor, on the right side. She is on the corner sitting down on the floor, her right side, right where this blood is on the floor. I wonder what she thought while she was there. Did she beg for mercy? Did she beg for mercy, as we have heard from Mr. Shaddock [defense counsel]. Did she beg this man for mercy at that point? Please, Jeffrey, don't.

¶270. In *Davis*, this Court reviewed *Hansen v. State*, 592 So. 2d 114, 146 (Miss.1991), *cert. denied*, 504 U.S. 921 (1992), *reh'g denied*, 505 U.S. 1231 (1992), wherein we adopted *Payne v. Tennessee*, 501 U.S. 808 (1990), and stated:

A state may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed.

*Conner*, 632 So. 2d at 1276, *cert. denied*, 115 S.Ct. 314 (1994) (*quoting **Hansen***, 592 So.

2d at 146)). In ***Conner***, this Court concluded that the "statements of the prosecutor were properly drawn inferences from the evidence of how and when Hillman was shot and stabbed." *Id.* As in ***Conner,*** the statements by the prosecutor in the case *sub judice* were properly drawn inferences from the evidence. Evans described in his confession that Beatrice was confined in the jeep, bound with duct tape, and crying for her mother. From that evidence, one may clearly infer and argue that Beatrice never had a chance.

¶271. In ***Monk v. State,*** 532 So. 2d 592, 601 (Miss.1988), this Court stated:

The right to argument contemplates liberal freedom of speech and range of discussion confined only to bounds of logic and reason; and if counsel's argument is within limits of proper debate, it is immaterial whether it is sound or unsound or whether he employs wit, invective, and illustration therein. Moreover, figurative speech is legitimate if there is evidence on which it may be founded. Exaggerated statements and hasty observations are often made in the heat of the day, which, although not legitimate, are generally disregarded by the court, because in its opinion, they are harmless. There are, however, certain well established limits beyond which counsel is forbidden to go. He must confine himself to the facts introduced in evidence and to the fair and reasonable deduction and conclusions to be drawn therefrom and to the application of the law, as given by the court, to the facts.

¶272. Absent impermissible factors such as commenting on the failure of the defendant to testify, a prosecuting attorney is entitled to great latitude in closing argument. *Dunaway v. State*, 551 So. 2d 162, 163 (Miss.1989). Having addressed each comment alleged by Evans to be improper, this issue is without merit.

### XV. WHETHER THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION TO RECUSE.

¶273. Evans argues that the trial judge erred when he refused to recuse himself after Evans was granted in forma pauperis status (hereinafter "IFP") in pending federal litigation against various individuals in Harrison County, one of whom was Judge Vlahos. ***Donald Leroy Evans, Dempsey A. Bruner and Manuel Victor Brown, et. al v. Harrison County, Mississippi, Hon. Kosta Vlahos, Joe Price, Rick Gaston, Bobby Eleuterius, Robin Alfred-Midcalf, David LaRosa, Larry Benefield, and C.T. Switzer, Jr.*** , Civil Action No. 1:93-CV-43(Br)(R), was attached as Exhibit A to the Motion to Recuse filed by Evans on February 24, 1993. In the lawsuit, Evans alleges that numerous officials, acting in their official capacities, violated Evans' constitutional rights. Specific allegations regarding Judge Vlahos are as follows:

9. Defendant Honorable Kosta N. Vlahos is sued in his official capacity as Senior Circuit Judge of Harrison County. Judge Vlahos is presiding over the capital murder trial of Plaintiff Donald

Leroy Evans.

\* \* \*

36. Defendant Vlahos intentionally and knowingly is violating Plaintiff Evans' right of access to the courts by denying him access to attorneys who do not represent Plaintiff Evans in his criminal matter. Defendant Vlahos has issued an "order" in the form of a request to Defendant Price[7] that all counsel except those appointed to handle Plaintiff Evans' capital trial must seek prior approval from his appointed counsel, Judge Vlahos or Sheriff Price before they may meet with Plaintiff Evans. Plaintiff Evans has contacted counsel to handle legal matters other than his criminal matter and sought to have attorney-client visits with these attorneys, only to have them turned away. The requirement, per Judge Vlahos, that such attorneys seek prior approval from Plaintiff Evans appointed counsel, Defendant Price or Defendant Vlahos unreasonably invades the relationship of Plaintiff to the courts.

¶274. Evans was granted IFP status by the federal district court and now argues that this action by the federal court compels the conclusion that the allegations in the lawsuit were not frivolous and that the plaintiffs could proceed. Judge Vlahos, however, indicated that until the federal court made an adverse determination he would continue with the criminal trial.

¶275. Evans cites *James v. Alfred*, 835 F.2d 605, 606 (5th Cir. 1988), *cert. denied*, 485 U.S. 1036 (1988), wherein the Court held:

The claim of one seeking in forma pauperis status must cross the threshold of litigation worthiness. *Cay v. Estelle*, 789 F.2d 318 (5th Cir.1986). In determining whether a case should be allowed to proceed IFP or be dismissed as frivolous under 28 U.S.C. § 1915(d), we have formulated a three-pronged test: (1) does the complaint have a realistic chance for success; (2) does it present an arguably sound basis in fact and law; (3) can the complainant prove any set of facts that would warrant relief.

¶276. This Court is therefore presented with the issue of whether the filing of a civil rights lawsuit against the trial judge by a criminal defendant requires recusal. In *Collins v. Joshi*, 611 So. 2d 898 (Miss.1992), this Court discussed the standards governing judicial recusal:

The standard by which the Court determines if a judge should have disqualified himself or herself, is an objective standard under Canon 3. "A judge is required to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality." *Rutland v. Pridgen*, 493 So.2d 952, 954 (Miss.1986); *Jenkins*, 570 So. 2d at 1192; *Collins*, 543 So. 2d at 166. The presumption is "that a judge, sworn to administer impartial justice, is qualified and unbiased. To overcome the presumption, the evidence must produce a 'reasonable doubt' (about the validity of the presumption) [.]" *Turner v. State*, 573 So. 2d 657, 678 (Miss.1990). When a judge is not disqualified under the constitutional or statutory provisions, "the propriety of his or her sitting is a question to be decided by the judge and is subject to review only in case of manifest abuse of discretion." *Buchanan v. Buchanan*, 587 So. 2d 892 (Miss.1991); *Turner*, 573 So.2d at 677; *Ruffin v. State*, 481 So. 2d 312 at 317 (1985); (*quoting McLendon v. State*, 187 Miss. 247, 191 So. 821, 823 (1939)). Under the appropriate standard, the judge is presumed qualified and unbiased. This presumption may only be

overcome by evidence showing beyond a reasonable doubt that the judge was biased or not qualified. If a reasonable person, knowing all the circumstances, would doubt the judge's impartiality, the judge is required to recuse him or herself from the case.

*Collins*, 611 So.2d at 901.

¶277. Evans relies on *Johnson v. Mississippi*, 403 U.S. 212 (1971), in support of his argument that Judge Vlahos should have recused himself. Johnson, an active civil rights worker, was served with process requiring his presence in court on contempt charges. Johnson later filed a motion to recuse alleging that the trial judge revealed "deep prejudice against civil rights workers and civil rights lawyers." No hearing was conducted on the motion to recuse and Johnson eventually filed a petition to remove his case to federal court. The federal court remanded the case back to Judge Perry and the Circuit Court of Grenada County.

¶278. Johnson later filed a lawsuit in federal court to enjoin trials in the Circuit Court of Grenada County until discriminatory practices were eliminated. Judge Perry, who had been named as a defendant, was temporarily enjoined from engaging in discriminatory practices. Two days after the federal injunction, Judge Perry adjudged Johnson in contempt and sentenced him to four months in jail. Johnson's request for a hearing on the merits and an opportunity to show why Judge Perry should recuse himself was denied.

¶279. The Supreme Court held that Judge Perry should have recused himself. Specifically, the Court held:

> Beyond all that was the fact that Judge Perry immediately prior to the adjudication of contempt was a defendant in one of petitioner's civil rights suits and a losing party at that. From that it is plain that he was so enmeshed in matters involving petitioner as to make it most appropriate for another judge to sit. Trial before an 'unbiased judge' is essential to due process. *Bloom v. Illinois*, 391 U.S. 194, 205, 88 S.Ct. 1477, 1484, 20 L.Ed.2d 522; *Mayberry v. Pennsylvania*, 400 U.S. 455, 465, 91 S.Ct. 499, 505, 27 L.Ed.2d 532.

*Johnson*, 403 U.S. 212, 215-16.

¶280. Judge Vlahos, like Judge Perry in *Johnson*, was named as a defendant in a federal civil rights lawsuit. However, in the instant case, there was no successful resolution of the federal litigation against Judge Vlahos. Moreover, the initial "IFP" determination by the federal court served only to ascertain whether the suit by Evans and others had "arguable merit" and could not be dismissed unless the federal district court could conclude that the "plaintiff can prove no set of facts in support of his claim." *See Green v. McKaskle*, 788 F.2d 1116, 1120 (5th Cir. 1986). In *Green*, the court further stated:

> It is, of course, not always easy to determine whether a claim is frivolous simply by examining the pleadings. Prisoner complaints are notoriously difficult to decipher, and pro se pleadings must be construed liberally. Unless the frivolousness of a claim is facially apparent, it is "incumbent upon the court to develop the case and to sift the claims and known facts thoroughly until completely satisfied either of its merit or lack of same."

*Id.* at 1119. (citations omitted).

¶281. Most importantly, there is no indication in the record that Judge Vlahos demonstrated any prejudice against Evans that would rebut the presumption of impartiality. However, in **Johnson**, Judge Perry "revealed deep prejudice against civil rights workers and civil rights lawyers." 403 U.S. 212 at 215.

¶282. We therefore hold that the mere filing of a lawsuit, wherein a prisoner is allowed to proceed in forma pauperis, is insufficient to require recusal of a trial judge named as a defendant in that lawsuit where there is no evidence in the record which demonstrates that the trial judge is biased or unqualified. This issue is without merit.

### XVI. WHETHER THE GUILTY VERDICT ON COUNT THREE WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.

¶283. Evans next argues that the guilty verdict on Count III of the indictment was against the overwhelming weight of the evidence. Count III of the indictment charged that Evans committed sexual battery by penetrating the rectum of Beatrice Louise Routh.

> When reviewing a challenge to the weight of the evidence, this Court must determine whether the trial judge abused his discretion in denying a new trial. This Court, accepting as true all evidence favorable to the State, will determine whether "the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice."

**Taylor v. State,** 672 So.2d 1246, 1256 (Miss.1996), *cert. denied*, 117 S.Ct. 486 (1996),*reh'g denied*, 117 S.Ct. 755 (1997)(*quoting* **Wetz v. State**, 503 So. 2d 803, 812-13 (Miss.1987)).

¶284. Evans argues that the only evidence regarding anal penetration was the testimony of Dr. Paul McGarry. Dr. McGarry is a forensic pathologist licensed to practice medicine in Louisiana and Mississippi. On August 11, 1991, at approximately 4:50 a.m., Dr. McGarry was called to the scene to examine the remains of Beatrice. While at the scene, McGarry testified that he observed the following:

> And the tissue around the genital area and the region of the opening of the vagina and the opening of the vagina and the opening of the anus was torn and blood stained. Inside those areas there was extensive hemorrhage on the inner surface of the thighs and around the genital area into the deep tissues of the pelvis.

¶285. Following the examination of the body at the scene, the remains were transported to a funeral home in Picayune where Dr. McGarry continued his examination and was able to verify his observations. Dr. McGarry's testimony detailed the extensive bruising and tearing that he found when examining the genital and anal areas. For example:

> A. I described in my report, and I saw when I examined that, tears of the opening of the rectum that extended from the opening upward into the canal, front and back one-half and three-fourth inch so that the rectal opening connected with the vaginal opening, there was a tear in the front of the rectum that extended into the back of the vagina. And then on the front of the vagina

there was a tear going up into that canal. These were surrounded by dark bruising of the tissues that went up into the pelvis inside of that area.

Q. Would you describe the condition that you found those two tubes, the vagina and the rectum, going to their - -

A. There's a small septum or a small piece of - - a small separating wall between the vagina and the rectum that was torn from the front and front the back so that the two openings which should be separate and apart by a small intact area of skin were connected by tears. And the tears went forward beyond the front of the vagina and backward beyond the back of the anus so that these four areas of tearing converted the two small openings into one larger opening.

Dr. McGarry concluded that the genital and anal injuries were due to "forceful lacerating penetration of the area."

¶286. On cross-examination, Evans established that the body was in an advanced state of decomposition and heavily infested with insects during the examination by Dr. McGarry. Evans challenged Dr. McGarry's findings due to the condition of the body. However, Dr. McGarry testified that it is possible to distinguish the "difference between post-mortem activity of maggots and insects versus injuries that occurred in a person before she died." Dr. McGarry testified that although insects and maggots attack the body "they do not make lacerations of the tissue, they do not tear open orifices."

¶287. Evans called Dr. LeRoy Riddick and Dr. Steven Hayne to testify as to findings from their examinations of the remains of Beatrice. Dr. Riddick, the State Medical Examiner for the Alabama Department of Forensic Sciences in Mobile, conducted a second autopsy on on May 18, 1993, approximately twenty-two months after Dr. McGarry. This second autopsy was attended by Dr. Steven Hayne, State Medical Examiner for the State of Mississippi and Dr. Richard Smith, a resident pathologist at the University of Mississippi College of Medicine in Jackson, as well as Detective Whitney Carvin of the Gulfport Police Department.

¶288. Dr. Riddick testified that he examined both the body, which had been preserved in cold storage, and tissues and organs which had been preserved separately in formaldehyde. Dr. Riddick also testified that he viewed photographs taken of the body at the scene depicting its condition on August 11, 1991. While noting that a number of incisions and changes had been made to the body, Dr. Riddick testified that the body had not decomposed or deteriorated from the time the photographs were taken at the scene.

¶289. With regard to the injuries to the rectal region as charged by Count III of the indictment, Dr. Riddick testified that he was unable to locate any tears or injuries to the perineum nor did he observe contusions or bruising of this area. Dr. Riddick testified that he also examined the anal region and did not observe tears, contusions, or lacerations.

¶290. However, on cross-examination, Dr. Riddick agreed that the person in the best position to render a diagnosis is the first pathologist who conducts an autopsy and visits the scene. In addition, Dr. Riddick conceded that there were no marks on the remains which would indicate that animals or insects had caused the injuries to the perineum or the rectal region. Dr. Riddick also conceded that

the best way to make a determination of the condition of the genitalia would be while the tissue is connected to the body.

¶291. Dr. Steven Hayne also testified on behalf of Evans. Dr. Hayne testified that he did not observe the genital/anal tissue during the second autopsy, but was able to examine this tissue on the morning of September 15, 1993, prior to testifying. When questioned about the existence of injuries to the genital/anal region, Dr. Hayne testified that he could not exclude this type of injury, but did not see evidence of it. Dr. Hayne testified that he did not find any evidence of tearing in the anal tissue. Dr. Hayne testified that he could not conclude with reasonable medical certainty as to the presence or absence of a penetrating injury in the area of the perineum.

¶292. The jury had before it the testimony of three experts. The testimony of Dr. McGarry was unequivocal: Beatrice Louise Routh suffered a forceful penetrating injuries to her anal and vaginal areas. Dr. Riddick and Dr. Hayne both testified that they could not identify lacerations or tearing to the anal region. However, Dr. Hayne testified that he could neither include or exclude this type of injury, he simply could not identify tearing of tissue which had been preserved for approximately twenty-five months.

¶293. This Court has repeatedly emphasized our role when confronted with conflicting testimony. In *Bond v. State*, 249 Miss. 352, 162 So. 2d 510 (1964), this Court held:

> It is the function of the jury to pass upon the credibility of the evidence. *Scott v. State,* 185 Miss. 454, 188 So. 546 [1939]. Only two witnesses testified for the state as to what happened at the scene of the homicide, while many more testified for the defense. However, the strength or weakness of testimony is not measured by the number of witnesses. *Spiers v. State*, 231 Miss. 307, 94 So. 2d 803 [1957]. In a criminal prosecution, the jury may accept the testimony of some witnesses and reject that of others, and may accept in part and reject in part the testimony of any witnesses, or may believe part of the evidence on behalf of the state and part of that for the accused, and the credibility of such witnesses is not for the reviewing court, but only for the jury. *Ivey v. State*, 206 Miss. 734, 40 So. 2d 609 [1949]; *Cobb v. State*, 235 Miss. 57, 108 So. 2d 719 [1959]; *Matthews v. State*, 243 Miss. 568, 139 So. 2d 386 [1962].

*Bond*, 249 Miss. at 357, 162 So. 2d at 512. From the evidence presented at trial, reasonable jurors could have found beyond a reasonable doubt that Evans was guilty of sexual battery as alleged in Count III. This issue is without merit.

### XVII. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE PROSECUTION TO AMEND THE INDICTMENT.

¶294. Following the commencement of voir dire on September 7, 1993, the State made an ore tenus motion to amend the indictment to include the language "with design"[8] in order to reflect the exact language of the statute and to conform to the proof to be presented at trial. Evans objected on the basis that the amendment constituted a material change in the substance of the indictment which adversely affected his trial strategy. The trial court granted the State's motion.

¶295. In *Holmes v. State*, 660 So.2d 1225 (Miss.1995), this Court addressed the amendment of an indictment:

Mississippi statutory law allows amendments to indictments at trial. Miss. Code Ann. § 99-17-13 (1994). However, such amendments may not be "material to the merits of the case" and the defendant must not be prejudiced in "his defense on the merits." *Id.* The State may not seek amendments altering the material set of facts in the indictment or "materially alter(ing) a defense to the indictment. . . to prejudice the defendant's case."*Griffin v. State*, 584 So.2d 1274, 1276 (Miss.1991) (*Griffin II*). The test for determining whether an amendment will prejudice the defendant's case is "whether a defense as it originally stood would be equally available after the amendment is made." *Griffin v. State*, 540 So.2d 17, 21 (Miss.1989)(*Griffin I*).

*Id.* at 1226. "[A]mendments as to the substance of the charge must be made by the grand jury."*Eakes v. State*, 665 So.2d 852 (Miss.1995).

¶296. Evans now argues that the amendment prejudiced his defense to the charge of capital murder. Evans argues that his trial strategy was to admit to killing Beatrice, but argue that the killing was not intentional or that he suffered from diminished capacity at the time of the killing. Evans also argues that the injection of the "with design" element had serious ramifications with regard to sentencing.

¶297. The indictment clearly stated that Evans was indicted for the offense contained within Miss. Code Ann. § 97-3-19 (2)(e) which provides that the killing of a human being is capital murder:

"[w]hen done *with or without any design to effect death*, by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson, robbery, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or in any attempt to commit such felonies.

(emphasis added).

¶298. In *Quick v. State*, 569 So.2d 1197 (Miss.1990), the defendant was indicted by the grand jury for the offense of aggravated assault pursuant to Miss. Code Ann. 97-3-7 (2)(b). The original indictment charged that Quick "did willfully, unlawfully, feloniously, purposely and knowingly commit an aggravated assault upon one Gene Baker, a human being, with a deadly weapon. . . ." However, on the morning of trial the State moved to amend the indictment to include language from subsection (a) of Miss. Code Ann. § 97-3-7(2) which allowed the jury to convict if they found Quick "recklessly caus[ed] serious bodily injury under circumstances manifesting extreme indifference to the value of human life." *Id.* at 1199. In reversing the conviction, this Court concluded that the amendment "proposed a change of substance and not of form." *Id.* at 1200.

¶299. The case *sub judice* may be distinguished from *Quick* in that the amendment in the present case does not alter the substance of the offense. In fact, the same offense is charged prior to and after the amendment. Despite Evans' claims, § 97-3-19 (2)(e) defines capital murder as that which is done during the commission of one of the listed felonies, when done with or without any design to effect death. Regardless of Evans' intent, he faced a charge of capital murder. By virtue of the statute, Evans had clear notice of the charge he was facing. *Lacy v. State*, 629 So.2d 591, 594 (Miss.1993).

¶300. In *Rhymes v. State*, 638 So.2d 1270 (Miss.1994), the defendant was indicted for the crime of sexual battery of a female under the age of fourteen years under Miss. Code Ann. § 97-3-65(1) (1972). Following the impaneling of the jury, the indictment was amended to change "under"

fourteen years to "over" fourteen years pursuant to Miss. Code Ann. § 97-3-65(2) (1972). This Court held that the amendment permitted Rhymes to be charged with violation of Miss. Code Ann. 97-3-65(2), not subsection (1) as indicted by the grand jury. As a result, this Court concluded that Rhymes' defense that [the victim] was not under fourteen years of age but twenty-six years old at the time would have required the jury to return a verdict of acquittal. *Id.* at 1276.

¶301. Again, the case *sub judice* may be distinguished. Here, the offense for which Evans was indicted was not changed by the amendment due to the express language of the statute. The offense is the same regardless of the killer's intent. Thus, the injection of "with design" does not alter the indictment nor did this language render Evans' defense strategy a nullity as in **Rhymes**.

¶302. Moreover, it makes little sense for Evans to now argue that he was prejudiced by the amendment of the indictment when he states that his trial strategy was to admit the killing but claim it was unintentional. Clearly, this same defense strategy would remain after the amendment or as an argument for mitigation during the sentencing phase. Evans was not deprived of a defense by virtue of the amendment.

¶303. In **Contreras v. State**, 445 So. 2d 543 (Miss.1984), the indictment charged that the defendant used "force" in obtaining the victim to perform the unnatural act. However, the evidence showed that no physical force was used. As a result, the State moved to amend the indictment by deleting the word "forcing." There, we held the amendment to be "simply one of form and . . . properly allowed by the court." *Id.* at 545 (*citing* **Porter v. State**, 339 So. 2d 564 (Miss.1976); **Hannah v. State**, 336 So.2d 1317 (Miss.1976), *cert. denied*, 429 U.S. 1101 (1977); **Shelby v. State**, 246 So.2d 543 (Miss.1971)).

¶304. Evans, citing **Enmund v. Florida**, 458 U.S. 782 (1982), also claims that the amendment carried with it serious ramifications with regard to sentencing. The jury could have found two of the **Enmund**[9] factors whether or not the indictment was amended. Moreover, whether Evans acted intentionally or unintentionally, he remained subject to the same penalties.

¶305. Because Evans had clear notice of the charge he faced and the express language of Miss. Code Ann. § 97-3-19 (2)(e) encompasses intentional and unintentional homicides, there was no prejudice to Evans' defense at trial. Moreover, at the time the State moved to amend the indictment, Evans did not seek a continuance to review his defense strategy.

## XVIII. WHETHER MISS. CODE ANN. § 99-19-101 (5)(D) IS UNCONSTITUTIONAL.

¶306. Evans next argues that Miss. Code Ann. § 99-19-101 (5)(d) violates the Eighth and Fourteenth Amendments to the United States Constitution. Evans attacks the constitutionality of this statute on three separate bases.

¶307. Miss. Code Ann. § 99-19-101 (5)(d) reads as follows:

> The capital offense was committed while the defendant was engaged or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnapping, aircraft piracy, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse

with mankind, or felonious abuse and/or battery of a child in violation of subsection (2) of Section 97-5-39, Mississippi Code of 1972, or the unlawful use or detonation of a bomb or explosive device.

¶308. Evans' first basis of contention is that this statute is unconstitutional because it allows the imposition of the death penalty for "simple felony murder" but not for premeditated murder. Specifically, Evans argues there is no rational or historical basis for treating simple felony murderers as *more culpable* than premeditated murderers for purposes of capital punishment.

¶309. In *Gray v. State*, 351 So. 2d 1342 (Miss.1977), *appeal after remand*, 375 So. 2d 994 (Miss.1979), *cert. denied*, 446 U.S. 988 (1980), *reh'g denied*, 448 U.S. 988 (1980), and *Culberson v. State*, 379 So. 2d 499 (Miss.1979), *cert. denied*, 449 U.S. 986 (1980), *reh'g denied*, 449 U.S. 1103 (1981), this Court had occasion to address the constitutionality of Miss. Code Ann. 97-3-19 (2). Here, Evans challenges not the capital murder statute itself, but rather the sentencing procedure as set forth in § 99-19-101. However, *Gray* and *Culberson* are instructive because Evans challenges the aggravating circumstance which repeats the capital murder provision in § 97-3-21 (2)(e).

¶310. In *Gray* and *Culberson*, the appellants challenged the constitutionality of this statute on the basis that it allows the imposition of the death penalty upon one who harbors no specific intent to kill. In each case, this Court concluded that Mississippi's capital punishment scheme, wherein a defendant who commits murder while in the commission of one of the designated felonies is subject to the death penalty, is constitutionally sound. In *Culberson*, this Court held:

> The subjunctive nature of the intention to kill makes it no less deserving of capital punishment than if it had been expressed, in our opinion. The felon who causes death in furthering his crime manifests a callous disregard for human life, because he subordinates the life of the innocent to his desire for gain, thereby inviting the outrage of a society understandably bent upon protecting itself from physical violence.

*Culberson*, 379 So. 2d at 507.

¶311. Evans, however, relies on *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987), *reh'g denied*, 482 U.S. 137 (1987). In *Enmund* and *Tison*, the Supreme Court addressed the constitutionality of the death penalty for defendants who, although involved in the commission of a felony, did not actually kill. In *Enmund*, the Court reversed the death sentence of a defendant who was the driver of the "getaway" car in an armed robbery. The robbery victims were murdered by Enmund's accomplices after they resisted. Enmund was convicted under Florida's felony-murder rule and sentenced to death.

¶312. The United States Supreme Court reversed because the Florida Supreme Court affirmed the death penalty in the absence of proof that Enmund killed or attempted to kill, and regardless of whether Enmund intended or contemplated that life would be taken. The Court stated:

> Enmund's criminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt. Putting Enmund to death to avenge two killings that he did not commit and had no intention of committing or causing does not measurably contribute to the retributive end of ensuring that the criminal gets

his just deserts.

*Enmund*, 458 U.S. at 797.

¶313. In *Tison v. Arizona*, the Court held that the Eighth Amendment did not prohibit the death penalty in the intermediate case of the defendant whose participation is major and whose mental state is one of reckless indifference to human life. 481 U.S. 150.

¶314. In *Enmund*, the Court noted that only eight jurisdictions authorized the death penalty solely for participation in a robbery in which another robber takes life. 458 U.S. at 789. Mississippi was among these eight jurisdictions. Following *Enmund v. Florida*, Mississippi amended its capital sentencing scheme to require that a jury must find that the defendant actually killed, attempted to kill, intended that a killing take place, and/or contemplated that lethal force would be employed in order to return and impose a sentence of death. Ch. 429, Senate Bill No. 2699, 1983 General Laws of Mississippi. *See* Miss. Code Ann. 99-19-101 (7). In *Tison*, the Court noted that Mississippi had modified the capital murder sentencing scheme following *Enmund*. *Id.* at 152, n.4.

¶315. Contrary to Evans' assertions, Mississippi requires more than simple felony murder to sentence a defendant to death. Miss. Code Ann. § 99-19-101 allows a jury to consider as an aggravating circumstance the fact that a murder was committed while the defendant was engaged in the commission of felony. However, after *Enmund* and the amendments to our sentencing scheme, that fact alone is insufficient to impose the death penalty. Rather, a jury must find that the defendant actually killed, attempted to kill, intended that a killing take place, or contemplated that lethal force would be employed in order to impose a death sentence. Our sentencing scheme, consistent with *Tison*, allows a jury to consider as a mitigating circumstance that the defendant was an accomplice whose participation was relatively minor.

¶316. In light of *Enmund* and *Tison*, a critical review of our capital sentencing scheme reveals no constitutional infirmities. Moreover, unlike the defendants in *Enmund* and *Tison*, Evans was a major participant in a felony-murder and actually killed his victim. There is no merit to this issue.

## B. SENTENCING PHASE

### XIX. WHETHER THE TRIAL COURT ERRED IN ADMITTING EVIDENCE TO PROVE AGGRAVATING CIRCUMSTANCES IN VIOLATION OF MISS. R. EVID. 8.03.

¶317. Evans argues that the trial court erred in allowed the introduction of his prior Texas conviction for aggravated sexual battery in support of the aggravating circumstance that he was previously convicted of a felony involving the use of threat of violence to the person. *See* Miss. Code Ann. § 99-19-101 (5)(d). Evans argues that this conviction was based upon a plea of nolo contendere and is thus inadmissible hearsay pursuant to MR.E. 803 (22).

¶318. During the sentencing phase, the State introduced certified copies of the indictment and additional documents relating to the *State of Texas v. Jason Michael McGowan*,[(10)]86CR0374, 212th District. Court for Galveston County. Following Evans' objection, the trial court, relying on the

Texas classification of aggravated sexual assault, allowed the conviction to be admitted. The trial court noted that this evidence could have also been admitted pursuant to M.R.E. 8.03 (24).

¶319. Utilizing traditional conflict of law analysis, Evans argues that Mississippi law, the law of the forum, governs procedural aspects of a trial such as the admission of evidence. Evans, therefore, argues that his prior conviction is inadmissible under M.R.E. 803 (22), which states:

> (22) **Judgment of Previous Conviction**. Evidence of a final judgment, entered after a trial or upon a plea of guilty (*but not upon a plea of nolo contendere*), adjudging a person guilty of a crime punishable by death or imprisonment in excess of one year, to prove any fact essential to sustain the judgment, but not including, when offered by the state in a criminal prosecution for purposes other than impeachment, judgments against persons other than the accused. The pendency of an appeal may be shown but does not affect admissibility.

(emphasis added).

¶320. In *Holland v. State*, 587 So. 2d 848, 874 (Miss.1991), this Court was called upon to decide a similar issue. There, the State sought to introduce a 1974 Texas rape conviction. This Court cautioned the State upon remand for re-sentencing that:

> Although a trial court is not required to examine the underlying legal validity of the prior conviction, *Nixon v. State,* 533 So. 2d 1078, 1099 (Miss.1987); *Phillips v. State*, 421 So. 2d 476, 481 (Miss.1982), determining whether a defendant's prior conviction was a felony involving the use or threat of violence requires that **this state's statutes be construed and applied**. **Where as here the conviction occurred in a sister state, this Court does not look to how that state characterizes the question of whether the crime was one of violence, rather, the analysis must be done under Mississippi law.** For a conviction to qualify as predicate for an aggravating circumstance under this state's statutes, the conviction from the sister state must have been acquired under a statute which has as an element the use or threat of violence against the person or, by necessity, must involve conduct that is inherently violent or presents a serious potential risk of physical violence to another. *United States v. Sherbondy*, 865 F.2d 996, 1010-11 (9th Cir.1988).

*Id.* (emphasis added).

¶321. *Holland* clearly requires a trial court to utilize Mississippi law in order to determine whether a prior conviction from another state is in fact a felony involving the use or threat of violence to the person. Here, however, this Court is called upon to address whether a prior criminal conviction entered upon a plea of nolo contendere is admissible under the M.R.E. in light of the method by which the conviction was obtained. We now hold that M.R.E. 803 (22) does not apply to the situation presented in the case *sub judice*.

¶322. Rule 803 sets forth numerous hearsay exceptions, one of which is Rule 803 (22), which provides that evidence of judgments of previous convictions are exceptions to the hearsay rule. However, judgments entered upon a plea of nolo contendere are not exceptions to the hearsay rule. Evans now argues that 803 (22) and the language exempting judgments entered upon a plea of nolo contendere from the exception serve to prohibit the introduction of his prior conviction.

¶323. This rule applies to evidence of a prior judgment offered to "prove any fact essential to sustain the judgment." Here, however, evidence of Evans' final judgment of conviction was not offered to prove any fact essential to sustain the judgment. Rather, the conviction was introduced by the State to prove the prior conviction. In light of the clear language of Rule 803 (22), this provision is simply not applicable to the case *sub judice* and therefore does not prohibit the admission of Evans' prior conviction. The trial court did not err. This issue is without merit.

## XX. WHETHER THE TRIAL COURT ERRED IN ALLOWING DR. MAGGIO TO TESTIFY IN REBUTTAL AT THE SENTENCING PHASE THEREBY VIOLATING EVANS' FIFTH AND SIXTH AMENDMENT RIGHTS.

¶324. Upon the request of Evans' attorney, Fred Lusk, Dr. Henry Maggio was appointed by the federal district court in 1991 to conduct a competency evaluation in conjunction with Evans' guilty plea to federal kidnapping charges. During this initial examination, Maggio testified that he examined Evans for a three and a half hours, however, Maggio conceded that much of this time he simply observed Evans speaking with his attorney. Maggio made no formal diagnosis, but concluded that Evans was competent.

¶325. On August 6, 1993, the trial court appointed Dr. Maggio to conduct a forensic examination of Evans for the purposes of determining his competency to stand trial on state charges. In the order, the trial court noted defense counsel's objection to the appointment of Dr. Maggio. Moreover, the trial court specifically stated that "nothing contained herein shall be construed as authorizing the State to use such information at sentencing." The trial court sealed Maggio's report, the result of which would be made available only if the defense elected to proceed with a determination of competency.

¶326. Maggio testified that prior to his examination he received copies of Evans' mental health records from the Veterans Administration and the Texas Department of Corrections. On August 6, 1993, Dr. Maggio attempted to examine Evans at the Harrison County Detention Center. Evans, however, was on the telephone with his attorney, Bill Boyd.

¶327. Evans recognized Maggio and asked to see the court order. Evans refused to speak with Maggio further and invoked his Fifth Amendment rights. Maggio continued to observe Evans while he was on the telephone with Boyd and left after Evans refused to speak with him for the third time.

¶328. During the motion to determine habitual status, the State informed Evans that Dr. Maggio might be called to testify as a rebuttal witness if Evans called Dr. Zimmerman. However, the State indicated that out of an abundance of caution Dr. Maggio would not testify to his observations on August 6, 1993, because Evans was not accompanied by counsel.

¶329. During the sentencing phase, Evans chose to call Dr. Zimmerman to testify as to mitigation and the State called Maggio in rebuttal. During his rebuttal testimony, Maggio relied on the following bases for his conclusions and opinions: the competency examination conducted during August, 1991 in conjunction with the federal guilty plea[11]; his evaluation of Evans' prior mental health records; and his observations of Evans during the competency hearing on August 9-11, 1993. From these sources, Maggio testified that, in his opinion, Evans did not suffer from schizophrenia, but did have an antisocial personality disorder, with paranoid, dependent, and manipulative features.

¶330. Evans now argues that the trial court erroneously allowed Maggio's rebuttal testimony which was based on his observations of Evans during the competency hearing on August 9-11, 1993, and the use of psychiatric records provided to Maggio for purposes of the competency determination. On cross-examination, Dr. Maggio testified that "observation is a part of a psychiatric evaluation." Evans now claims that Maggio's testimony was based upon an "examination" conducted in violation of his Fifth and Sixth Amendment rights.

## A. Fifth Amendment

¶331. In *Estelle v. Smith*, 451 U.S. 454 (1981), the United States Supreme Court held that the testimony at the sentencing phase of a capital trial of a psychiatrist who conducted an evaluation of the defendant for purposes of determining whether he was competent to stand trial was error and a violation of the Fifth and Sixth Amendments when the evaluation was conducted without notice to defense counsel and without advising the defendant that he had the right to remain silent.

¶332. In *Estelle*, the trial judge, sua sponte, ordered a psychiatric evaluation for the limited, neutral purpose of determining his competency to stand trial. At trial, the defendant introduced no psychiatric evidence, nor had he indicated that he might do so. The State, however, offered information obtained from the competency examination as affirmative evidence during the sentencing phase to prove "future dangerousness[(12)]." *Id.* at 466. After review, the Court held that "a capital defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." 451 U.S. at 468. The Court specifically held that the fact that Smith's statements were uttered in the context of a psychiatric examination did not remove them from the reach of the Fifth Amendment. *Id.* at 465. Moreover, the Court held "if the application of the Dr. Grigson's findings had been confined to [use at a competency hearing], no Fifth Amendment issue would have arisen." *Id.* However, "the State used the respondent's own statements, unwittingly made without an awareness that he was assisting the State's efforts to obtain the death penalty." *Id.* The Court concluded that the statements could have been used during the penalty phase "only if respondent had been appraised of his rights and had knowingly decided to waive them." *Id.* at 468.

¶333. There are several distinctions between *Estelle* and the case *sub judice*. First, unlike *Estelle*, Evans was not compelled to respond to Dr. Maggio. At no time did Dr. Maggio question Evans or initiate contact with Evans, but simply observed Evans' participation. There was no interview or discussion. Moreover, Dr. Maggio's testimony was based on observations of Evans during the competency hearing and the evaluation of prior medical reports.

¶334. Therefore, the initial inquiry before this Court is whether the Fifth Amendment is implicated. In *Estelle*, the Court concluded that the "[psychiatrist's] diagnosis, as detailed in his testimony, was not based simply on his observation of [Smith.]" *Id.* at 463. There, the Court held that the prognosis for future dangerousness "rested on statements the respondent made, and remarks he omitted, in reciting the details of the crime." *Id.* Moreover, the psychiatrist specifically testified that his findings were based on his "discussion" with Smith. *Id.* at n.9. The Court held that "the Fifth Amendment was implicated because the State used as evidence . . . the substance of his disclosures during the pretrial psychiatric examination." *Id.* at 464-65.

¶335. Here, however, Evans objects to the admission of testimony based upon observations. Dr. Maggio conceded on cross-examination that he "had no one-on-one contact with Mr. Evans." In *Pennsylvania v. Muniz*, 496 U.S. 582, 589 (1990), the Supreme Court extensively discussed the appropriate subject matter of the Fifth Amendment. There, the Court stated that "the privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." *Id.* (*quoting Schmerber v. California*, 384 U.S. 757, 764 (1966)). "In order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information. Only then is a person compelled to be a witness against himself." *Id.* (*quoting Doe v. United States*, 487 U.S. 201, 210 (1988)). In *Schmerber v. California*, 384 U.S. 757, 764 (1966), the Supreme Court "acknowledged that both federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, *to appear in court*, to stand, to assume a stand, to walk, or to make a particular gesture." (emphasis added).

¶336. In *United States v. Wade*, 388 U.S. 218, 222 (1967), the Court held that requiring a suspect's presence and speech at a lineup reflected a "compulsion to exhibit physical characteristics, not compulsion to disclose any knowledge he might have." Here, it appears that Maggio's courtroom observations focused only on Evans' appearance, demeanor, and participation in the competency hearing. The Fifth Amendment, therefore, is not implicated because Evans was simply displaying physical, not testimonial evidence.

¶337. Moreover, *Estelle* may be distinguished on another basis. Here, unlike the defendant in *Estelle*, Evans offered psychiatric evidence at trial. In *Buchanan v. Kentucky*, 483 U.S. 402, 422 (1987), the Supreme Court noted that in *Estelle* the finding that the Fifth Amendment was implicated was a result of the "distinct circumstances of that case [where] . . . the trial court had ordered, sua sponte, the psychiatric examination and Smith neither had asserted an insanity defense nor had offered psychiatric evidence at trial." In *Estelle*, the Court stated that "a different situation arises where a defendant intends to introduce psychiatric evidence at the penalty phase." 451 U.S. at 471. The *Buchanan* Court recognized that in other situations the State may have an interest in introducing psychiatric evidence to rebut a petitioner's defense.

¶338. In *Buchanan*, defense counsel joined a motion to determine competency. There, the petitioner's entire defense strategy was to establish the "mental status" defense of extreme emotional disturbance. The sole witness for the defense was a social worker formerly assigned to the petitioner's case who read from various psychological reports. The defendant did not take the stand. There, the Court held that "the Commonwealth could not respond to this defense unless it presented other psychological evidence." *Id.* at 423. As a result, the Commonwealth asked the social worker to read excerpts of a psychological report wherein the psychiatrist had set forth general observations about the mental state of petitioner but had not described any statements by the petitioner dealing with the crimes for which he was charged. The *Buchanan* Court concluded that the introduction of such a report for this limited rebuttal purpose did not constitute a Fifth Amendment violation.

¶339. Evans offered psychiatric evidence through the testimony of Dr. Zimmerman during the sentencing phase. As a result, the State called Dr. Maggio in rebuttal. As in *Buchanan*, the defendant did not testify, and therefore there was no other way for the prosecution to rebut the psychological

testimony. Moreover, Evans was on notice that the State would call Dr. Maggio if Dr. Zimmerman testified.

¶340. Evans also argues that the Fifth Amendment was violated because he was not advised that Dr. Maggio would be using his prior mental health records during the sentencing phase. Evans, however, sought the admission of these documents during the sentencing phase as evidence of mitigation and Dr. Zimmerman testified that he also relied upon these medical records. The trial court overruled the State's objection and admitted the records into evidence. In rebuttal, Dr. Maggio testified that he also relied upon Evans' records as a basis for his opinion. By placing Evans' mental status in issue during the sentencing phase and introducing the medical reports as evidence of mitigation, the State was clearly entitled to allow its expert to rebut this evidence.

### B. Sixth Amendment

¶341. Evans likewise argues that Dr. Maggio's testimony violated his Sixth Amendment right to counsel. Evans again relies on *Estelle v. Smith*, 451 U.S. 454 (1981), where the Court held that the Sixth Amendment had been violated because "defense counsel were not notified in advance that the psychiatric examination would encompass the issue of their client's future dangerousness, and respondent was denied the assistance of his attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed." *Id.* at 469.

¶342. Evans argues that his counsel was not notified that Dr. Maggio would be observing during the competency hearing for purposes of a psychiatric examination or that this examination would encompass sentencing-phase issues. Again, Evans, unlike the defendant in *Estelle,* requested that a competency evaluation be conducted.

¶343. Here, however, it is not clear that defense counsel knew Maggio would be observing the competency hearing. Moreover, Evans' counsel did not appear to have notice that the competency evaluation would be used for sentencing phase issues. As a matter of fact, the Order appointing Dr. Maggio to conduct the examination specifically prohibited any use of the information during the sentencing phase. In *Buchanan*, the Supreme Court held in order for a consultation with counsel to be effective it "must be based on counsel's being informed about the scope and nature of the proceeding." 483 U.S. at 425. The *Buchanan* Court further held "[g]iven our decision in *Smith*, however, counsel was certainly on notice that if, as appears to be the case, he intended to put on a mental status defense for petitioner, he would have to anticipate the use of psychological evidence by the prosecution in rebuttal." *Id*. If such circumstances existed, the Court concluded that there was no Sixth Amendment violation.

¶344. In *Powell v. Texas*, 492 U.S. 680, 685 (1989), the Court held that defense counsel in *Buchanan* knew what the scope of the examination would be before it took place. In *Powell*, however, the Supreme Court reversed because defense counsel did not know that the examination would involve sentencing-phase evidence regarding "future dangerousness." 492 U.S. at 685. However, the *Powell* Court did not disturb the pronouncement in *Estelle* that ". . . a different situation arises where a defendant intends to introduce psychiatric evidence at the penalty phase." 451 U.S. at 472.

¶345. Given the language in the trial court's order, defense counsel was not aware that sentencing-

phase testimony would result from Dr. Maggio's evaluation. However, Evans intended to and did introduce psychiatric evidence at the penalty phase. Clearly, he would "anticipate the use of psychological evidence by the prosecution." *Buchanan*, 483 U.S. at 425.

¶346. In *Satterwhite v. Texas*, 486 U.S. 249, 257 (1988), the Supreme Court held that the "harmless error rule applies to the admission of psychiatric testimony in violation of the Sixth Amendment right set out in *Estelle v. Smith*." In *Satterwhite*, however, the Court declined to hold that the error was harmless where the testimony offered in violation of the Sixth Amendment stood out "both because of his qualifications as a medical doctor specializing in psychiatry and because of the powerful content of his message." 486 U.S. at 259.

¶347. Dr. Maggio's testimony was purely in rebuttal. Moreover, the defense was on notice that if Dr. Zimmerman testified during the sentencing phase, the State would call Dr. Maggio. Evans intended to and did introduce psychiatric testimony. As a result, the State was clearly entitled to rebut this testimony. This issue is without merit.

### XXI. WHETHER THE JURY WAS PROPERLY INSTRUCTED ON THE AGGRAVATING CIRCUMSTANCE THAT THE OFFENSE WAS COMMITTED FOR THE PURPOSE OF AVOIDING OR PREVENTING A LAWFUL ARREST AND WHETHER THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THIS AGGRAVATING CIRCUMSTANCE BEYOND A REASONABLE DOUBT.

¶348. Evans argues that the trial court erred in instructing the jury on the aggravating circumstance that the offense was committed for the purpose of avoiding or preventing a lawful arrest. Additionally, Evans argues that there was insufficient evidence to support the jury's finding of this aggravating circumstance. Specifically, Evans argues that "attempts to avoid detection *after* the killing, as occurred here, are arguably relevant only if there is some evidence that the defendant committed the offense in order to avoid detection." Evans also argues that this aggravator is unconstitutionally vague and overbroad without an accompanying limiting instruction.

¶349. This Court has repeatedly held that it is unnecessary to have a limiting instruction defining the "avoiding arrest" aggravator if the evidence reasonably inferred that avoiding arrest was a substantial reason for the killing. *Brown v. State*, 682 So. 2d 340, 355 (Miss.1996), *cert. denied*, 117 S.Ct.1271 (1997); *Walker v. State,* 671 So. 2d 581 (Miss.1996), *cert. denied*, 117 S.Ct. 518 (1996); *Carr v. State*, 655 So. 2d 824 (Miss.1995), *cert. denied*, 116 S.Ct. 782 (1996); *Chase v. State*, 645 So. 2d 829 (Miss.1994), *cert. denied*, 115 S.Ct. 2279 (1995), *reh'g denied*, 116 S.Ct. 20 (1995). In *Brown*, this Court stated that "[e]ach case must be decided on its peculiar fact situation. If there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to "cover their tracks" so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance." *Id.* (*citing Leatherwood v. State*, 435 So. 2d 645, 651 (Miss.1983)). "[I]t is this Court's role to inquire into whether there is any credible evidence upon which the jury could find the aggravating circumstance in question." *Carr v. State*, 655 So. 2d 824, 854 (Miss.1995) 655 So. 2d 824 (Miss.1995), *cert. denied*, 116 S.Ct. 782 (1996)(*quoting Lanier v. State*, 533 So. 2d 473, 490 (Miss.1988)).

¶350. The evidence at trial showed that Evans deceived Tammy Giles, Beatrice's mother, into

believing that he was going to the store to purchase items for a barbecue. Evans told Giles that he needed an hour to purchase groceries and call a friend. Evans lied about his identity to Giles and claimed to be a school teacher from Texas. When Beatrice became concerned about the length of the trip, Evans convinced her that they were simply taking a longer route.

¶351. In his confession, Evans explained that he searched for a secluded area where he could rape and murder Beatrice. After Evans parked the vehicle he placed duct tape around Beatrice's mouth to muffle her cries and told her that she was alone with him and there was no one to help her. Evans indicated that he kept everything he used in the jeep because he was concerned about evidence being at the scene.

¶352. After raping and killing Beatrice, Evans drove around searching for a secluded area where he could dump her body. After dumping the body, he disposed of Beatrice's clothing along the side of the highway and continued his efforts to cover his tracks and avoid detection.

¶353. The jury had before it evidence which indicated from the time Evans abducted Beatrice from her mother, he used special precaution to avoid detection or apprehension. The jury could have easily concluded that Evans killed Beatrice to prevent her from reporting the sexual assault she suffered. Moreover, the jury could have concluded beyond a reasonable doubt that Evans murdered Beatrice for the purposes of avoiding or preventing a lawful arrest. Here, as in *Chase*, and *Walker*, "the murder . . . was only one of the many attempts to avoid detection and arrest." The trial court properly submitted this aggravating circumstance to the jury. This issue is without merit.

### XXII. WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY AT THE SENTENCING PHASE TO DISREGARD SYMPATHY.

¶354. Evans argues that Sentencing Instruction C-1 improperly instructed the jury to totally disregard sympathy in determining the appropriate sentence. The language complained of by Evans is as follows:

> You should not be influenced by bias, sympathy, or prejudice. Your verdict should be based on the evidence and not upon speculation, guesswork or conjecture.

¶355. Despite Evans' current claims, the record reveals that any error regarding this instruction was waived because defense counsel voiced no objection and approved the instruction. This Court has repeatedly held that "[t]he assertion on appeal of grounds for an objection which was not the assertion at trial is not an issue properly preserved on appeal." *Ballenger v. State*, 667 So. 2d 1242, 1264 (Miss.1995), *cert. denied*, 116 S.Ct. 2565 (1996), *reh'g denied*, 117 S.Ct. 26 (1996); *Haddox v. State*, 636 So. 2d 1229, 1240 (Miss.1994).

¶356. In *Williams v. State*, 445 So. 2d 798, 810 (Miss.1984), *cert. denied*, 469 U.S. 1117 (1985), this Court held that "[w]e have in death penalty cases the prerogative of relaxing our contemporaneous objection and plain error rules when the interest of justice so requires." The State, acknowledging that proper objection was made to instruction S-1, presumes that Evans is appealing the submission of this instruction. Defense counsel, relying on *Pinkney v. State*, 538 So. 2d 329, 351 (Miss.1988), *cert. granted*, *vacated*, 494 U.S. 1075 (1990), *on remand*, 602 So. 2d 1177 (1992), objected to S-1 on the grounds that it instructed the jury "to totally disregard sympathy." Therefore,

it is a reasonable conclusion that Evans intended to challenge instruction S-1 and its directives regarding sympathy. Instruction S-I, in pertinent part, contains the following language:

> You should consider and weigh any aggravating and mitigating circumstances, as set forth later in this instruction, but you are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.

¶357. In *Pinkney v. State*, 538 So. 2d 329, 351 (Miss.1988), *cert. granted*, *vacated on other grounds*, 494 U.S. 1075 (1990), *on remand*, 602 So. 2d 1177 (1992), this Court held that "a jury may not be instructed to disregard, in toto, sympathy . . . ." Here, the jury was not instructed to disregard sympathy in toto. Rather, the instruction given is identical to that approved by this Court in *Blue v. State,* 674 So. 2d 1184, 1225 (Miss.1996), *cert. denied,* 117 S.Ct. 588 (1996); *Ballenger v. State,* 667 So. 2d 1242, 1264 (Miss.1995), *cert. denied*, 116 S.Ct. 2565 (1996), *reh'g denied*, 117 S.Ct. 26 (1996), and *Willie v. State*, 585 So. 2d 660, 671 (Miss.1991). In *Willie*, this Court held:

> The United States Supreme Court has found that the anti-sympathy language used in the preceding instruction passes constitutional muster. *California v. Brown*, 479 U.S. 538, 542-43, 107 S.Ct. 837, 839-40, 93 L.Ed.2d 934 (1987). We find that because the instruction does not inform the jury that it must disregard in toto sympathy and leaves the jury the option to vote for or against the death penalty, the instruction is a proper statement of the law. *See Pinkney v. State*, 538 So.2d 329, 351 (Miss.1988), *vacated on other grounds*, --- U.S. ---, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990); *Williams v. State*, 544 So.2d 782, 788 (Miss.1987). This argument has no merit.

*Willie*, 585 So. 2d at 677. This issue is without merit.

### XXIII. WHETHER THE LIMITING INSTRUCTION ON THE HEINOUS, ATROCIOUS, OR CRUEL AGGRAVATING CIRCUMSTANCE WAS UNCONSTITUTIONALLY VAGUE AND WHETHER THERE WAS SUFFICIENT EVIDENCE TO SUPPORT THIS CIRCUMSTANCE.

¶358. Evans first argues that the limiting instruction given by the lower court regarding the heinous, atrocious or cruel aggravating circumstance was unconstitutionally vague and over broad because it failed to limit the meaning of "especially heinous, atrocious, or cruel."

¶359. In *Davis v. State*, 684 So.2d 643 (Miss.1996), this Court considered an identical instruction and held that "the 'especially heinous' aggravating circumstance was properly narrowed for the jury's consideration." *Id.* at 662. *See also Williams v. State*, 684 So. 2d 1179, 1198 (Miss.1996); *Jenkins v. State*, 607 So. 2d 1171, 1181 (Miss. 1992). This issue is without merit.

¶360. Evans also challenges the sufficiency of the evidence to support this aggravating circumstance. However, Evans fails to cite any authority. "An assignment of error, unsupported by any authority, 'lacks persuasion' on review." *Williams v. State*, 684 So. 2d 1179, 1202 (Miss.1996)(citations omitted). Notwithstanding appropriate authority and in light of our heightened scrutiny of death penalty cases, we alternatively address this argument. *Id.*

¶361. Challenges to the sufficiency of the evidence are subject to the following standard of review:

When reviewing a challenge to the sufficiency of the evidence, this Court considers all of the evidence in the light most consistent with the verdict, giving the State the benefit of all inferences favorable to the verdict. When the evidence before the jury is such that reasonable jurors could have found the defendant guilty, the verdict is beyond this Court's authority to disturb.

*Taylor v. State,* 672 So.2d 1246, 1255 (Miss.1996), *cert. denied*, 117 S.Ct. 486 (1996), *reh'g denied*, 117 S.Ct. 755 (1997)(*quoting* **McFee v. State**, 511 So. 2d 130, 133-34 (Miss.1987)).

¶362. During the sentencing phase, the prosecution called Dr. McGarry, who testified as to the pain and suffering that Beatrice could have suffered given her injuries. Dr. McGarry testified as follows:

DR. MCGARRY: I found in the area of the anus a tear on the back edge of the anus that was three-fourth inch long. On the front edge of the anus a one-half inch tear going from the opening into the area of the vagina which is adjacent to the anus. A tear that connected the two channels across tissue that should be intact between them, and a tear on the front of the vagina three-fourth inch long going from the opening upward. All of these tears, the three-fourth inch on the front of the vagina and the back of the anus and the tear across the septum between them started at the opening and went up into the channel. These are the tears that are produced by forceful penetration, stretching the delicate tissues of these parts of the body until the tissues tear open.

MR. CARANNA: Could you determine whether or not these injuries were inflicted upon Beatrice Routh during her lifetime?

DR. MCGARRY: During her lifetime. The degree of hemorrhage, the extent of the hemorrhage in the areas of tearing and into the adjacent tissue would not occur in a person after death.

* * *

DR. MCGARRY: The anus and the and vaginal opening are composed of tissue that is very delicate and thin and sensitive. It has a large amount of nerve supply to such a degree that procedures that require opening this tissue are not done without anesthesia because of the extensive pain inflicted by this kind of disruption of tissue.

¶363. Dr. McGarry also testified as to the pain associated with death by asphysixa due to strangulation:

DR. MCGARRY: This causes pain and suffering because it damages the tissue, it compresses and traumatizes the tissue to a point of causing bruising in the area. It closes off the lower part of the throat through which the person must breathe, prevents the person from breathing.

* * *

DR. MCGARRY: This has the effect of adding to the physical pain of injuries to the neck, the inability to get breath, the sensation that goes through a person when they are unable to breathe, and the fear that accompanies that when respiration is prevented.

¶364. The nature of the wounds, in conjunction with the pain associated with this manner of death as well as the fact that Evans killed a ten year-old child who was begging to be returned to her mother, provides sufficient evidence from which reasonable jurors could conclude that this murder was "especially heinous, atrocious, or cruel." This issue is without merit.

### XIV. WHETHER THE TRIAL COURT ERRED IN LIMITING EVANS TO SIX JURY INSTRUCTIONS DURING THE SENTENCING PHASE.

¶365. Evans argues that the trial court erred in imposing a six-instruction limit on the defense during the sentencing phase of trial, forcing him to withdraw other instructions regarding "weighing, deliberations or things of that nature in a sentencing phase in a capital case." Evans argues the trial court imposed the limit after misinterpreting Unif. Crim. R. of Cir. Ct. Prac. 5.03. At the time of trial, Rule 5.03[13] in pertinent part provided:

> The attorneys may submit no more than six instructions on the substantive law of the case to which the opposing party shall dictate into the record the specific objections.

¶366. In *Young v. State*, 451 So. 2d 208, 211 (Miss.1984), *cert. denied*, 469 U.S 860 (1984), this Court addressed the six-instruction limit contained in Rule 5.03 and held that the number of instructions submitted to the court and the jury "lies within the sound judicial discretion of the trial judge who may limit or expand for good cause shown." There, we held that the six-instruction limit is a "numerical beginning point . . . [not] an inflexible rule. . . . " *Id.* However, an abuse of discretion by the trial court in limiting the number of instructions alone is insufficient to require reversal by this Court. In *Shaw v. State*, 540 So.2d 26, 29-30 (Miss.1989), this Court held that "failure to follow the dictates of Rule 5.03, Crim.R.Cir.Ct.Prac., will not lead to reversal absent actual prejudice to the defendant." *Id.* (*citing Carter v. State*, 493 So.2d 327, 331 (Miss.1986)).

¶367. When reviewing the submission or omission of jury instructions, this Court has repeatedly held that this Court reviews the "instructions as a whole, with no one instruction taken out of context." *Heidel v. State*, 587 So.2d 835, 842 (Miss.1991). The Evans jury was given five sentencing instructions, each of which extensively instructed the jury on capital sentencing procedure. Evans' argument that the six-instruction limit denied the jury instructions regarding weighing, deliberations or things of that nature in a sentencing phase in a capital case is without merit. The jury was amply instructed regarding the weighing and consideration of the evidence presented at trial. The jury was also extensively instructed as to the consideration of aggravating and mitigating circumstances. Moreover, a review of the instructions excluded by the trial court reveals that the subject matter of those instructions was addressed by instructions given by the trial court or contained incorrect statements of the law.

¶368. In *Heidel v. State*, 587 So. 2d 835, 842 (Miss.1991), this Court held that "[a] defendant is entitled to have jury instructions given which present his theory of the case, *Murphy*, 566 So.2d at 1206; *Young v. State*, 451 So.2d 208, 210 (Miss.1984); however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence. *Murphy*, 566 So.2d at 1206; *United States v. Robinson*, 700 F.2d 205, 211 (5th Cir. 1983), *appeal after remand*, 713 F.2d 110 (1984); *Davis v. State*, 431 So.2d 468, 475 (Miss.1983)(A trial court is not required to give instructions which are covered by other instructions although the language may differ.)." This issue is without merit.

## XV. WHETHER THE TRIAL COURT ERRED IN OVERRULING OBJECTIONS TO SENTENCING INSTRUCTION S-1A.

¶369. Evans alleges that sentencing instruction S-1A was erroneous for three reasons. First, Evans argues that the catch-all language utilized in the instruction would allow reasonable jurors to conclude that they had discretion to ignore non-statutory mitigating circumstances when deciding Evans' fate. The language Evans complains of is as follows:

> (j) Any other matter, any other aspect of the defendant's character or record, and any other circumstance of the offense brought to you during the trial on this cause which *you, the Jury, deem to be mitigating on behalf of the defendant.*

(emphasis added). Evans relies on ***Eddings v. Oklahoma***, 455 U.S. 104 (1982), *appeal after remand*, 688 P.2d 342 (1984), *cert. denied*, 470 U.S. 1051 (1985), in arguing that "sentencers in a capital case 'may not give [mitigating circumstances] no weight by excluding such evidence from their deliberations.'"

¶370. The record reveals that all objections made by Evans to Instruction S-1 were incorporated into S-1A. However, during the colloquy among defense counsel, the prosecution, and the court, no objection was made to this particular language in Instruction S-1. Because Evans failed to object to the inclusion of the catch-all language, this assignment of error is barred. However, without waiving the bar, we will alternatively consider the merits of this assignment.

¶371. Contrary to Evans' argument, this language does not authorize the jury to ignore non-statutory elements of mitigation but rather, instructs the jury that they may consider additional mitigating evidence and therefore is in conformity with ***Eddings*** and Miss. Code Ann. § 99-19-101 (1), which states that any relevant mitigating evidence introduced on behalf of the defendant may be considered by the jury.

¶372. Moreover, this Court has approved instructions containing this language in ***Carr v. State,*** 655 So.2d 824, 855 (Miss.1995), *cert. denied*, 116 S.Ct. 782 (1996); ***Ladner v. State***, 584 So.2d 743, 761 (Miss.1991), *cert. denied*, 502 U.S. 1015 (1991); ***Turner v. State***, 573 So.2d 657, 668 (Miss.1990), *cert. denied*, 500 U.S. 910 (1991), and expressly held in ***Neal v. State***, 451 So.2d 743, 761 (Miss.1984), *cert. denied*, 469 U.S. 1098 (1984), that catch-all language regarding mitigating factors should be employed in every case. This issue is without merit.

¶373. Evans next argues that language contained within S-1A could have instructed the jury that they must find mitigating factors unanimously. Evans argues that the reference to the jury using the pronoun "you, the Jury" implies that the jury must act as a collective body and thus must act unanimously when considering the existence of mitigating factors. Evans cites the following language as erroneous:

> Any other matter, any other aspect of the defendant's character or record, and any other circumstance of the offense brought to you during the trial on this cause which ***you, theJury,*** deem to be mitigating on behalf of the defendant.

> If ***you*** find from the evidence that one or more of the preceding elements of mitigation exists,

then *you* must consider whether it (or they) outweigh(s) or overcome(s) the aggravating circumstance(s) *you* previously found. In the event that you find the mitigating circumstances do not outweigh or overcome the aggravating circumstance(s), *you* may impose the death sentence. Should *you* find that the mitigating circumstance(s) outweigh or overcome the aggravating circumstance(s), *you* shall not impose the death sentence.

C.

The verdict *you* return must be written on a separate sheet of paper signed by the foreman. *You* (sic) verdict should be written in one of the following forms. . . .

(emphasis added).

¶374. This Court has addressed instructions either identical or similar to that with which we are presented today. *See Williams v. State,* 684 So.2d 1179, 1200 (Miss.1996); *Chase v. State*, 645 So.2d 829, 859-60 (Miss.1995); *cert. denied*, 115 S.Ct. 2279 (1995), *reh'g denied*, 116 S.Ct. 20 (1995); *Thorson v. State*, 653 So. 2d 876, 894 (Miss.1994); *Hansen v. State*, 592 So. 2d 114, 149-50 (Miss.1991), *cert. denied*, 504 U.S. 921 (1992); *reh'g denied*, 505 U.S. 1231 (1992); *Shell v. State*, 554 So. 2d 887, 905 (Miss.1989), *cert. granted, rev'd in part*, 498 U.S. 1 (1990). Each time we held that the instruction[s] did not violate the holding in *McKoy v. North Carolina*, 494 U.S. 433 (1990), *McNeil v. North Carolina*, 494 U.S. 1050 (1990), or *Mills v. Maryland*, 486 U.S. 367 (1988).

¶375. Once again, this Court is confronted with an instruction where:

[t]he mitigating circumstances portion of the instruction does not contain "unanimous" or "unanimously." Only the aggravating circumstances part contains these words. No instruction says, implies or intimates to any reasonably literate juror that he or she should await unanimity before considering a mitigating circumstance.

*Hansen v. State*, 592 So. 2d 114, 150 (Miss.1991), *cert. denied*, 504 U.S. 921 (1992); *reh'g denied*, 505 U.S. 1231 (1992). *See also Williams v. State*, 684 So.2d 1179, 1200; *Davis v. State*, 684 So. 2d 643, 664 (Miss 1996)(*citing Ladner v. State*, 584 So.2d 743, 760 (Miss.1991)); *Willie v. State*, 585 So.2d 660, 681 (Miss.1991); *Turner v. State*, 573 So.2d 657, 668 (Miss.1990); and *Shell v. State*, 554 So.2d 887 (Miss.1989), *reversed on other grounds*, 498 U.S. 1(1990)). This issue is without merit.

¶376. The third ground of contention with regard to Sentencing Instruction S-1A is that "reasonable jurors could-- and-- would have taken the instruction to mean that, once the jury found at least one aggravating circumstance, both the burden of production and the burden of proof shifted to the defendant to demonstrate that a death sentence should not be imposed." Evans objects to the following language:

If one or more of the above aggravating circumstances is found to exist, then you must consider whether there are mitigating circumstances which outweigh the aggravating circumstance(s). Consider the following elements of mitigation in determining *whether thedeath penalty should not be imposed;*

* * *

> *If you find* from the evidence that one or more of the preceding elements of mitigation exists, *then* you must consider whether it (or they) outweigh(s) or overcome(s) the aggravating circumstance(s) you previously found. In the event that you find that the mitigating circumstance(s) do not outweigh or overcome the aggravating circumstance(s), you may impose the death sentence. Should you find that the mitigating circumstance(s) outweigh or overcome the aggravating circumstance(s), you shall not impose the death sentence.

(emphasis added).

¶377. Evans' argument is as familiar as is the language of the instruction. Identical language was before this Court in **Blue v. State,** 674 So.2d 1184, 1222-23 (Miss.1996); **Conner v. State**, 632 So. 2d 1239, 1278 (Miss.1993), *cert. denied*, 115 S.Ct. 314 (1994); **Stringer v. State**, 500 So. 2d 928, 944 (Miss.1986); **Turner v. State**, 573 So. 2d 657 (Miss.1990), *cert. denied*, 500 U.S. 910 (1991). In each case, the appellant, like Evans, argued that this language impermissibly shifted the burden of proof to the defendant. After review, this Court has consistently held that this argument is without merit. *See also* **Shell v. State**, 554 So. 2d 887, 904 (Miss.1989), *rev'd on other grounds*, 498 U.S. 1 (1990); **Jordan v. State**, 365 So. 2d 1198, 1206 (Miss.1978), *cert. denied*, 444 U.S. 885 (1979).

¶378. Evans, however, expands the argument somewhat by challenging the language included in the initial paragraph wherein the jury was instructed to "consider the following elements of mitigation in determining whether the death penalty should not be imposed." In **Williams v. State**, 684 So. 2d 1179, 1202 (Miss.1996), we were confronted with identical language. There we held:

> One of the criteria that jurors must find exists to impose the sentence of death is the presence of one or more of the aggravating circumstances. What the defendant is citing to in S-2 is language instructing jurors to consider the following mitigators after the jury has unanimously determined that one or more of the enumerated aggravators exist. When taken in context, we find that this issue, as in **Shell**, lacks merit.

¶379. Lastly, Evans argues that Sentencing Instruction S-1A failed to require the prosecution to prove beyond a reasonable doubt that the death penalty was the appropriate penalty. Specifically, Evans argues that the instruction unconstitutionally relieved the State of its obligation to prove beyond a reasonable doubt that (1) the aggravating circumstances were sufficient to impose the death penalty; (2) there were insufficient mitigating circumstances to outweigh any aggravating circumstances; or (3) the Defendant should suffer death.

¶380. In essence, Evans argues that the jury should utilize the "beyond a reasonable doubt" standard in weighing the aggravating and mitigating circumstances during the sentencing phase of a capital trial. To require such would exceed what is required by statute or by case law. In **Wiley v. State**, 484 So.2d 339, 352 (Miss.1986), *overruled on other grounds*, **Willie v. State**, 585 So. 2d 660, 681 (Miss.1991), this Court was confronted with the same argument and held that "[t]he majority rule of this Court is that the jurors are required to find the existence of each aggravating circumstance beyond a reasonable doubt, but the jury is not required to find that the aggravating circumstances beyond a reasonable doubt outweigh the mitigating circumstances following the statute." The instruction given by the lower court clearly complied with Miss. Code Ann. § 99-19-101 and the

precedent of this Court. This issue is without merit.

## XVI. WHETHER THE TRIAL COURT ERRED IN RULING THAT DEFENSE EXHIBIT 15 WOULD OPEN THE DOOR TO FUTURE DANGEROUSNESS.

¶381. Evans next argues that the trial court erred in ruling that Evans would open the door to a future dangerous argument by the State if the defense sought to admit a parole report from the Texas Department of Corrections which indicated that just seven days prior to the kidnapping and murder of Beatrice, Evans tested positive for cocaine.

¶382. A review of the record and Evans motion for new trial reveals that Evans did not assert this ground of contention in the trial court and therefore this issue is procedurally barred from consideration on appeal. *Metcalf v. State*, 629 So. 2d 558, 561-62 (Miss.1993). However, without waiving the bar, this Court may alternatively address the merits of the assignment of error. *Foster v. State*, 639 So. 2d 1263, 1270-71 (Miss.1994).

¶383. Although Evans repeatedly refers to the erroneous "ruling" by the trial court, the trial court never ruled upon the State's objection to the introduction of Defense Exhibit 15, nor did Evans request such a ruling from the trial judge. Exhibit 15 was discussed among the trial court, the State and defense counsel. However, the trial court did not sustain the State's objection, but merely observed that by introducing Exhibit 15 in order to argue that Evans was negligently released, Evans may open the door to a future dangerousness argument by the State. After conferring with Evans, defense counsel withdrew the exhibit.

¶384. In *Gayten v. State*, 595 So. 2d 409, 413 (Miss.1992), this Court held that the failure to seek a definitive ruling on objections or to seek corrective action by the defendant waives the issue for the purposes of appeal. *See also* *Cole v. State*, 525 So. 2d 365, 369 (Miss.1987), *cert. denied*, 488 U.S. 934 (1988); *reh'g denied*, 488 U.S. 1023 (1989); *Cummings v. State*, 465 So. 2d 993, 996 (Miss.1985). Moreover, we have long held that a "trial court cannot be put in error on a matter not presented to the court for decision." *Chase v. State*, 645 So. 2d 829, 846 (Miss.1994), *cert. denied*, 115 S.Ct. 2279 (1995); *reh'g denied*, 116 S.Ct. 20 (1995); *Jones v. State*, 606 So. 2d 1051, 1058 (Miss.1992); *Crenshaw v. State*, 520 So. 2d 131, 134-135 (Miss.1988). Evans' failure to seek a definite ruling by the trial court waives this issue for appellate purposes. This issue is without merit.

¶385. Notwithstanding Evans' failure to obtain a ruling by the trial court and his voluntary, tactical decision to withdraw the report, Evans contends the trial court erroneously deterred his use of the Texas parole report as evidence of mitigation by observing that this may open the door to a rebuttal argument by the prosecution concerning future dangerousness. Evans maintains that he was entitled to introduce this report as mitigating evidence that he was under the influence of cocaine at the time of the offense.

¶386. Evans cites *Balfour v. State*, 598 So. 2d 731, 748 (Miss.1992), wherein this Court stated "[a] word of caution would be that our holding in *Hansen* is not an open season license for prosecutors to circumvent the plain mandate of § 99-19-101 (5), under the guise of relevant Rule 401 *rebuttal* evidence. In *Balfour*, this Court was faced with a situation wherein the prosecutor "repeatedly hammered away in an attempt to secure a commitment from Balfour for her propensity to commit future robberies." *Id.* There, this Court held that "the state is limited to offering evidence that is

relevant to one of the aggravating circumstances included in § 99-19-101." ***Stringer v. State*** 500 So. 2d 928, 941 (Miss.1986); *see* ***Coleman v. State***, 378 So. 2d 640, 648 (Miss.1979). "While some jurisdictions do provide for propensity for future dangerousness as a statutory aggravating factor, such is not the case in Mississippi jurisprudence." ***Id.*** This Court concluded that the trial court erred as a matter of law when it allowed the prosecutor to repeatedly explore the appellant's propensity for future crimes. ***Id.***

¶387. Evans argues that ***Balfour*** mandates that the State would have been precluded from arguing Evans' propensity for future dangerousness from the admission of the parole report. Evans argues that he intended to argue that he was under the influence of crack cocaine at the time of the offense, and that the Texas parole officer was negligent in failing to arrest him- - both in mitigation.

¶388. Evans was clearly entitled to offer mitigating evidence during the sentencing phase. Here, however, the trial court did not prohibit this introduction but merely cautioned Evans that this argument might backfire. Unlike ***Balfour***, the prosecution did not offer the report or make a future dangerousness argument. Moreover, the defense made a tactical decision to withdraw the report based upon observations by the trial judge. However, this withdrawal came after the trial court indicated that the jury, using its own common sense, might draw the conclusion from the report that if the Texas parole authorities were negligent in carrying out their duties, Mississippi correctional authorities might also be negligent if Evans were given a life sentence.

¶389. Because we are not presented with any actual error which occurred at the trial level, this issue is without merit.

> ### XXVII. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE INTRODUCTION OF THE VERDICT ON COUNT I INTO EVIDENCE AT THE SENTENCING PHASE.

¶390. Evans argues that the trial judge erroneously allowed the State to introduce the jury's verdict on Count I into evidence at the sentencing phase as proof of the aggravating circumstance that the offense was committed during a kidnapping. Specifically, Evans argues that "the jury's guilt-innocence phase verdict was not competent evidence of the aggravating circumstance that the offense occurred during a kidnapping."

¶391. This issue was recently before this Court in ***Williams v. State***, 684 So. 2d 1179 (Miss.1996). In ***Williams***, the trial court allowed the State to introduce the guilty verdict from the guilt-innocence phase at Williams' re-sentencing after the case was reversed by this Court on direct appeal. This Court held that "the second jury did not have to 're-find' the elements of murder and/or kidnaping, the underlying offense" and could "rely upon the prior finding made . . . during the guilt-finding phase." ***Id.*** at 1188.

¶392. In ***Williams***, this Court relied on ***Lowenfield v. Phelps***, 484 U.S. 231, 241-46 (1988), *reh'g denied*, 485 U.S. 944 (1988), wherein the United States Supreme Court approved of the overlap between a finding of guilt in an underlying felony supporting a capital offense, and the reuse of that felony to prove an aggravator in the sentencing phase. Applying ***Lowenfield*** to the facts presented in ***Williams***, this Court held "with its 'no reason' language, ***Lowenfield*** allows a resentencing jury to rely on what was found in the original trial in deciding whether or not an aggravator would apply."

*Williams*, 684 So.2d at 1189.

¶393. In *Williams*, this Court recognized that *Irving v. State*, 441 So. 2d 846, 849 (Miss. 1986), *cert. denied*, 481 U.S. 1042 (1987), clearly holds that the resentencing jury could not relitigate the issue of guilt, "[r]ather the second jury's function was to accept the first jury's finding that Irving was guilty of felony-murder involving robbery and then to determine [the] sentence." Thus, this Court concluded that the "resentencing jury could 'reuse' the capital murder conviction to establish the aggravator that the offense was committed while Williams was engaged in the commission of kidnaping." 684 So.2d at 1190-91. "The issue at the resentencing hearing was not the initial elements of the crime, but rather the sentence imposed upon a defendant who had been found guilty by a prior jury." *Id.*

¶394. In the present case, one jury heard all of the evidence regarding the charges against Evans and returned a guilty verdict against Evans for the crime of capital murder during the commission of a kidnapping. Certainly this same jury is entitled to rely upon their verdict in determining the appropriate punishment for that offense. Moreover, as in *Williams*, the jury in the present case was properly instructed that they were required to find aggravating circumstances beyond a reasonable doubt. Contrary to Evans' argument, there is nothing which indicates that the introduction of the guilty verdict resulted in unfair prejudice. This issue is without merit.

### XXVIII. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE PROSECUTION TO INTRODUCE EVIDENCE ON COUNTS II AND III AT THE SENTENCING PHASE.

¶395. Evans' next assignment of error challenges the admission by the trial court of all evidence presented at the guilt-innocence phase, including evidence relevant only to the sexual battery counts.

¶396. Evans' first challenge is to the reintroduction of all evidence presented at the guilt phase. In *Davis v. State*, 660 So.2d 1228, 1253 (Miss.1995), *cert. denied*, 116 S.Ct. 1684 (1996), *reh'g denied*, 117 S.Ct. 7 (1996), this Court held that the trial court did not commit reversible error by allowing the prosecution to introduce all of the testimony from the guilt phase. This holding is consistent with *Jackson v. State*, 337 So. 2d 1242, 1256 (Miss.1976), wherein this Court held:

> At the sentencing hearing, the question to be decided by the jury is whether the defendant shall be sentenced to death or to life imprisonment. At this hearing, the State may elect to stand on the case made at the first hearing, if before the same jury, or may reintroduce any part of the evidence adduced at the first hearing which it considers to be relevant to the particular question of whether the defendant shall suffer death or be sentenced to life imprisonment.

¶397. Evans also contends that evidence regarding the sexual battery of Beatrice was irrelevant to any of the eight statutory aggravating circumstances. Miss. Code Ann. § 99-19-101 clearly provides that "[i]n the proceeding, evidence may be presented as to *any matter that the court deems relevant to sentence*, and shall include *matters relating to any of the aggravating or mitigating circumstances*." (emphasis added). Evidence of sexual battery was admitted to prove that "the capital offense was especially heinous, atrocious, or cruel." During the sentencing phase, the State recalled Dr. McGarry to testify as to his findings regarding the sexual battery charges. Dr. McGarry's testimony regarding the pain and suffering endured by Beatrice during the sexual assault was highly

relevant and probative to the "especially, heinous, atrocious, and cruel" aggravating factor. This issue is without merit.

### XXIX. WHETHER THE TRIAL COURT ERRED IN AWARDING ATTORNEY'S FEES TO DEFENSE COUNSEL.

¶398. On the issue of attorneys' fees, the instant appeal is consolidated with Donald Leroy Evans v. State, 94-CA-0176-SCT.

¶399. Evans contends the trial judge erred in providing his defense counsel, William S. Boyd, III only $ 31,008.33 as compensation. At the time of Boyd's representation of Evans, he was a member in the firm of Eaton & Cottrell, P.A. Following trial and sentencing, Boyd filed an Application for Payment of Court-Appointed Counsel. The Application was accompanied by a detailed summary of the nature and type of professional services rendered and disbursements made in connection with the representation of Donald Leroy Evans. In addition to Boyd, two associates, two law clerks and one paralegal assisted in preparation for trial. Total hours expended by each of these individuals were as follows:

William S. Boyd, III 631.00

Kenneth R. Flottman 99.25

Scott E. Andress 3.50

Ricky J. Cox 47.95

Thomas Carpenter 14.75

Jodee F. McGill 252.70

¶400. Attached to the Application as "Exhibit A" is the affidavit of Robert E. Bass, Jr., a certified public accountant with the firm of Moore & Powell. Bass prepared an hourly cost analysis to detail the actual expenses attributable to the time expended by counsel and his staff. These figures are as follows:

William S. Boyd $ 54,808.66

Kenneth R. Flottman $ 5,086.56

Scott E. Andress $ 179.38

Ricky J. Cox $ 1,642.29

Thomas Carpenter $ 505.19

Jodee F. McGill $ 8,654.98

TOTAL COST PER HOUR $ 70,877.06[14]

This analysis utilizes an hourly overhead rate for different classes of professionals at Eaton &

Cottrell. Those rates are as follows:

Shareholders/Principals $ 86.26

Associates $51.25

Paralegals and Law Clerks $34.25

In his affidavit, Bass noted that he included shareholder/principal compensation, including bonuses, when calculating the hourly rates "because it is a normal ongoing expense of every professional practice." Total overhead cost per hour plus actual expenses incurred ($ 6, 773.23) yields a total amount of $ 77,650.29. The same calculation utilizing market rates for services ($ 101, 252.25) plus expenses (6, 773.23) yields a total result of $ 108, 025.48.

¶401. On January 27, 1994, a hearing was held on the Application for Payment. Harrison County was represented by Honorable Walter W. Teel. William S. Boyd, III represented Evans. Boyd indicated that he did not expect to receive payment based on market rates, however, he included these amounts in the Application in order that "everybody [could] understand what was being given up, $ 40,000.00 by me and my law firm in this matter." Rather, Boyd stated that he was only asking for $ 66, 377.06 plus expenses. Counsel for the Harrison County conceded that the county did not dispute the amount of hours submitted for payment, but did contest the method of calculation of the overhead hourly rates.

¶402. On January 27, 1994, the trial court found that the "applicant failed to meet the burden of proof required to rebut or overcome the presumption of $ 25.00 per hour overhead expense" and ordered that Boyd be compensated in the amount of $ 31,008.33. The trial court found that the calculation of an hourly corporate overhead rate rather than an hourly rate for the pro-rata actual office overhead expenses of Mr. Boyd did not "conform to the limits of actual overhead expense defined in *Wilson* and *Pruett*." Additionally, the trial court noted that the CPA "did not itemize or describe all expenses he determined to be overhead."

¶403. The trial court allowed the following compensation:

Reimbursement of actual office overhead $ 20,255.10

(631 x $32.10)[(15)]

Statutory Compensation $ 2,000.00

(Boyd was the only attorney appointed

under § 99-15-15)

Actual Expenses incurred in trial of the case

(includes $ 2,000.00 approved by this order for 1 law clerk

and 1 paralegal, less $ 20.00 expenses dated 8/27/93) $ 8,753.23

$ 31, 008.33

¶404. This Court, in *Wilson v. State*, 574 So. 2d 1338 (Miss.1990), was faced with a constitutional challenge to Miss. Code Ann. § 99-15-17 and held:

> Although § 99-15-17 limits the compensation which an attorney may receive for the representation of an indigent, it also allows for "reimbursement of actual expenses." Following our rule of statutory construction, we are able to save this statute from unconstitutionality by interpreting this language to include reimbursement for all actual costs to the lawyer for the purpose of keeping his or her door open to handle this case, i.e., the lawyer will receive a pro rata share of actual overhead.

¶405. This Court adopted a rebuttable presumption that an attorney's actual overhead within the statute is $ 25.00 per hour. *Id.* However, this Court stated that a "trial court is bound by this only in the absence of actual proof to the contrary--proof offered by the lawyer that it is more or by the State that it is less." *Id.*

¶406. Evans argues that the trial court erred in holding that he failed to rebut the $ 25.00 per hour presumption announced by this Court in *Wilson*. From this record, the trial court was not presented with sufficient evidence to rebut the presumption. Although counsel refers to a document titled "Overhead Analysis-Case Reimbursement" which presented various hourly overhead rates (i.e. with and without the inclusion of bonuses/shareholder compensation), this information is not contained within the record. Moreover, the trial court specifically found that the CPA calculated a corporate rate, rather than an individual pro rata share of actual overhead and did not itemize the components of the hourly overhead rate. Notably, however, the trial judge, *sua sponte*, increased the amount to $ 32.10 per hour to provide for inflation. As such, counsel received sufficiently more than $ 25.00 per hour.

¶407. "The appointed attorney should not expect to be compensated at market rate, rather at a reasonable, but lesser rate, which reflects the unique difficulty these cases present as balanced with the attorney's obligation to defend the indigent." *Bailey v. State*, 424 S.E.2d 503, 508 (S.C.1992). What constitutes "reasonable" compensation is left to the discretion of the trial court in most jurisdictions. In the instant case, there was no dispute that the amount of hours submitted by counsel was "reasonable and necessary." *Wilson*, 574 So. 2d at 1340. Moreover, the trial court emphasized that counsel's performance in the instant matter was "exemplary" and noted that counsel "renewed my faith in the law profession because of the professionalism that you responded to a request from the court not someone whom you have known personally for many years." However, in light of the proof presented and the increase allowed by the trial court it is not apparent that the trial court abused his discretion in determining the amount of attorney's fees.

### XXX. WHETHER EVANS WAS DENIED THE RIGHT OF SELF-REPRESENTATION.

¶408. In his pro se' brief Evans raises two additional assignments of error. Relying on *Faretta v. California*, 422 U.S. 806 (1975), Evans first argues that he was denied the right of self-representation. The essence of the issue before this Court is whether Evans' waiver of the right to represent himself was knowing, intelligent and voluntary. A review of the record is helpful.

¶409. On September 3, 1991, the trial court held a hearing on Evans' Motion to Dismiss Counsel. Evans requested the trial court to dismiss court-appointed counsel and allow him to proceed pro se with competent advisory counsel. The trial court ascertained Evans' level of education, prior experience with the legal system and prior employment experience in an effort to determine whether Evans was competent to waive his right to counsel. The trial judge also explained the risks involved in proceeding pro se and advised Evans that if he became disruptive the trial court could terminate his pro se status. After reviewing medical reports and the competency examination completed in conjunction with the federal plea, the trial court sustained Evans' motion and allowed him to proceed pro se with James Tucker as advisory counsel.

¶410. On October 4, 1991, Evans requested access to a law library in order to prepare pre-trial motions and his trial strategy. Evans argued that the appointment of advisory counsel to perform research tasks circumvented his rights. Evans also argued that he was unable to prepare for his preliminary hearing without access to a law library. The State thereafter confessed the motion. However, during a second hearing on Evans' Motion on Access to Law Library, the trial court, relying on **Bounds v. Smith**, 430 U.S. 817 (1977), denied Evans' motion and ruled that "[t]he defendant's right of access to the courts have been fulfilled by the appointment of Mr. Tucker either as an advisory counsel or as standby counsel."

¶411. On October 19, 1991, Evans pled guilty to federal kidnapping charges and began serving a life sentence at the federal penitentiary in Marion, Illinois. On February 28, 1992, Evans filed a Motion to Withdraw and Waive Self-Representation pro se, with Request for Appointment of Counsel. Evans alleged that he was denied access to Mississippi law books while being held in the Harrison County Detention Center. Evans also alleged that standby counsel had been forced upon him and had not provided Evans with appropriate research. However, Evans' waiver was conditioned upon the trial court's revocation of the writ of habeas corpus ad prosequendum, a procedure by which a court brings a defendant into a particular jurisdiction for trial.

¶412. Evans filed an additional motion regarding access to a law library wherein he denounced the use of standby counsel to perform research tasks. Evans argued that he should be allowed to conduct his own research. During the motion hearing, Evans indicated that he could not proceed because he needed to subpoena witnesses on this issue.

¶413. On March 16, 1992, Evans filed a Motion to Withdraw Waiver of Ineffective Counsel wherein he maintained his right to proceed pro se and alleged that he had been denied access to the courts. Evans later filed a Motion to Dismiss Standby Counsel due to Obstructive Non-Performance, alleging that James Tucker failed to subpoena witnesses, respond to correspondence, and provide Evans with research materials. On Marc h 23, 1992, Evans filed a Motion to Secure Self-Representation Rights.

¶414. During the motion hearing, the State requested that the trial court reconsider its decision to allow Evans to proceed *pro se*. The court did not reconsider, but did, however, remind Evans that his decision to represent himself carried with it some limitations. Evans argued that James Tucker had not provided him with a constitutionally adequate law library containing the last thirty years of criminal cases in Mississippi and all federal criminal cases. James Tucker was later allowed to withdraw from his representation of Evans.

¶415. On August 7, 1992, the trial court rescinded the September 13, 1991, order allowing Evans to

proceed *pro se*. The trial court stated that this decision was based on the evidence introduced at the motion to withdraw; the record made since the indictment and the law governing the issue of pro se counsel; ineffective assistance of counsel; and the heightened standard of review in capital cases. The trial court concluded:

> While the defendant is able and willing to abide by rules of procedure and courtroom protocol, it is obvious from the record made to date, that this defendant lacks the necessary skills, training and experience to adequately represent himself in a death eligible case. In removing the defendant from pro se status the Court is not limiting his rights to be heard. The Court is simply finding that in death eligible cases, a defendant can better be heard with the guidance of a skilled, trained and experienced attorney.

The trial court appointed Fred Lusk to represent Evans, however, Lusk subsequently withdrew from the case. Evans, however, indicated that he knew of no attorney in Mississippi that he could cooperate with. The trial court reminded Evans that he still had a right to be heard during the trial, but acknowledged if "Mr. Evans wants to block this trial by confirming in my mind his pattern of conduct concerning my ruling on his pro se status he can go ahead and do that, and I'll do the best that I can to document his position on the matter."

¶416. The trial court appointed William S. Boyd, III and Woodrow Pringle to represent Evans. Pringle later withdrew and Donald Smith was appointed. Prior to trial, Evans filed two motions to plead guilty, but refused to enter a plea upon arrival in court. Evans stated that he refused to plead because his appointed attorneys would delay the sentencing process. Shortly thereafter, Evans escaped from custody.

¶417. The trial court repeatedly advised Evans that the revocation of his pro se status did not diminish his right to be heard. However, on January 21, 1993, Evans, through his attorney William Boyd, filed a Motion to Discharge Counsel and Allow the Defendant to Proceed pro se. Evans later filed motions in objection to the revocation of his pro se status which were denied by the trial court on August 9, 1993.

¶418. Evans argues that the trial court unconstitutionally revoked his right to proceed pro se. In *Faretta v. California*, 422 U.S. 806 (1975), the United States Supreme Court held that a criminal defendant has a Sixth Amendment right to conduct his own defense. There, the Court recognized that the "Sixth Amendment right to the assistance of counsel implicitly embodies a correlative right to dispense with a lawyer's help." *Id.* at 814 (*quoting Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)). The Court further held that "[t]he Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." *Id.* at 819.

¶419. The Mississippi Constitution of 1890, Article 3, section 26 provides that "[i]n all criminal prosecutions the accused shall have a right to be heard by himself or counsel or both." In *Metcalf v. State*, 629 So. 2d 558, 562 (Miss. 1993), this Court held that the "refusal to permit defendant to argue his case is in direct violation of the above constitutional provisions and requires reversal." (*quoting Gray v. State*, 351 So. 2d 1342 (Miss.1977); *cert. denied,* 446 U.S. 988 (1980), *reh'g denied*, 448 U.S. 912 (1980)). Moreover, the denial of the right to self-representation is not "amenable to 'harmless error' analysis." *McCaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984), *reh'g*

*denied*, 465 U.S. 168 (1984).

¶420. Here, the trial court, relying on the evidence introduced at the motion to withdraw, the law governing the issue of pro se counsel and ineffective assistance of counsel, and the heightened standard of appellate review in death eligible cases, terminated Evans' right to proceed pro se. The trial court also heard evidence about Evans' conduct during the hearing on the motion to withdraw filed by James Tucker. For example, Evans wanted to challenge the entire proceedings because witnesses' travel expenses, the District Attorney and appointed counsel were not paid in gold and silver tender. Evans also wanted to observe an examination of the remains of the deceased child conducted in the courtroom. Tucker explained that Evans was irrational and flew into rages when his requests were not met and made unreasonable requests with regard to legal research.

¶421. In *Faretta*, the Supreme Court acknowledged that "the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." 422 U.S. 834 n.46 (*quoting* ***Illinois v. Allen***, 397 U.S. 337 (1970)). Furthermore, this Court has held that a defendant who elects to proceed without counsel may not "use this right to play a 'cat and mouse' game with the court or by ruse or stratagem fraudulently seek to have the trial judge placed in a position where, in moving along the business of the court, the judge appears to be arbitrarily depriving the defendant of counsel." ***Metcalf v. State***, 629 So. 2d 558, 563 (Miss.1993)(*quoting* ***Evans v. State***, 273 So. 2d 495, 499 (Miss.1973)).

¶422. Here, however, the trial judge did not rely on Evans' obstructionist behavior when he revoked Evans' right to proceed pro se, but rather expressly stated in the order that "the defendant is able and willing to abide by rules of procedure and courtroom protocol." The trial court stated:

> [I]t is obvious from the record made to date, that this defendant lacks the necessary skills, training and experience to adequately represent himself in a death eligible case. In removing the defendant from pro se status the Court is not limiting his rights to be heard. The Court is simply finding that in death eligible cases, a defendant can better be heard with the guidance of a skilled, trained and experienced attorney.

¶423. In *Faretta*, the Supreme Court clearly held that a criminal defendant's skill or expertise is not the relevant inquiry when determining whether the defendant will proceed without counsel. Specifically, the Court held:

> It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and expertise, can be realized, if at all, only imperfectly. To force a lawyer on a defendant can only lead him to believe that the law contrives against him. Moreover, it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.

*Faretta*, 422 U.S. at 834 (1975).

¶424. From the record and the order entered by the trial judge, there is serious doubt as to whether the trial court properly terminated Evans' right to proceed without counsel. Here, as in *Faretta*, Evans repeatedly declared that he wished to proceed without counsel and voiced objection to any appointment of counsel. Moreover, the trial court recognized that Evans was "willing and able to abide by rules of procedure and courtroom protocol." Evans' "technical legal knowledge, . . . was not relevant to an assessment of his knowing exercise of the right to defend himself." *Faretta,* 422 U.S. at 836.

¶425. However, the second issue which arises is whether Evans' waived his right to self-representation after the hearing on the Motion to Determine Competency. In *Godinez v. Moran*, 509 U.S. 389, 401 (1993), the Supreme Court held that there is a heightened standard for waiving the right to counsel. There, the Court held that "[i]n addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." *Id.* at 400.

¶426. In *McCaskle v. Wiggins*, 465 U.S. 168, 182 (1984), the Court held that "[o]nce a pro se defendant invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and unambiguously renews his request that counsel be silenced."

¶427. On August 10, 1993, following the hearing on the Motion to Determine Competency, the trial court, *sua sponte*, reminded Evans that he could invoke his *Faretta* rights and proceed pro se. Evans noted that the court would have to consider the issue of preparational time, however, the trial court stated that Evans had contributed to the lack of time when he escaped from jail. The following morning, after conferring with counsel, Evans announced that he wished to proceed with counsel.

¶428. However, after the jury was selected, Evans again renewed his request to proceed pro se. When questioned by the trial court, Evans stated that he did not intend to withdraw as pro se counsel after the competency hearing. This claim, however, is not supported by the record which indicates that Evans unequivocally stated that he elected to proceed with counsel. Prior to the sentencing phase, Evans again renewed his request to proceed pro se. However, upon further questioning by the trial court, Evans stated he was not waiving counsel, but only requesting effective assistance of counsel.

¶429. A thorough review of the record reveals that Evans repeatedly renewed his request to proceed pro se. However, each time his request was conditional and far from the unambiguous request as required in *McCaskle*. Moreover, further inquiry by the trial judge usually revealed that Evans' intentions were based on considerations other than his right to proceed pro se. Therefore, based on the record, Evans' conduct throughout the proceedings and the lack of a clear and unambiguous request, we hold that Evans' continued acquiescence in representation by counsel waived his *Faretta* rights. We also reiterate that a defendant who elects to proceed without counsel may not "use this right to play a 'cat and mouse' game with the court or by ruse or stratagem fraudulently seek to have the trial judge placed in a position where, in moving along the business of the court, the judge appears to be arbitrarily depriving the defendant of counsel." *Metcalf v. State*, 629 So. 2d 558, 563

(Miss.1993)(*quoting* **Evans v. State**, 273 So. 2d 495, 499 (Miss.1973)).

¶430. We also take this opportunity to address a repeated problem which arose during the proceedings in the case sub judice. Evans repeatedly requested access to a library and research materials in order to prepare for trial. The trial court, however, denied Evans' direct access to a library and delegated research tasks to Evans' standby counsel, James Tucker. Evans, however, objected to Tucker's role and demanded that he, like the District Attorney, have access to a law library.

¶431. In **Bounds v. Smith**, 430 U.S. 817, 828 (1977), the Supreme Court held that the "fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries *or adequate assistance from persons trained in the law*." (emphasis added). *See also* **Lewis v. Casey**, 116 S.Ct. 2174 (1996). Although **Bounds** involved prisoners in pursuit of post-conviction relief, the same reasoning may logically apply to to a pro se criminal defendant facing trial. *See* **Taylor v. List**, 880 F.2d 1040, 1047 (9th Cir. 1989).

¶432. Judge Vlahos provided Evans with an attorney to perform research. Despite Evans' complaints, there is no indication that Tucker failed to satisfy reasonable requests by Evans. However, Evans continued to demand that he personally be provided with access to a law library. Clearly, the trial court was under no obligation to allow an inmate who was serving a life sentence for kidnapping, facing trial for capital murder, and with a prior escape attempt to have unfettered access to a law library. With the appointment of Attorney Tucker, Evans' right to meaningful access to the courts was satisfied.

## XXXI. WHETHER EVANS RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.

¶433. The second issue raised in Evans pro se brief is whether he received ineffective assistance of counsel. Specifically, Evans argues that trial counsel was ineffective by admitting guilt during voir dire proceedings. Defense counsel stated:

> And if the defendant is found guilty of those charges, and I have been up front with you and told you that he will be, the State must prove it, but that he will be found guilty of that charge or of the substantive charge of killing Beatrice Routh. I've been up front with you.

After the State objected to counsel's stipulation of guilt, defense counsel explained that he was simply telling the jury up front that the State did have to meet its burden of proof, but they would reach the sentencing phase. The record reflects that these types of statements were made throughout voir dire.

¶434. Evans now claims that he was "shocked" by these admissions which "totally abolished the defendant's right to presumption of innocence." Although Evans concedes that he agreed that such a strategy would be used during the guilt-phase, he now argues that he did not agree that such concessions would be made during voir dire. The record, however, reveals that Evans was present during each statement and did not object.[(16)] Evans did not object to these statements until the jury had been selected and the trial court was about to adjourn to return to Harrison County.

¶435. Moreover, this strategy was discussed in chambers while Evans was present. Prior to voir dire,

trial counsel stated, "I intend to tell the prospective jurors that we anticipate that we will not contest the State's contention that our client killed Beatrice Routh while in the course of a kidnapping." Evans raised no objection. Moreover, during a recess and prior to the continuation of voir dire, all parties were again present in chambers. Evans made no objection to the statements which had been made.

¶436. During voir dire of the first panel of potential jurors, the following exchange took place:

> MR. MARTIN: So you are automatic in your decision that if he's found guilty you will--
>
> JUROR WILSON: He's already said he was guilty.
>
> (Laughter)

¶437. After the juror's remark, all parties again were present in chambers. Evans indicated that he needed to make a telephone call concerning a potential witness and waived his right to be present during the meeting. However, prior to Evans' departure to make the phone call, the trial judge asked if he had any problems regarding voir dire. Again, Evans made no objection.

¶438. During voir dire of the second panel, the trial court denied Evans' motion for individual voir dire due to pre-trial publicity. Evans then raised an ineffective assistance of counsel claim alleging that he was not aware that defense counsel was going to confess guilt to the venire. Evans argues that this concession undermined the guilt/innocence phase of the trial and stated that he did not "see how any juror sitting on that panel or those excused can come into this court and sit on that jury over there and have an impartial attitude as to the guilt or innocence of this defendant. . . ."

¶439. Evans later filed a motion to proceed pro se at the sentencing phase due to ineffective assistance of counsel. Although Evans claimed counsel had been ineffective due to the failure to adequately seek out mitigating evidence, Evans did not allege that counsel had been ineffective due to the statements made during voir dire. Evans later withdrew this motion and agreed to proceed with counsel during the sentencing phase. Evans also indicated he wished to withdraw the ore tenus motion made at the conclusion of voir dire wherein he claimed ineffective assistance of counsel resulting from the concessions of guilt during voir dire.

¶440. When evaluating claims of ineffective assistance of counsel, this Court uses the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Blue v. State*, 674 So. 2d 1184, 1195 (Miss.1996), *cert. denied*, 117 S.Ct. 588 (1996), this Court held:

> If an appellant is to be successful on his ineffective assistance of counsel claim, he must satisfy the two-pronged test set forth in *Strickland*, and adopted by this Court in *Stringer v. State*, 454 So. 2d 468 (1984). The appellant must prove (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense. *Stringer*, 454 So. 2d at 476. The burden of proving both prongs of the test is on the defendant. *Id.*, *McQuarter v. State*, 574 So. 2d 685, 687 (Miss.1990). Furthermore, the defendant must show that there is a reasonable probability that but for the errors, the outcome of the case would have been different. *Nicolau v. State*, 612 So. 2d 1080, 1086 (Miss.1992); *Ahmad v. State*, 603 So. 2d 843, 848 (Miss.1992).

¶441. In *Faraga v. State*, 514 So. 2d 295, 308 (Miss.1987), *cert. denied*, 487 U.S. 1210 (1988), *reh'g denied*, 487 U.S. 1263 (1988), this Court held that an attorney should not concede his client's guilt when that client had pled not guilty to the crime charged. However, this Court stated, "[w]hen proof of certain facts is overwhelming, however, an attorney may find it strategically prudent to concede such facts while still denying that his client is guilty of the crime charged in the indictment." *Id.* Further, this Court held that "[a]n attorney who, while sincerely trying to help his client, at the same time is open and honest with the jury is more likely to receive a sympathetic and open ear in his other arguments." *Id.*

¶442. In *Faraga*, this Court held that an attorney's admission that his client had been proven guilty of murder but not capital murder, was "the product of a tactical decision" and the "best argument that could be made given the circumstances . . . ." *Id.*

¶443.In *Wiley v. State*, 517 So. 2d 1373 (Miss.1987), *cert. denied*, 486 U.S. 1036 (1988), *reh'g denied*, 487 U.S. 1246 (1988), this Court was confronted with statements similar to those in the case *sub judice*. There, defense counsel stated during opening argument that "I feel fairly certain based on the proof that the State is going to offer, that y'all are going to return a verdict of guilty. I think that the State is going to bring forth evidence that's going to convince y'all beyond a reasonable doubt that William Wiley did shoot Mr. Turner." *Id.* at 1382.

¶444. In *Wiley*, this Court held that such statements may have been trial strategy and again noted that "candor at the guilt phase may help the defendant in the sentencing phase . . . ." *Id.* This Court concluded that Wiley was not deprived of effective assistance of counsel.

¶445. Statements made by defense counsel in the case *sub judice* are extremely similar to those presented in *Wiley*. Here, trial strategy was to concede guilt and present evidence during the sentencing phase in mitigation of the sentence. This strategy was clearly reasonable given the prior ruling by the trial court that Evans' confessions were admissible. Defense counsel explained to the trial court that they were using this strategy because"we could not plead guilty" unless they wished to waive several issues for appellate review. From the record, it is apparent that the actions of defense counsel were not deficient.

¶446. Moreover, Evans cannot demonstrate prejudice as required by the second prong of the *Strickland* analysis. In *United States v. Swanson*, 943 F.2d 1070 (9th Cir.1991), the Court held that prejudice is presumed when defense counsel argued that no reasonable doubt existed concerning the defendant's guilt. In *Swanson*, the Court held that "counsel's confession lessened the government's burden of proving guilt and caused a breakdown in the adversarial system such that the defendant should not be required to show prejudice." *Id.* at 1073 (citations omitted).

¶447. Unlike *Swanson*, defense counsel did not relieve the State of their burden of proof nor did counsel concede that Evans was guilty of the crimes charged beyond a reasonable doubt. Rather, counsel merely predicted that the jury would likely find Evans guilty based on the State's proof. Prejudice is therefore not presumed.

¶448. In *Blue v. State*, 674 So.2d 1184, 1198-99 (Miss.1996), *cert. denied*, 117 S.Ct. 588 (1996), this Court held that where prejudice is not presumed, the appellant bore the "burden of proving that there is a reasonable probability that the outcome of the case would have been different but for

counsel's statements." ***Id.*** (*citing **Nicolaou v. State***, 612 So. 2d at 1086; ***Ahmad v. State***, 603 So. 2d at 848.))

¶449. There was overwhelming evidence of Evans' guilt. The jury had before it three confessions wherein Evans detailed the sexual assault, strangulation, and murder of Beatrice Louise Routh. Moreover, the jury heard the testimony of Betty and Sherry Lynn Vincent, which identified Evans as the person with whom Beatrice left Jones Park on August 1, 1991. In light of the evidence presented at trial, there is no reasonable probability that the result of the trial would have been different but for statements made by counsel during voir dire. This issue is without merit.

¶450. In his *pro se* rebuttal brief, Evans, for the first time, argues that an actual conflict of interest existed between himself and defense counsel and therefore prejudice is presumed. Evans argues that his refusal to consent to the trial strategy utilized by defense counsel, i.e. the concession of guilt during voir dire, gave rise to an actual conflict of interest which is demonstrated by the Motion for Determination of the Role of Counsel filed by defense counsel.

¶451. On July 23, 1993, defense counsel filed a Motion for a Determination of the Role of Counsel In These Proceedings wherein defense counsel acknowledged that the trial court had advised Evans that he would be allowed to participate in the trial. Counsel indicated that the "philosophy and tactics followed and used by counsel and the Defendant herein are not congruous and, in fact, often oppose one another." As such, counsel sought guidance from the court as to the resolution of conflicts which may arise during the course of the trial regarding such matters as the presentation of witnesses, questioning of witnesses, voir dire, and opening and closing statements.

¶452. After close review of the motion, it is apparent that defense counsel sought guidance from the trial court in the event that a conflict arose. Although it is evident that Evans and defense counsel did not agree on every aspect of trial preparation, the motion does not compel the conclusion that defense counsel labored under an actual conflict of interest which affected his representation of Evans at trial. In ***Strickland v. Washington***, 466 U.S. 668, 692 (1984), the Supreme Court held that "prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that an 'actual conflict of interest adversely affected his lawyer's performance.'" (*quoting **Cuyler v. Sullivan***, 446 U.S. 335, 350 (1980)). Moreover, "the possibility of conflict is insufficient to impugn a criminal conviction on appeal." ***Wheat v. United States***, 486 U.S. 153, 160 (1988).

¶453. There is simply no evidence in this record to demonstrate that defense counsel did not function in a loyal and capable manner. As such, the mere possibility that Evans and defense counsel might have had a "possible conflict" is insufficient to impugn his conviction.

¶454. The record reveals no order entered by the trial court in response to this motion nor does the record indicate that a hearing on the motion was held. Evans, relying upon ***United States v. Greig***, 967 F.2d 1018 (5th Cir. 1992), argues that the trial court erred by failing to conduct a hearing on this motion in order to determine whether a conflict existed. However, in ***Cuyler v. Sullivan***, 446 U.S. 335, 347 (1980), the Court held that a trial court is under no duty to inquire into conflict on its own. "Unless a trial court knows or reasonably should know that a particular conflict exists the court need not initiate an inquiry." ***Id.*** at 347. The motion filed by defense counsel simply requested guidance on the procedures to be employed *if* an actual conflict between Evans and defense counsel arose.

Without more, the trial court was under no duty to conduct a hearing on this motion.

¶455. Moreover, the burden lay with Evans and his defense counsel to obtain a ruling on this motion. This Court has repeatedly held that "[i]t is the responsibility of the movant to obtain a ruling from the court on motions . . . and failure to do so constitutes a waiver." *Johnson v. State*, 461 So.2d 1288, 1290 (Miss.1984); *Minor v. State*, 396 So.2d 1031 (Miss.1981); *Martin v. State*, 354 So.2d 1114 (Miss.1978); *Conn v. State*, 260 So.2d 471 (Miss.1972); *Marr v. State*, 248 Miss. 281, 159 So.2d 167 (1963); *Grant v. Planter's Bank*, 5 Miss. (4 How.) 326 (1840).

## PROPORTIONALITY REVIEW

¶456. Miss. Code Ann. § 99-19-105 (3)(c) mandates that this Court "determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." If this Court determines the sentence to be disproportionate, this Court may "set the sentence aside and remand the case for modification of the sentence to imprisonment for life." Miss. Code Ann. § 99-19-105 (5)(b).

¶457. In *Woodward v. State*, 533 So.2d 418 (Miss.1988), *cert. denied*, 490 U.S. 1028, (1989), *reh'g denied,* 490 U.S. 1117 (1989), *vacated in part on other grounds*, 635 So.2d 805 (Miss.1993), the defendant was convicted of capital murder during the course of kidnapping, rape, and sexual battery. There, Woodward kidnapped twenty-four year old Rhonda Crane after forcing her to stop her car on a highway. Woodward raped Ms. Crane and forced her to perform oral sex. After sexually assaulting Crane, Woodward murdered her with a single gunshot to the head.

¶458. Like Woodward, Evans kidnapped, sexually assaulted, and murdered his victim. Evans, however, chose to victimize a ten-year old child who begged to be returned to her mother. After refusing, Evans sexually assaulted Beatrice vaginally and anally. Testimony at trial detailed the extreme pain these acts would cause a child to suffer. Evans then strangled Beatrice and dumped her body in a wooded area where it lay for nine days.

¶459. From the evidence, the death penalty for Donald Leroy Evans does not appear to be disproportionate or excessive when compared to other capital murder cases affirmed by this Court.

¶460. **94-CA-00176-SCT- JUDGMENT AWARDING ATTORNEY FEES AND EXPENSES AFFIRMED.**

¶461. **93-DP-01173-SCT- CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH AFFIRMED. EXECUTION DATE TO BE SET WITHIN SIXTY DAYS OF FINAL DISPOSITION OF THIS CASE PURSUANT TO MISS. CODE ANN. § 99-19-105(7)(SUPP. 1995) AND M.R.A.P. 41(a).**

**PRATHER, P.J., PITTMAN, ROBERTS AND MILLS, JJ., CONCUR. BANKS, J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY LEE, C.J., AND SULLIVAN, P.J. McRAE, J., NOT PARTICIPATING.**

**BANKS, JUSTICE, CONCURRING:**

¶462. I concur in the result reached by the majority. I write separately to note that as to Part IX of the majority opinion I do not agree with the majority that federal convictions are not included within the statutory bar of Miss. Code Ann. §  99-11-27. In my view, it suffices for purposes of this case, that the crime of kidnaping is not the same offense as that of capital murder and, therefore, the statute does not apply here.

**LEE, C.J., AND SULLIVAN, P.J., JOIN THIS OPINION.**

## APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

***Shell v. State**, 554 So. 2d 887 (Miss. 1989), **Shell v. Mississippi,** 498 U.S. 1 (1990) reversing, in part, and remanding, **Shell v. State**, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

***Pinkney v. State**, 538 So. 2d 329 (Miss. 1989), **Pinkney v. Mississippi**, 494 U.S. 1075 (1990) vacating and remanding **Pinkney v. State**, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

***Clemons v. State**, 535 So. 2d 1354 (Miss. 1988), **Clemons v. Mississippi**, 494 U.S. 738 (1990) vacating and remanding, **Clemons v. State**, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

***Jones v. State**, 517 So. 2d 1295 (Miss. 1987)**, Jones v. Mississippi**, 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).


## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE

## <u>AND SENTENCE PHASE</u>

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State*, 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

## DEATH CASES REVERSED AS TO GUILT PHASE

### AND SENTENCE PHASE

### (continued)

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

## DEATH CASES REVERSED

### AS TO PUNISHMENT AND REMANDED

### FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO

# PUNISHMENT AND REMANDED FOR A NEW TRIAL

# ON SENTENCING PHASE ONLY

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

***Shell v. State**, 554 So. 2d 887 (Miss. 1989), **Shell v. Mississippi**, 498 U.S. 1 (1990) reversing, in part, and remanding, **Shell v. State** 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*∗**Pinkney v. State**, 538 So. 2d 329 (Miss. 1989), **Pinkney v. Mississippi,** 494 U.S. 1075 (1990) vacating and remanding, **Pinkney v. State,** 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

***Clemons v. State**, 535 So. 2d 1354 (Miss. 1988), **Clemons v. Mississippi**, 494 U.S. 738 (1990) vacating and remanding, **Clemons v. State**, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

***Jones v. State**, 517 So. 2d 1295 (Miss. 1987), **Jones v. Mississippi,** 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (Miss. 1996)

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

## DEATH CASES REVERSED AS TO

## PUNISHMENT AND REMANDED FOR A NEW TRIAL

## <u>ON SENTENCING PHASE ONLY</u>

### <u>(continued)</u>

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was

remanded by this Court for a new sentencing hearing.

1. At the time of trial, Sherry Lynn Vincent had married and taken the surname of Wilson.

2. Initial appearances are now government by Uniform Circuit and County Court Rule 6.03. Rule 6.03 requires that "[e]very person in custody shall be taken, without unnecessary delay and within 48 hours of arrest, before a judicial officer . . . for an initial appearance."

3. Evans' renewed motion for change of venue from Adams County was made orally during voir dire proceedings and was not supported by affidavits as required by Miss. Code § 99-15-35. The trial court, therefore could have properly denied the motion based on non-compliance with this statute.

4. On May 1, 1995 the Uniform Rules of Circuit and County Court Practice were adopted. In the current rules, mistrials are controlled by Rule 3.12. Evans, however, was tried during 1993.

5. This portion of voir dire remains under seal by the trial court.

6. Evans called Drs. Steven Hayne and LeRoy Riddick, not Dr. Zimmerman to testify as to autopsy results.

7. Defendant Price is Joe Price, Sheriff of Harrison County.

8. The original indictment returned by the grand jury on October 15, 1991 listed Count I as Capital Murder; Section 97-3-19 (2)(e), Miss Code of 1972, as amended; as a Habitual Offender, Section 99-19-81, Miss. Code of 1972, as amended. The indictment contained the following language:

"did then and there wilfully, unlawfully, feloniously, and *without any design* to effect death, kill and murder Beatrice Louise Routh, a human being, while in the commission of the crime and felony of kidnapping, as defined by Section 97-3-53, Miss. Code of 1972, as amended, contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the State of Mississippi." (emphasis added).

9. Without the amendment, the jury could have found (1) that Evans actually killed the victim; or (2) that Evans contemplated lethal force. Miss. Code Ann. § 99-19-101(7).

10. At the time of this conviction, Evans' alias was Jason Michael McGowan.

11. Maggio was instructed by the trial judge to omit any reference to the fact that he was appointed in conjunction with federal proceedings.

12. The Texas capital sentencing scheme required that a jury affirmatively find three questions on which the State had the burden of proof beyond a reasonable doubt. One of the three critical issues is "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *Estelle*, 451 U.S. at 458.

13. Formerly known as the Uniform Criminal Rules of Circuit Court Practice, the rules are now

designated as the Uniform Rules of Circuit and County Court Practice. Rule 5.03 is now Rule 3.07.

14. The total cost reflected in the Application contains an addition error and has been corrected.

15. The trial court took judicial notice that the actual overhead expenses of practicing law in Mississippi has increased since 1987. Using the Consumer Price Index, the trial judge "updated" 1987 dollars to 1993 dollars and thus utilized a per hour overhead presumption of $ 32.10.

16. Throughout voir dire, Evans raised numerous other objections before the trial court.